David J. Bodney (006065)
Craig C. Hoffman (026017)
BALLARD SPAHR LLP
1 E. Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone:  602.798.5400
Facsimile:   602.798.5595
Email: bodneyd@ballardspahr.com
Email: hoffmanc@ballardspahr.com

David A. Schulz, *pro hac vice*
Jonathan Manes, *pro hac vice*
Amanda Lynch (student certification pending)
Lourdes Pantin (student certification pending)
Ben Picozzi (student certification pending)
MEDIA FREEDOM AND
    INFORMATION ACCESS CLINIC
P.O. Box 208215
New Haven, CT 06520
Telephone:  203.432.9387
Facsimile:   203.432.3034
Email: dschulz@lskslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Guardian News & Media LLC, *et al.*, | NO. 2:14-cv-02363-GMS |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Charles L. Ryan, | Oral Argument Requested |
| Defendant. | Assigned to the Hon. G. Murray Snow |

Pursuant to Fed. R. Civ. P. 56, plaintiffs Guardian News & Media LLC, Associated Press, *The Arizona Republic*, KPNX-TV Channel 12, KPHO Broadcasting Corporation, and *The Arizona Daily Star* request that this Court grant summary judgment in their favor (a) declaring that defendant's refusal to disclose the source, composition, and quality of lethal injection drugs and the qualifications of those who administer them violates the public's First Amendment right of access to State executions; (b) declaring that defendant's failure to allow witnesses at lethal injection executions to observe the

totality of the proceeding, including the administration of all lethal injection drugs, violates the public's First Amendment right of access to State executions; and (c) enjoining defendant from violating plaintiffs' First Amendment rights at all future executions by lethal injection, together with such other and further relief as the Court deems just and proper.

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

This case concerns the public's right to fully observe and understand the means by which executions are carried out by the State of Arizona. Specifically, plaintiffs seek disclosure of both the source, quality, and composition of the drugs actually used in executions and the qualifications of those who administer them, as well as visual access to the entire execution process, including the administration of all execution drugs. As demonstrated below, the public has a First Amendment right of access to this information, which is critical to assessing the effectiveness and propriety of executions carried out by defendant Director of the Arizona Department of Corrections ("ADC").

## FACTUAL BACKGROUND

The relevant facts supporting summary judgment are set out in plaintiffs' Rule 56 Statement of Facts ("SOF") and the expert reports attached thereto[1] and are only summarized here in brief.

**A.      The Information About Arizona's
            Means of Execution That Is at Issue**

Spurred by litigation brought by death row inmates, ADC makes public its lethal injection protocol. SOF ¶ 43. This protocol identifies only the names of the drugs ADC may use at an execution and the intended doses. SOF ¶ 62. To induce death in the manner

---

[1] Plaintiffs submit four expert reports in support of this motion: the declaration of Stuart Banner sworn to June 4, 2015 ("Banner Decl."); the declaration of Scott Christianson sworn to June 8, 2015 ("Christianson Decl."); the declaration of Austin Sarat sworn to June 5, 2015 ("Sarat Decl."); the declaration of David Waisel sworn to June 9, 2015 ("Waisel Decl.").

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

2

intended, however, lethal injection drugs must be of proper purity, concentration, and potency and must be administered properly. SOF ¶¶ 64, 76. Arizona does not disclose information needed to assess the effectiveness of the chemicals actually used or the ability of those chosen to administer them. SOF ¶¶ 61-63.

A drug's attributes can vary significantly depending upon its source. SOF ¶¶ 64-65, 67-68, 70. Arizona currently allows ADC to obtain lethal injection drugs from compounding pharmacies. SOF ¶ 66. These pharmacies are not regulated by the FDA and their products can range widely in quality. SOF ¶¶ 67-68. Drug potency can vary, which can result in a slow and prolonged death, and compounded drugs can contain contaminants that produce severe pain during or immediately after injection. SOF ¶¶ 70, 72. An investigation by the FDA in 2012 revealed problems with more than 75% of the compounding pharmacies reviewed. SOF ¶ 68.

Adequately trained personnel are also essential to proper administration of lethal injection drugs. SOF ¶¶ 76-81. Lethal injection drugs are administered through intravenous catheters, which must be inserted and maintained correctly to ensure the inmate is adequately anesthetized. SOF ¶ 77. Monitoring intravenous lines and consciousness are technical skills that require specific expertise. SOF ¶¶ 79-81. Observers need to know basic information about the lethal injection drugs in use and those who are administering them to understand what they are witnessing. SOF ¶¶ 64-81.

**B.  The Tradition of Public Access to**
**    Information About the Means of Execution**

Information about the means of execution and the manner in which it is administered has been publicly available throughout the history of this country. SOF ¶ 1. Until 1830, virtually all executions were hangings conducted in the open. SOF ¶ 3. The public typically could observe the full execution, from the arrival of prisoners to their death, as well as the construction and operation of the gallows. SOF ¶¶ 6-8. When executions were moved inside prison grounds, public access continued to be allowed through the use of press observers, who reported to the public at large. SOF ¶ 5.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

When new technologies were used to conduct executions, such as the electric chair and gas chamber, public observation continued to be the norm, and details of the methods of operation of these devices were publicly known. SOF ¶¶ 9-17. These disclosures were important to ensure that executions occurred as intended, and they also facilitated a public debate that led to improvements in the implementation of the death penalty nationwide. SOF ¶¶ 18-26. For example, Arizona voters adopted lethal injection as a means of execution less than a year after reporters covering Donald Harding's execution by cyanide gas described an "inhuman" scene, in which Harding turned red, struggled against the straps restraining him, and convulsed for eleven minutes. SOF ¶¶ 35-38.

Through a combination of litigation and voluntary disclosure, Arizona has until recently provided public access to comparable details about the drugs used in lethal injections. SOF ¶¶ 46-50. For example, the public learned in 2010 that ADC had illegally imported sodium thiopental from London supplier Dream Pharma, Ltd. SOF ¶¶ 47-48. In 2013, Arizona obtained another drug, pentobarbital, which ADC subsequently disclosed had been manufactured by Lundbeck, Inc. SOF ¶ 49.

C.     **Arizona's Refusal to Reveal Crucial Information About Its Means of Conducting Lethal Injection Executions**

ADC now refuses to disclose the source, composition, and quality of drugs used to execute inmates or to reveal the qualifications of those who administer lethal injection drugs. SOF ¶¶ 61-63. ADC asserts a right to keep this information confidential under state law. SOF ¶ 61. ADC's refusal to disclose the source, composition, and quality of drugs used in executions increases the risk of error, inhibits the ability of observers to understand what they are seeing, and prevents informed public discussion and meaningful democratic oversight of the execution process. SOF ¶¶ 51-59, 69-74.

The importance of public access to this information is underscored by recent events. On July 23, 2014, Arizona executed Joseph R. Wood. SOF ¶ 54. During the nearly two hour process, observers could see Wood but could not see ADC officials administering *fourteen* additional doses of midazolam and hydromorphone after the

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

single dose called for by Arizona's protocol did not quickly induce death. SOF ¶¶ 54-58. Only after Wood's execution did ADC first perform quality tests on the drugs that it had acquired from a still-undisclosed source. SOF ¶¶ 59, 63.

Nationwide, lethal injections are more than twice as likely to be botched as executions using other methods. SOF ¶ 60. Just last month, Oklahoma cancelled an execution only moments before it was to occur, upon realizing it had received a shipment of the wrong drug. Manny Fernandez, *Oklahoma Appellate Court Stays Execution for 3 Inmates*, N.Y. Times, Oct. 2, 2015, http://www.nytimes.com/2015/10/03/us/oklahoma-court-stays-execution-for-3-inmates.html.

**Procedural Posture**

Plaintiffs filed suit in October 2014, asserting a claim under 42 U.S.C. § 1983 for the violation of their First Amendment right of access. The parties have completed discovery in accordance with the Case Management Order. There appearing to be no material facts genuinely in dispute, the case is ripe for disposition on summary judgment.

**ARGUMENT**

**I.**

**THE PUBLIC HAS A CONSTITUTIONAL RIGHT OF ACCESS TO INFORMATION ABOUT THE MEANS USED FOR STATE EXECUTIONS**

**A.    The First Amendment Conveys a
        Right of Public Access to Executions**

   **1.    The Supreme Court has articulated clear standards for identifying
            where the First Amendment right of access exists.**

The First Amendment provides the public a right to access certain government proceedings and related records. The Supreme Court first articulated the scope of this right in 1980, in considering whether the Constitution conveys to the general public a right to attend criminal trials. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). The Court explained that the First Amendment's express guarantees of free speech, press, and the right to petition the government necessarily incorporate an implicit right of access to certain government information. *Id.* at 576-78.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

This right plays a "structural role" in enabling democracy to function. It is based on "the principle that debate on public issues should be uninhibited, robust, and wide-open" and its "antecedent assumption that valuable public debate—as well as other civic behavior—must be informed." *Id*. at 587 (citation omitted) (Brennan, J., concurring). After *Richmond Newspapers*, the Court reaffirmed and extended the right in a series of cases that established a two-part test for determining *where* the constitutional access right applies and imposed strict standards that must be met before the right can be abridged. *See Press-Enter. Co. v. Superior Court* (*Press-Enter. II*), 478 U.S. 1, 9 (1986) (access to preliminary hearings); *Press-Enter. Co. v. Superior Court* (*Press-Enter. I*), 464 U.S. 501, 505 (1984) (*voir dire*); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607-08 (1982) (testimony of child victim of sex offense).

This two-part test, dubbed the "history and logic test," identifies when the right of access attaches. It requires a court to consider (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. II*, 478 U.S. at 8.

Where the right access exists, the government bears a "weighty" burden to defeat it. *Globe Newspaper*, 457 U.S. at 606. The constitutional access right "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. I*, 464 U.S. at 510; *see also Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1466 (9th Cir. 1990) (listing three substantive requirements government must meet before overcoming a qualified right to access). The evidence needed to abridge the right is demanding; it cannot be overcome by conclusory assertions. *Press-Enter. II*, 478 U.S. at 14.

**2.     Under controlling Ninth Circuit precedent, the right of access extends to the entirety of a State-sponsored execution.**

The Ninth Circuit has held that the First Amendment right of access extends to the entire execution. In *California First Amendment Coalition v. Woodford*, 299 F.3d 868

(9th Cir. 2002), the Ninth Circuit held that the constitutional access right extends to executions and struck down a regulation restricting public viewing of executions at San Quentin Prison in California as inconsistent with that right. In *Associated Press v. Otter* (*Associated Press I*), 682 F.3d 821 (9th Cir. 2012), the Ninth Circuit further held that Idaho's policy of excluding observers from the initial insertion of the intravenous lines violated the right of access to executions. Under this controlling authority, the First Amendment access right unambiguously requires uninterrupted access "from the moment the condemned is escorted into the execution chamber." *Cal. First Amendment Coal.*, 299 F.3d at 870-71; *see also Philadelphia Inquirer v. Wetzel*, 906 F. Supp. 2d 362, 371 (M.D. Pa. 2012) ("[P]ublic perception of fairness and transparency concerning the death penalty . . . can only be achieved by permitting full public view of the execution.").

ADC violates this access right by excluding the administration of drugs from observation, leaving witnesses unaware of the administration of doses beyond those called for by its protocol. *See* SOF ¶¶ 55-58. At the most recent execution, observers did not know that *fourteen* extra doses of the midazolam-hydromorphone combination were used to induce death. SOF ¶¶ 55-57. ADC's conduct of the execution prevented observers from understanding how the execution was being carried out. This Court should declare that ADC's conduct violated the public access right and enjoin ADC to permit full viewing of all future executions, including the viewing of each administration of drugs.

**B.      The Right of Access to Executions Encompasses a
           <u>Right to Information About the Means of Execution</u>**

**1.      The right to attend proceedings incorporates a right to the information necessary to understand what transpires and to exercise oversight.**

The First Amendment access right applies not only to attendance at a proceeding, but also to information that is necessary for attendance to be meaningful. Courts have widely recognized the existence of a constitutional right to inspect the records of judicial proceedings that are themselves subject to the access right. *See Associated Press v. U.S. Dist. Court for Cent. Dist. of California* (*Associated Press II*), 705 F.2d 1143, 1145 (9th

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

Cir. 1983) (right of access to civil motion papers); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (right of access to summary judgment motion papers); *In re Providence Journal Co.*, 293 F.3d 1, 10 (1st Cir. 2002) (right of access to records in criminal prosecutions); *In re Washington Post*, 807 F.2d 383, 389-90 (4th Cir. 1986) (same); *United States v. Smith*, 776 F.2d 1104, 1111-12 (3d Cir. 1985) (same). This "public attendance" approach recognizes that access to records is "a necessary corollary of the capacity to attend the relevant proceedings." *In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 410 (2d Cir. 2009) (citation omitted). As the Ninth Circuit has held, "[t]here is no reason to distinguish between . . . proceedings and the documents filed in regard to them." *Associated Press II*, 705 F.2d at 1145. The public has a right to access records relating to judicial proceedings because they are "important to a full understanding of the way in which 'the judicial process and the government as a whole' are functioning." *Id.*

The same principle applies to executions. Because the public has a right of access to an execution, *Cal. First Amendment Coal.*, 299 F.3d at 877, it also has a right to information that is "important to a full understanding" of an execution. While the First Amendment does not generally grant "a right of access to government information or sources of information within the government's control," *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978), it does protect a right of public access to records that are inextricably intertwined with a proceeding subject to the access right, including executions.

**2.    Information about the source, concentration, and quality of the drugs used and those who administers them is necessary for meaningful access to executions and for democratic oversight of them.**

Last year, the Ninth Circuit acknowledged that information about the source, quality, and composition of lethal injection drugs is "like the memoranda, factual findings, affidavits, and transcripts recognized in other cases" and is "inextricably intertwined with the process of putting [an inmate] to death." *Wood v. Ryan*, 759 F.3d 1076, 1081, 1082 (9th Cir.), *vacated*, 135 S. Ct. 21 (2014) (citation omitted). The right of access attaches to this information because it is essential both to understand what

8

transpires during an execution and to exercise meaningful democratic oversight of the State's power to put an individual to death. SOF ¶¶ 18, 64-65, 71-74.

Information about the means of execution is necessary for a meaningful understanding of the proceeding. Viewing an execution, much like viewing a trial, does not provide the complete picture. Access to the related information enables comprehension of the proceeding and is essential for meaningful commentary on the efficiency and propriety of the means used. SOF ¶¶ 18, 64-65, 71-74. As the Ninth Circuit has explained, "more information about the drugs used in lethal injections can help an alert public make better informed decisions about the changing standards of decency in this country surrounding lethal injection" and "will give the public more confidence than a state's generic assurance that executions will be administered safely and pursuant to certain qualifications and standards." *Wood*, 759 F.3d at 1085-86.

In this respect, access to information about the lethal injection drugs used and the qualifications of those who administer them effectuates "a major purpose" of the First Amendment: "to protect the free discussion of governmental affairs." *Globe Newspaper*, 457 U.S. at 604 (internal citations omitted) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). In order to engage in an intelligent debate about government conduct, citizens must first understand what the government is doing. The First Amendment access right ensures that the "constitutionally protected 'discussion of governmental affairs' is an informed one." *Id*.

The limited information requested by plaintiffs is subject to the First Amendment access right because it is essential to understanding the means used by the State at executions, which are themselves subject to the constitutional access right.

**C.** **The "History and Logic Test" Independently Confirms That the Right of Access Extends to Information About the Means of Execution**

The Supreme Court's "history and logic" test independently confirms that the First Amendment right to access extends to information about the source, concentration, and quality of lethal injection drugs and about those who administer them. This test "does not

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

look to the particular practice of any one jurisdiction, but instead 'to the experience in that *type* or *kind* of hearing throughout the United States . . . .'" *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (quoting *Rivera-Puig v. Garcia-Rosario*, 983 F.2d 311, 323 (1st Cir. 1992)).

1. **There is a long history in the United States of public access to information about the means of execution.**

As established by the record before the Court, the public has traditionally enjoyed broad access to information about the methods of execution and their effectiveness since the founding of this country. *See* SOF ¶ 1; *see also Cal. First Amendment Coal.*, 299 F.3d at 868 (noting that historically, "executions were fully open events").

This tradition of access has long provided the public with material information about the means of execution used. Some historic records reflect that members of the public were able to observe the construction of the scaffold and were permitted to inspect the scaffold by testing its spring and pulley mechanisms. SOF ¶ 7. Moreover, public accounts "supplied information about both the types of ropes used in hangings and the manufacturers who provided them." *Wood*, 759 F.3d at 1083. Members of the public could see the manner in which the noose was tied and collected pieces of rope, allowing them to determine its size and quality. SOF ¶¶ 7-8.[2]

The practice of affording public access to the information needed to assess the means of execution persisted as execution methods became more sophisticated. New York's Electrical Execution Act of 1888, N.Y. Laws § 489(5), which adopted electrocution as the state's execution method, became the prototype for modern execution statutes. SOF ¶ 21. Its enactment followed extensive public discussion, testing, hearings, and press coverage concerning the precise apparatus to be used in electrocutions. *Id.* This

_____

[2] Even when hangings were moved into jail yards, the public continued to enjoy access to this type of information about how the hangings were carried out. Local officials allowed journalists and other members of the general public to attend closed proceedings, which were attended by hundreds of public representatives. SOF ¶ 5. Even non-invitees were often afforded the opportunity to inspect the gallows before uninvited members of the public were cleared from the grounds. SOF ¶¶ 7-8.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

debate included "specific details of the type of electricity and equipment used." *Wood*, 759 F.3d at 1084.

The public enjoyed similar access to information concerning gas chambers. Eaton Metal Products Co., the exclusive provider of lethal gas chambers to Arizona and other states, filed patent applications publicly disclosing its devices' inner workings. SOF ¶¶ 11-12. Newspapers described the "size, cost, and makeup" of Eaton's gas chambers, *Wood*, 759 F.3d at 1083, and documented Eaton's efforts to install them in various states. SOF ¶ 13. Journalists also reported states' efforts to obtain permits to operate their chambers and the company's maintenance practices. *Id.* The public also knew the source, composition, and quality of lethal gas used in the chamber. For example, in Nevada, newspapers reported that state officials had chosen to use hydrogen cyanide. SOF ¶ 14. They also reported that California Cyanide Co. manufactured the state's lethal gas, and company officials openly described their product's lethality. SOF ¶ 15. Further, "the identities of many of the officials who handled the chemical up until the point of execution were a matter of public record." *Wood*, 759 F.3d at 1083. One Nevada official published a clinical study reporting the effects of the gas on a prisoner's cardiac and respiratory action. SOF ¶ 16. In North Carolina, newspapers sponsored a study that found the use of hydrocyanic acid made slow and painful death more likely. SOF ¶ 24.

Throughout this history, the public was routinely provided access to information about the effects of execution methods. In the nineteenth and twentieth centuries, newspapers in Arizona, New York, Ohio, and other states reported the physical effects of hangings on prisoners' bodies. SOF ¶¶ 6, 20. Following the transition to gas chambers and other execution methods, journalists continued to report, in detail, the procedures used during execution, the qualifications of the officials performing or advising executions, and the pain and suffering of the condemned. SOF ¶¶ 10-17, 22, 24-25, 32-37. Across history, journalists with direct access to execution proceedings and personnel have described the statements and movements of the prisoners, the length of time until

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

death, the statements of executing officials, and the psychological effects of executions on witnesses. SOF ¶ 2

Arizona's current veil of secrecy surrounding its lethal injection drugs and those who administer them departs from this long tradition of access to information about the means of execution. Arizona adopted lethal injection in 1992. *See* Ariz. Const. art. 22, § 22; Ariz. Rev. Stat. § 13-757(A)-(B). Six years later the State exempted from its disclosure laws records identifying "executioners and other persons who participate or perform ancillary functions." Act of May 29, 1998, 1998 Ariz. Sess. Laws, ch. 232, § 1 (codified as amended at Ariz. Rev. Stat. § 13-757(C)).

Between 1992 and 2010, Arizona's lethal injection protocols required the state to use sodium thiopental in executions. SOF ¶ 40. Hospira, Inc. was known to be the only approved manufacturer of sodium thiopental until it exited the market in 2011. *See Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015). As recently as 2013, Arizona publicly disclosed the source of its pentobarbital, in response to court order. SOF ¶ 49; *see also Schad v. Brewer*, No. CV-13-2001-PHX-ROS (D. Ariz. Oct. 5, 2013), ECF No. 24. This past access to drug information in Arizona is consistent with access previously afforded elsewhere. In *Wood*, the Ninth Circuit noted that Arkansas released the "manufacturer and batch numbers" of its lethal injection drugs in 2013, and observed that Texas and Louisiana had "only recently attempted to shield the identities of suppliers of lethal injection drugs." 759 F.3d at 1083-84.

**2.**   **Access to details about the means of execution improves the functioning of executions and is necessary for democratic oversight.**

Access to information about the means of execution also "plays a particularly significant positive role in the actual functioning of the process." *Press-Enter. II*, 478 U.S. at 11. In the context of criminal trials, the Supreme Court noted that access to the proceedings produces both specific benefits to the functioning of trials and general support for the trial system. Public attendance improves the performance of all trial participants, discourages perjury by witnesses and abuse by judges, and encourages those

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

with relevant information to come forward—specific benefits to the process. *See, e.g.*, *Press-Enter. I*, 464 U.S. at 508; *Richmond Newspapers*, 448 U.S. at 594. Public access also assures the public that justice is being done in ways that secret proceedings cannot, supporting the legitimacy of the judicial system. As the Court explained, "[o]penness thus enhance[s] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enter. I*, 464 U.S. at 508.

The same is true of access to information about the means of execution. It both improves the execution process and is essential to public confidence in the operation of the system of executions. It is also necessary for meaningful voter discussion of the means of imposing capital punishment.

First, access to information about the source, quality, and concentration of the drugs used in an execution helps assure the effectiveness of the drugs used and reduces the risk of errors. "Proper drug purity, concentration, and potency are essential for the safety and functioning of intravenously administered drugs . . . ." Waisel Decl. ¶ 21; SOF ¶ 64. For example, minor changes in osmolality, acid-base status, and purity can substantially affect a "drug's effectiveness and suitability." Waisel Decl. ¶ 46; SOF ¶ 73. Subtle differences in drug qualities can result in extreme differences in execution. SOF ¶¶ 72-73. Public disclosure of the source, quality, and concentration of a drug provides an advance check against error and is critical for the public to assess whether it will function as intended. Knowing the name of the drug alone does not convey the information needed to know that the chemicals used will be effective. SOF ¶¶ 71-74, 80.

Second, knowing this information is essential to ensuring that unnecessary pain is not caused upon injection. SOF ¶¶ 71-74. Disclosure of the source, quality, and composition of a drug informs the public about "the speed with which a drug should have its intended effect, the depth of sedation, and the likelihood of unnecessary pain." Waisel Decl. ¶ 25; SOF ¶¶ 71-72. Neither effectiveness nor pain may be apparent from observing an execution. SOF ¶¶ 71-74, 80.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

The source of the drugs used in lethal injection is itself vital information because it serves as "an important indicator of quality," particularly where compounding pharmacies are involved. Waisel Decl. ¶ 26; SOF ¶ 65. This information allows "observers to evaluate the pharmacy's reputation by checking such facts as its volume of drug sales, number of drug recalls, litigation filed against it or citations issued by the FDA or state pharmacy board." Waisel Decl. ¶ 32; SOF ¶ 69. Unlike pharmaceutical manufacturers, compounding pharmacies face little government oversight. They are largely unregulated by the FDA, and compounded drugs are not FDA-approved. SOF ¶ 67. Given their key role in the execution process, compounding pharmacies warrant public scrutiny that can only come with access to information about their role. SOF ¶¶ 66-70. As a recent spate of botched executions has demonstrated, the process needs accountability—Joseph Wood's execution in 2014 lasted nearly 2 hours and required 15 doses of drugs. SOF ¶¶ 54-55.

Disclosure of the source and quality of drugs thus promotes the functioning of the execution process. As discussed above (Part I.B.2), it equally supports public confidence in the execution process itself and ensures an informed debate over capital punishment. Without the relevant information about the means of execution citizens cannot know if lethal injections are "fairly and humanely administered" or rather are "invasive, possibly painful and may give rise to serious complications." *Cal. First Amendment Coal.*, 299 F.3d at 876.

The Supreme Court has long recognized the shifting and evolving public opinion concerning execution methods. What methods of execution are cruel and unusual—as prohibited by the Eighth Amendment—"[are] not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems v. United States*, 217 U.S. 349, 378 (1910). Thus, the Court draws "from the evolving standards of decency that mark the progress of a maturing society" in determining what constitutes cruel and unusual punishment. *Trop v. Dulles*, 356 U.S. 86, 101 (1958). But for society to assess whether capital punishment comports with its evolving standards of

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

14

decency, it must have access to information concerning the procedure itself. In the debate "whether lethal injection executions are fairly and humanely administered, or whether they ever can be," the public "must have reliable information about the 'initial procedures.'" *Cal. First Amendment Coal.*, 299 F.3d at 876.

In short, public access to information about the means of execution has historically been available, and it both improves the functioning of the process and is necessary to support the legitimacy of State executions. Both "history" and "logic" compel recognition of a First Amendment right of access to this information.

## II.

### ADC FAILS TO DEMONSTRATE ANY PROPER BASIS TO LIMIT THE PUBLIC'S RIGHT OF ACCESS TO INFORMATION ABOUT ITS MEANS OF EXECUTION

ADC has offered no justification sufficient to overcome the public's constitutional right of access to the information at issue. To overcome the access right ADC must demonstrate "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. I*, 464 U.S. at 510. The Ninth Circuit uses a three-part test to determine whether the State has met its burden. It requires ADC here to show that: "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Oregonian Publ'g*, 920 F.2d at 1466 (citing *Press-Enter. II*, 478 U.S. at 13-14).[3] ADC has identified two justifications for its refusal to divulge information; neither can satisfy this test.

---

[3] In *California First Amendment Coalition*, the Ninth Circuit applied a less stringent test laid out in *Turner v. Safley*, 482 U.S. 78 (1987). That test does not apply to the assertion of constitutional rights by plaintiff news organizations. As the Ninth Circuit recognized, the *Turner* test has never been applied by the Supreme Court in cases asserting the rights of "outsiders" rather than prisoners, but that test governed as "law of the case" in *Cal. First Amendment Coal.* 299 F.3d at 878-79. Moreover, *California First Amendment Coalition* considered a specific prison's procedure that limited public access to proceedings taking place "within prison walls." *Id.* at 877. In contrast, plaintiffs' request for information about lethal injection drugs does not seek physical access to a prison or to its staff; it seeks external information needed to understand proceedings the public may

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

ADC's first justification is that the information at issue is "confidential pursuant to A.R.S. § 13-757(C)." Def.'s Ans. to Interrog. ¶ 2 [Decl. David A. Schulz Ex. A ("Schulz Decl.")].[4] But a state law cannot defeat a constitutional right. U.S. Const. art. VI, cl. 2. Indeed, the Supreme Court has repeatedly upheld the First Amendment access right over state laws authorizing secrecy. *Globe Newspaper*, 457 U.S. at 610-11 (Massachusetts laws requiring closed testimony by juvenile victims of sex offenses); *Richmond Newspapers*, 448 U.S. 555 (1980) (Virginia law authorizing closed trials).

ADC is on no more solid ground in claiming that the information at issue is not subject to disclosure based upon prison security. *See* Def.'s Resp. to Pls.' Req. for Prod. ¶ 14 [Schulz Decl. Ex. N]. ADC has provided no evidence explaining how disclosing the information plaintiffs seek could endanger prison security, let alone establish a "substantial probability" of prejudice to prison security. ADC has also failed to demonstrate that there are no alternatives that would adequately protect this interest.

ADC has argued in other litigation that disclosing the identities of drug manufacturers would limit the drugs' availability. This speculative assertion likewise fails to justify a denial of the public's right to information about the means of execution. *See Schad*, 2013 WL 5551668, at *6. ADC has produced no evidence showing that public knowledge would actually prevent it from obtaining lethal injection drugs. Arizona's continued "refusal to disclose information concerning the manufacture and quality of its lethal injection drugs" frustrates the functioning of the execution process: such obstinacy "prevents the press and public from accessing the kind of detailed information . . . that has been central to promoting change to policy and protocol." Sarat Decl. ¶ 27.

---

already observe. That the information at issue is held by ADC should not give the State leeway to avoid the heavy burden it otherwise must meet to abridge the public access right. However, even if this Court were to adopt the *Turner* test, ADC's arguments would still fail under that standard. *See Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *5 (D. Ariz. Oct. 7, 2013).

[4] The statute provides that "[t]he identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in records that would identify those persons is confidential and is not subject to disclosure." A.R.S. § 13-757(C).

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment should be granted in all respects.

RESPECTFULLY SUBMITTED this 9th day of October 2015.

By: /s/ Craig C. Hoffman

David J. Bodney (006065)
Craig C. Hoffman (026017)
BALLARD SPAHR LLP
1 E. Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Tel: (602) 798-5400
Fax: (602) 798-5595
Email: bodneyd@ballardspahr.com

David A. Schulz, *pro hac vice*
Jonathan Manes, *pro hac vice*
Amanda Lynch (student certification pending)
Lourdes Pantin (student certification pending)
Ben Picozzi (student certification pending)
MEDIA FREEDOM AND
  INFORMATION ACCESS CLINIC[5]
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387
Fax: (203) 432-3034
Email: dschulz@lskslaw.com

---

[5] This motion has been prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School, but does not purport to present the school's institutional views, if any.

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically transmitted the attached document to the clerk's office using the CM/ECF system for filing and transmittal of a notice of electronic filing to all registered parties this 9th day of October, 2015:

s/ Catherine M. Weber

Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400