UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Guardian News & Media, et al., Plaintiffs, vs. Charles L. Ryan, Director of the Arizona Department of Corrections, Defendant. | ) | No. CV 14-2363-PHX-GMS<br>Phoenix, Arizona<br>October 28, 2016<br>11:04 a.m. |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE G. MURRAY SNOW

(Motion Hearing)

Court Reporter: Gary Moll
401 W. Washington Street, SPC #38
Phoenix, Arizona 85003
(602) 322-7263

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

A P P E A R A N C E S

For the Plaintiffs:

David J. Bodney, Esq.
David A. Schulz, Esq.
BALLARD SPAHR, LLP
1 E. Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
(602) 798-5400

John Langford, Esq.
MEDIA FREDOM & INFORMATION
ACCESS CLINIC - YALE SCHOOL OF LAW
P.O. Box 208215
New Haven, Connecticut 06520
(203) 436-5831

For the Defendant:

Jeffrey L. Sparks
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
1275 W. Washington St.
Phoenix, Arizona 85007
(602) 542-4686

P R O C E E D I N G S

THE CLERK: All rise. Court is now in session, the Honorable G. Murray Snow presiding.

THE COURT: Thank you. Please be seated. 11:04:08

THE CLERK: This is civil case number CV 14-2363, Guardian News and Media, et al., v. Ryan, et al., on for motion hearing.

Counsel, please announce your appearances.

MR. BODNEY: Good morning, Your Honor. David Bodney 11:04:24 here on behalf of the plaintiffs. I'd like to introduce my co-counsel, David Schulz --

MR. SCHULZ: Good morning, Judge.

MR. BODNEY: -- and John Langford.

MR. LANGFORD: Good morning, Your Honor. 11:04:34

THE COURT: Good morning.

MR. BODNEY: Mr. Langford will be arguing for the plaintiffs.

THE COURT: All right.

MR. BODNEY: And we'd like to thank the Court for 11:04:38 accommodating our schedule this morning.

THE COURT: No problem.

MR. SPARKS: Good morning, Your Honor. Jeff Sparks from the Arizona Attorney General's Office for the defendant.

THE COURT: Good morning. I told you both you could 11:04:49

have a half an hour, and I'm not going to charge you time, but I thought it would be helpful -- I've asked you questions that I anticipate you're going to answer, and I thought it would be helpful to both sides, although I think you can gather this from the questions themselves, I thought it would be helpful if 11:05:07 I just took a few minutes and you listened and I tell you how I see this case, and what I see the issues being in this case, so that it will inform you, if you didn't already gather from the questions, why I asked the questions.

So to me, as I look at this case initially, I see it 11:05:25 as essentially two categories of requests. The first category is a request to view the execution proceeding itself in its entirety, and the second request is a request for information that is related to the execution proceeding but which cannot be obtained by viewing, being present in, or participating in the 11:05:55 execution proceeding itself. There are a couple of reasons why I think the cases give rise to that kind of division, but I'm going to tell you some of the reasons why that's important to me.

Let's take the first category. I think the first 11:06:13 category is clearly governed by California First, which applies the Press-Enterprise test. And if I read California First correctly, it actually applies a lesser standard that the State has to meet to impose some sort of viewing restriction, but at least in California First they rejected all of the 11:06:33

restrictions, even under the lesser standard, but it is, nevertheless, a lesser standard.

That's why the first question I posed to the plaintiff is -- although I think I can gather from your briefs what aspects of the viewing you're specifically complaining about, 11:06:46 I'm not completely sure; the briefing is a little fuzzy. I want to understand specifically what you're claiming the aspects you're restricted from being viewed are, and then we're going to see if the State can meet the Turner standard with respect to those restrictions each one, one by one. 11:07:03

Now, it also, it seems to me, gives rise to some other issues, and that is some or all of the information -- or the viewing, that you'd obtain by viewing, the State may be claiming is protected by state statute, depending on what it is, and I just can't really tell that, but it is the state 11:07:26 statute that you all know is at issue here, and that's 13-757(C). And it seems to me that if you want me to grant summary judgment on a declaratory judgment action, what you're asking me to do is find that that statute is unconstitutional per se, meaning that as it pertains to these restrictions, 11:07:46 there is no capable -- no possible capable constitutional application of the statute. So that's why I've asked the questions that I've asked pursuant to that first category.

Pursuant to the second category, which is the information that you can get -- the information that the State 11:08:08

presumably has but that you cannot get by simply viewing the totality of the execution, I realize that the briefing has viewed this as an adjunct to the proceeding itself. I tend not to be persuaded by that, and I will tell you why.

It seems to me that there have been all kinds of executions, and the history of executions suggests that some of them are completely open and some of them are not. The plaintiff has done a lot of good work providing some examples of historical methods of execution that are open. But it strikes me that there are well known -- and I may be wrong, so if I'm wrong, please tell me -- but I believe it's accurate to say that, for example, when you have death by firing squad, it is very typical that there are at least one or more blanks loaded into a gun that even the members of the firing squad don't know who has the blanks because -- and in that way, no one will know who's done the execution. Well, in such circumstances, there isn't a right to inspect the bullets; there isn't a right to inspect the gun. Certainly, the idea that executioners have always been hooded suggests that there may be some aspects of executions, depending upon the methods that they're done, that simply have not been open to the public. So to say that this is an execution and it's all open is not particularly meaningful to me, because execution methods change.

That being said, I don't know that the

Press-Enterprise test can be thrown out the door. There are cases applying the Press-Enterprise test that suggest that in cases that are relatively new, the sort of the experience and logic part, experience may be less important; logic may be more important. 11:10:13

But if that is true, it also seems to me that if the State has, as they've indicated, as the affidavit of Mr. McWilliams states, and as I understand it, Mr. McWilliams is the state official who's charged with procuring lethal injection drugs, and Press-Enterprise itself says: "[a]lthough 11:10:37 many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly."

And if I understand Mr. McWilliams' affidavit, he's 11:10:53 saying, If we have to give out the source here, we can't acquire the drug. And if we can't acquire the drug, we can't accomplish the only method that is statutorily authorized and recognized by the State as a legitimate punitive objective. So that's one of the reasons I think that Press Enterprise -- so 11:11:10 what I believe I'm inclined to do -- and I'll listen to what you have to say. As I said, I'm not running your time yet, but I'm going to start running it shortly -- is it seems to me that the Press-En -- you may want to argue the Press-Enterprise test and its progeny isn't applicable at all. I'm not sure that it 11:11:27

isn't applicable, but if it is applicable, I think that the Press-Enterprise test needs to be applied to the specific information you're seeking, and not simply a generic application that because this is an execution, you get to have everything, all kinds of information that relate to it. That is what my inclination is. 11:11:42

It seems to me, then, as with the proceeding, or access to the proceeding itself, it's also very important to understand specifically what additional information you're seeking. So I have no problem understanding when you say you want to have the source of the manufacturing drug. But when you say "qualifications," what do you mean by that? 11:12:08

Certainly, the First Amendment doesn't compel any qualifications. It may require their production, but it -- you may argue that it requires their production if they exist, but if none exist, what about the First Amendment requires the State to create qualifications? 11:12:27

And it seems to me that if we're going to talk in that line, for me to order that qualifications be provided without any specificity runs easily afoul, potentially, of the 757(C) statute, which could be identifying information. And so applying the Press-Enterprise test to that request, as opposed to the idea that they're merely involved in an execution, may give rise to a very different analysis. 11:12:45

Now, I think if you -- and you've been patient, thank 11:13:07

you -- but I think if you've listened, you understand now where my questions are coming from and why I'm going to ask them.

I don't promise to you, Mr. Langford, or to you, Mr. Sparks, that I won't ask questions; I generally tend to do that. But I hope by giving you this background you understand a lot more what's going to be helpful to me in deciding the case. 11:13:24

Mr. Langford, your time is now going to run, soon as you hit the podium.

MR. LANGFORD: Thank you, Your Honor. Good morning. 11:13:42 As you know, my name is John Langford, and I represent the plaintiffs.

First, we very much appreciate your questions and guiding this argument. I want to step back and clarify first what right of access we're asserting here. We're asserting a 11:14:00 right of access to the means of execution, and the critical information necessary to understand the means of execution.

THE COURT: I get that, so specifically, how does the State do it now that you think masks your access? And I'm talking now, as you'll understand, about the procedure of the 11:14:19 execution itself.

MR. LANGFORD: Your Honor, our clients and the public need access to the critical information necessary to understand what's happening in a lethal injection.

THE COURT: No, no, I get that. 11:14:35

MR. LANGFORD: Sure.

THE COURT: I want to know what you're not getting.

MR. LANGFORD: So what we're not getting is the source of Arizona's lethal drug suppliers.

THE COURT: Can you divide it up for me? 11:14:42

MR. LANGFORD: Sure. Absolutely.

THE COURT: Can you divide it up for me first let's talk about the proceeding or the execution itself. What, if anything, happens in the execution itself that you can't see that you want to be able to see or observe? 11:15:01

And that, to me, does not include the -- I'm not trying to prevent you from arguing that you want the source of the drug manufacturer, but I'm going to consider that separately.

MR. LANGFORD: Yes, Your Honor. 11:15:16

THE COURT: Do you understand what I'm saying?

MR. LANGFORD: I do.

THE COURT: All right.

MR. LANGFORD: So we have -- our clients have identified five categories of information that we believe are critical to understanding the means of execution. 11:15:21

THE COURT: Okay.

MR. LANGFORD: One category of information is the information about when Arizona administers additional doses of lethal drugs. 11:15:32

THE COURT: And you're not currently allowed to see that if you're viewing the execution from -- if you're viewing the execution within the DOC.

MR. LANGFORD: Your Honor, nothing in Department Order 710 facially prevents the Arizona Department of Corrections from producing that information. We know that in the Woods execution, the witnesses were unable to see when the State administered additional doses of the lethal injection drugs, and nothing in Department Order 710 requires Arizona to announce when it's administering additional doses. 11:15:43 11:16:03

Now, there are provisions in the one-drug protocol and the three-drug protocol that require a conscientious check after the first dose of drugs is administered, and so --

THE COURT: Well, let me tell you how I understand it, Mr. Langford, and you can tell me if I'm wrong. We've got an execution room; we've got a chemical room; we've got a viewing room. 11:16:18

MR. LANGFORD: Correct.

THE COURT: Is that right?

MR. LANGFORD: Yes, that's -- to my understanding. 11:16:28

THE COURT: All right. So in the execution room you cannot tell when new doses of lethal injection are being -- by your viewing the execution room, you can't tell when new legal injections are being administered because that happens in the chemical room? 11:16:42

MR. LANGFORD: Correct, Your Honor.

THE COURT: All right. Now, what else -- I get that you can't see that and you want to see that. What else do you want to have access to in the execution itself that you've been denied access to? 11:16:52

MR. LANGFORD: Your Honor, there are another set of provisions in the Department order that abridge the right of access explicitly. These are a set of discretion provisions that give the director discretion to basically kick the witnesses out of the viewing room at a moment's notice. 11:17:10

There's a general discretion provision on page 1 that subjects the entire protocol to the director's overall discretion, meaning that he can change anything in the protocol, but there are more specific discretion provisions included in the one-drug protocol and the three-drug protocol 11:17:25 which suggest that after the first consciousness check, the director may make a determination about how to proceed, and whether or not to allow the witnesses to continue to view the execution, and that allow the director to order that the curtains be closed during the execution. 11:17:41

Those provisions clearly violate even the most narrow reading of Woodford. The Ninth Circuit explained that the public has a right of access to view an execution from the moment the prisoner walks into the execution room to just after death. So those provisions, we would assert, violate even the 11:17:59

most sort of narrow reading of Woodford.

Now, the other four categories of information that we've identified include the source, quality, and composition of the drugs, as well as the qualifications of the IV team members. The right of access that we are asserting here is a right to intelligently view executions. And the reason that it makes -- the reason that the right of access extends to this additional information is that without this information, the public cannot meaningfully understand what's happening in the execution. That was not the case in hangings. That was not the case in lethal gas executions. In hangings, the public could --

THE COURT: What about firing squads?

MR. LANGFORD: Your Honor --

THE COURT: What about beheading?

MR. LANGFORD: Your Honor posed the hypothetical which is that we're not sure whether or not the public has a right of access to who has a blank in the rifle.

THE COURT: It seems to me my understanding, and even my very limited historical research is that not even the members of the firing squad had access to that information.

MR. LANGFORD: Assuming that is true -- and that is also my understanding -- that would not be encompassed within the right of access that we're asserting here. We're asserting a right of access to the critical information necessary to

understand the means of execution.

When someone is executed by a firing squad, it is not critical that the witnesses see which of the eight trigger-pullers have a blank. It does nothing to increase the democratic oversight of the execution. It -- 11:19:41

THE COURT: Well, why not? I mean, you might have more qualified riflemen than others. I mean, you might have four or five riflemen, and they have different levels of skill. And if you knew who had the bullet, you'd know whether the bullet -- you knew had the blank, you'd know whether the most 11:20:01 skilled rifleman had the blank.

MR. LANGFORD: First, my understanding is that it doesn't take a particularly skilled rifleman to carry out an execution. The rifleman --

THE COURT: Yeah, and it might be said that it doesn't 11:20:16 take a particularly skilled nurse to inject -- if it's an appropriately efficacious drug, it doesn't take any particular skill to accomplish an execution.

MR. LANGFORD: Your Honor --

THE COURT: Let me ask -- 11:20:34

MR. LANGFORD: Yes.

THE COURT: Let me start somewhere else first.

I notice that 710 has been revised.

MR. LANGFORD: Yes, Your Honor.

THE COURT: And now the State says that it will give a 11:20:42

complete qualitative analysis of the drug and the compound to anybody who asks for it 10 days after a warrant issues.

Why wouldn't that allow a -- I mean, and it seems to me that given that language, the government won't meet its own requirement if it doesn't provide a very thorough analysis of 11:21:04 the compound in each drug and the qualitative analysis of it.

Have you made application to the government to provide you that information?

MR. LANGFORD: Well, no, Your Honor, because the qualitative analysis will be given out 10 days after the 11:21:18 execution warrant. There hasn't been an opportunity to seek that information.

THE COURT: So why would that procedure, at least -- I understand that you still might want the source of the drugs, and I'm not -- I'm not talking about source here, but why 11:21:29 wouldn't that procedure allow you -- or be appropriate to evaluate the quality of the drug and its compounding?

MR. LANGFORD: There are a couple of reasons, some specific to the facts in this case and the record developed thus far and some that are more generic. I think Your Honor is 11:21:48 more interested in the sort of generic principle here.

THE COURT: Actually, I'm interested in both.

MR. LANGFORD: Sure.

THE COURT: One of my questions is: Can I really grant a summary judgment here when there may be facts that 11:22:00

would allow for a constitutional inter- -- constitutional application of 17- -- or what is it? 13-737?

MR. LANGFORD: Yeah.

THE COURT: So I'm interested in both.

MR. LANGFORD: So starting with the sort of generic application, first the provision requiring a qualitative analysis to be produced is still subject to the director's discretion, and so nothing in that protocol requires the director as a matter of law to produce that sort of analysis. That's a problem, because the First Amendment right of access extends to that information and this Court should still issue declaratory and injunctive relief to ensure that the qualitative analysis is issued. 11:22:16 11:22:32

We know that Arizona Department of Corrections has a track record of deviating from its protocol. That's a problem. Second -- 11:22:48

THE COURT: Let me ask, in terms of my determination whether a "one time for all" decision on this is necessary, let's say that you get -- there's a warrant issued. You apply for and get a qualitative analysis from the Department of Corrections, or you don't get one, and -- or you do get one and you think what you've gotten is severely deficient under their own regulations. 11:23:07

What prevents you from going to court to seek access to or seek to require the DOC to follow their own policies at 11:23:25

that time?

MR. LANGFORD: Well, first, their policies as they stand now don't require it. The provision of the qualitative analysis is still subject to the director's discretion.

THE COURT: Right. 11:23:37

MR. LANGFORD: That is a huge problem.

THE COURT: I know, but that's only a problem if there's a First Amendment right of access to that information, and that depends on the application of Press-Enterprise, right?

MR. LANGFORD: Yes. Yes, Your Honor. 11:23:47

THE COURT: Because we have such very -- and this is why, to me, the historical aspects of what kind of information you were able to receive pertaining to what kinds of discussions is just not very helpful, but -- because they've changed over time. And lethal injection is a relatively new 11:24:05 method.

That doesn't mean that Press-Enterprise doesn't apply, even though there's a very short history. I understand that. But you still have to demonstrate that you're entitled under Press-Enterprise, right? 11:24:27

Or maybe it's not Press-Enterprise; maybe it is actually California First. You understand the difference between the two standards there?

MR. LANGFORD: In terms of the closure of the informa- -- you mean -- so when we -- when we look at the 11:24:39

Press-Enterprise test, we're looking at whether the right exists, and whether the State has overcome its burden of demonstrating -- met its burden of demonstrating --

THE COURT: Right, but it seems to me, just so we're clear, that Press-Enterprise and California First, even though they're both applying Press-Enterprise, California First applies a lesser, more deferential standard because of the penological objectives involved in the prison setting. 11:24:50

MR. LANGFORD: Yes, Your Honor. You know our position on that, which is that the lower standard applied in California First Amendment is inappropriate to the information we're seeking here. 11:25:06

The reason it makes sense to apply that standard in -- made sense to apply that standard in Woodford is that the right asserted was a right to go into the prison to view the execution, which directly implicates sort of safety concerns related to the prison. And so the Ninth Circuit determined that the better standard to apply is the Turner standard, which is a lower standard, and that's -- we're not asserting a right to go into the prison to view the executions. We know we have that from California First Amendment. 11:25:20 11:25:43

THE COURT: Um-hum.

MR. LANGFORD: What we're asserting a right to is information that is necessary to understand the execution.

THE COURT: All right. So let's say Press-Enterprise 11:25:56

applies. So you still have the -- the experience and logic applications. You can't give me any -- any time that there's been a determination that you're entitled to know the makeup of the cocktail. This is the first time, right? Or at least the first time that you've asked for this? 11:26:13

MR. LANGFORD: We know that Judge Silver has already said that there is a First Amendment right of access to that information, but --

THE COURT: Judge Wake said there wasn't.

MR. LANGFORD: And Judge Wake said there wasn't. 11:26:26

But Your Honor, to be clear, when we do the Press-Enterprise -- what -- when we determine whether the right exists, that is not a method of execution by method of execution determination. It is a right of access to the means of execution, regardless of what method of execution Arizona 11:26:42 chooses. That is the same -- when you look at Woodford, the Ninth Circuit didn't find a right to view lethal injection executions; they found a right of access to view executions.

THE COURT: Um-hum.

MR. LANGFORD: So when we make that determination, it 11:26:58 doesn't matter whether we've had a history, necessarily, of access to the drug cocktail. If Arizona chooses tomorrow to switch its --

THE COURT: So can you get my -- my notes related to this proceeding? 11:27:08

MR. LANGFORD: Your Honor --

THE COURT: You don't have my notes. Can they have everything that's related to an execution?

MR. LANGFORD: Your Honor, the State argues that -- to be clear, we agree with the State. The First Amendment does not grant plaintiffs a right to every piece of information within the government's possession. This is not a federal FOIA right. 11:27:18

The right of access specifies that there is a right of access to certain government information, particularly information related to particular government processes for which there is a history of access and a logic of access, and -- 11:27:31

THE COURT: And Press-Enterprise places generally -- it isn't very far reaching. There are exceptions all over the place, and it generally relates to transcripts of proceedings, doesn't it? 11:27:45

MR. LANGFORD: It has often been applied in that context, but if you read Richmond, Globe and Press, you will see that consistently, the Supreme Court talks about applying the test to the government processes, not in proceedings. In those cases it involved proceedings. The Ninth Circuit itself, as we know from Cal Almond, has applied the -- 11:27:57

THE COURT: That was actually dicta, though, right?

MR. LANGFORD: It was dicta, in that the court decided 11:28:13

not to get -- reach the ultimate issue.

THE COURT: Right.

MR. LANGFORD: But we know that the public already has a First Amendment right of access to this particular process, executions. 11:28:23

THE COURT: Um-hum.

MR. LANGFORD: And the right of access embodies and subsumes a right of meaningful access. If this Court were to hold a criminal trial, to which no one disputes there is a right of access, and decided to conduct the trial in a language 11:28:36 that the witnesses could not understand but maybe the prosecutor could understand, there would, indeed, be a right of access to a transcript of that hearing, because otherwise, the right to attend the criminal trial cannot serve a positive role in the functioning of the trial itself. 11:28:53

So the right of access must encompass a right of meaningful access. And you can see this from the time that the Supreme Court first recognized the right. When it looked at criminal trials, it acknowledged that there were at least three reasons why there's a right of access to criminal trials. The 11:29:08 first is that it helps to legitimize the process. Maybe that's the same here. Maybe viewing a lethal injection execution helps legitimize the process.

THE COURT: It seems to me it might well.

MR. LANGFORD: But there are other reasons why there's 11:29:21

a right of access to criminal trials, those being that they improve the quality of the fact-finding, and they curb judicial misconduct and prosecutorial misconduct. And so they actually serve as a check on the exercise of government power. There is no more significant exercise of government power than the execution of the individual. 11:29:39

THE COURT: I agree, and it doesn't even seem to me that the State fights very hard on this point. But it seems to me that they make a -- an argument that also goes to whether or not there's a right of access and they say, If we have to disclose, for example, the identity of our source supplier, we won't be able to get any source. 11:29:52

MR. LANGFORD: Your Honor --

THE COURT: And doesn't that fall into that quote earlier from Press-Enterprise where it says: "[a]lthough many governmental processes operate best under public scrutiny" -- strikes me that this could be one of them -- "it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly." 11:30:05 11:10:52

And aren't the -- isn't that what they're saying, at least as it pertains to the source of the drug? They're saying, If we have to give that up, then we can't get the drug, and we cannot -- we cannot complete our function.

MR. LANGFORD: Your Honor, there are a couple of 11:30:33

responses to that question. The first is that, let's be clear, we're talking about whether the right has been overcome. So if this Court were to conclude --

THE COURT: No, I don't agree. It seems to me that there are two levels that creates a problem -- 11:30:53

MR. LANGFORD: Okay.

THE COURT: -- with, and one is: Is there logic in opening this up in the first place in this instance? And assuming that you can then find the logic prong and then create a qualified right of access, then there's a second -- second 11:31:03 inquiry, which is: Has the right of -- qualified right of governmental access been overcome?

MR. LANGFORD: And Your Honor, I think we have to be clear that what we're talking about in the first part of the test is a history and logic of access to the means of 11:31:18 execution. And it seems clear from the record that there --

THE COURT: Wait a minute. Wait a minute.

Say that again?

MR. LANGFORD: The history and logic applies not to legal injections in particular. It doesn't apply to a 11:31:30 particular criminal trial, it doesn't apply to a specific; it applies to a category of proceedings of processes. The Ninth Circuit's already told us it applies --

THE COURT: Where do you draw the line?

MR. LANGFORD: Between -- 11:31:46

THE COURT: What you're entitled to get and what you're not entitled to get as part of an execution process.

MR. LANGFORD: Your Honor, the line is drawn by the Press-Enterprise test itself. If --

THE COURT: So if we apply the Press-Enterprise test to the sort of information you're seeking, which is what I am inclined to do, specifically apply that in this case, there are reasons, as you've suggested, it seems to me, there are reasons that logic would suggest this be an open proceeding. There are also reasons, they are fact-specific reasons, that logic suggests this should not be an open proceeding. 11:31:57 11:32:14

MR. LANGFORD: Your Honor, the test is being flipped a little bit when we talk about a logic of denying access. The first part of the test does not talk about logic of denying the access. It's whether there's a logic -- 11:32:34

THE COURT: There's at least several cases that would contradict what you say. For example, the case that involves application for search warrant applications, they're just saying: It's not logical to do this in this circumstance.

MR. LANGFORD: What they're saying is that it's not logistical across the board to deny access. 11:32:55

THE COURT: Let's --

MR. LANGFORD: I want to get to your question on compelling -- on whether the State has an interest --

THE COURT: All right. 11:33:03

MR. LANGFORD: -- here --

THE COURT: Go ahead.

MR. LANGFORD: -- because I think that's a very important question.

THE COURT: Because it's fact specific, isn't it. 11:33:07

MR. LANGFORD: It is fact specific, Your Honor.

THE COURT: So how can I grant a motion for summary judgment that will for all time decide this question?

MR. LANGFORD: Your Honor, the --

THE COURT: Because in fact there is a possible 11:33:19 applica- -- constitutional application of the statute if the State can establish that they can't otherwise acquire an execution drug, right?

MR. LANGFORD: With one qualification, I agree. And that is that you asked in your second question: What interest 11:33:33 does the State have in carrying out executions --

THE COURT: Um-hum.

MR. LANGFORD: -- through a method that has been duly enacted by law?

THE COURT: Yeah. 11:33:42

MR. LANGFORD: Arizona has no compelling interest in lethal injection executions. Rather --

THE COURT: Well, it certainly does, to the extent that it's the only method authorized by the statute.

MR. LANGFORD: Your Honor, no one in this room would 11:33:53

dispute that Arizona cannot authorize a method of execution by statute that violates the Eighth Amendment.

THE COURT: Are you saying it violates the Eighth Amendment?

MR. LANGFORD: I am not, but I'm saying that Arizona can no more choose a method of execution from the menu of execution methods that violates the First Amendment or any other provision of the Bill of Rights. And so when we look at what the supreme -- 11:34:09

THE COURT: Okay. That's not -- that's not particularly per- -- I mean, what First Amendment right is there in all information relating to executions? 11:34:20

MR. LANGFORD: We are --

THE COURT: I mean, doesn't that -- isn't that sort of a bootstrap argument? 11:34:33

MR. LANGFORD: No, Your Honor. And we're not asserting a right of access to all information about executions. It passes through the significant positive role in the function --

THE COURT: You're saying -- 11:34:39

MR. LANGFORD: -- process.

THE COURT: -- that you have to adopt a method for execution in which all aspects of the execution are completely open to the public; otherwise, it violates the First Amendment?

MR. LANGFORD: No, Your Honor. 11:34:53

THE COURT: What are you saying, then?

MR. LANGFORD: I am saying that Arizona has to adopt a method of execution that comports with the First Amendment. And what the First Amendment requires is that there -- there be access to the information necessary to understand the means of execution. That has been the case throughout history. 11:35:07

THE COURT: And so if they give you a qualitative analysis, is that -- that's very high quality, is that sufficient to meet the First Amendment?

MR. LANGFORD: Your Honor, our position is that -- you asked whether Arizona has a -- 11:35:22

THE COURT: Well, I just asked a new question.

MR. LANGFORD: The answer is no. The short answer is no. And the reason is -- is sort of twofold.

First, in order to overcome the right of access to the means of execution, Arizona must demonstrate a compelling interest that there's a substantial probability that the disclosure would harm that compelling interest. 11:35:38

THE COURT: Um-hum.

MR. LANGFORD: And that there are no alternatives. Arizona does not have a compelling interest in lethal injection executions. What the Supreme Court has said in Baze v. Rees, 553 U.S. 35, is that the -- it recognizes three interests that states have in executions. 11:35:47

THE COURT: Um-hum. 11:36:02

MR. LANGFORD: It started with the proposition, Chief Justice Roberts starts with the proposition: Capital punishment is constitutional. It necessarily follows that there must be a means of carrying it out.

He goes on to recognize three interests in executions. 11:36:14
There's an interest --

THE COURT: So the upshot of your argument, though, is that lethal injection is not a constitutional method of execution because the First Amendment prohibits it.

MR. LANGFORD: If the only way for Arizona to carry 11:36:30
out lethal injection executions is to do so in a way that shields the critical information necessary to understand the means of execution --

THE COURT: And so I said, they give you a complete --
they give you a copy. They'll not only give you the 11:36:42
qualitative analysis, they give you a sample of the lethal injection drug so you can test it yourself.

That doesn't comply with the First Amendment?

MR. LANGFORD: Your Honor, our first position would still be "not entirely." And the reason is that the identity 11:36:53
of the drug supplier, for instance, serves two purposes: It serves as a proxy for the quality of the drugs, and to the extent that the qualitative analysis would address those concerns, then perhaps Arizona has met the requirements. But
the identity of the drug supplier serves another purpose 11:37:17

entirely, which is as a proxy for the way in which Arizona has been carrying out executions.

And I want to make something clear for Your Honor. There are two First Amendment interests that are distinct that are at stake in these cases. The first is to ensure that when 11:37:31 Arizona executes an individual, it does so in compliance with the floor set by the Eighth Amendment. The public has an interest in ensuring that Arizona doesn't violate the Eighth Amendment. That is one concern. But there's a separate and distinct First Amendment interest at stake here, and that is to 11:37:47 provide the public with reliable information that it needs to determine how it would like to carry out executions.

And over time, Arizona has changed its constitution and switched execution methods based not on a determination by the Supreme Court that hangings are unconstitutional, or that 11:38:05 lethal gas executions are unconstitutional, but based on a determination by the people that it would not stand for hangings any more. Following the Dugan execution, the public changed their mind about hangings and switched to gas executions. Following Donald Harding's gruesome execution in 11:38:23 1992, the public amended the constitution within six months to switch to lethal injection executions.

The Eighth Amendment is a floor, not a ceiling, and people of Arizona reserve discretion to change their method of execution. But what hap- -- the problem here is that in order 11:38:39

for that democratic process to function, the people of Arizona need the critical information necessary to understand what is going on.

And they don't have that here. They did with lethal injections. They saw what happened to Eva Dugan. They did 11:38:52 with Donald Harding. He was not sedated. You could see his reaction to the problem.

THE COURT: Again, they give you, the State gives you a copy of the drug itself, in addition to a qualitative analysis of it. How have they -- and let's say, for purposes 11:39:05 of argument, I grant your motion to the extent it asks for access to see how many times they inject lethal injection drug.

And I will warn you, Mr. Sparks, I'm inclined to do that.

Let's assume I give you that -- 11:39:24

MR. LANGFORD: Yeah.

THE COURT: -- and I say -- and they provide you with a complete --

MR. LANGFORD: Qualitative analysis.

THE COURT: -- qualitative analysis and a sample of 11:39:33 the drug itself so you can run your own qualitative analysis on the drug. How have they failed to comply with the concerns that you have raised?

MR. LANGFORD: Your Honor, the people of Arizona have a right to know if Arizona is importing drugs illegally in 11:39:52

violation of federal law in order to carry out lethal injection executions. Maybe the people of Arizona don't want to carry out executions --

THE COURT: What if they tell you: We didn't. We avow we didn't import this drug illegally? 11:40:07

MR. LANGFORD: Your Honor, we know from the factual record in this case and in related litigation that certifications from the Arizona Department of Corrections have not always been frank with the Court. They've certified that drugs were not expired that turns out, right before execution, 11:40:22 those drugs were indeed expired.

In these circumstances, we need declaratory and injunctive relief requiring Arizona to produce the information necessary to understand what is going on in an execution. Otherwise, it leaves the people of Arizona without the 11:40:41 fundamental information that they need to ensure that its agent is carrying out executions in a way that comports with its own understandings of how executions should be conducted.

With your permission, I would actually like to reserve the remaining three minutes, unless you have any further 11:41:01 questions.

THE COURT: You may.

MR. LANGFORD: Thank you.

THE COURT: Um-hum.

So Mr. Sparks, I've already indicated my first 11:41:17

question, which is: In light of Cal First, what interest does the State have in not letting the petitioner see the number of injections, lethal injections, as they contemporaneous occur?

MR. SPARKS: Well, I would look to the language of the holding of Cal First itself, which very clearly delineated the scope of the public's First Amendment right to view an execution, and I think that's the way that it's characterized by that opinion, it's a right to observe. And that right was delineated by the Court as the right to watch the inmate from the moment he's brought into the execution room until the moment that death is declared. And the state's procedures respect that right by making sure that the witnesses are able to view the inmate from the moment he enters the room until death is declared. 11:41:34 11:41:49

THE COURT: What about Mr. Langford's argument that you have discretion under 710 to draw the curtain whenever you want to draw it, and to tell people to leave the viewing room? 11:42:05

MR. SPARKS: Right, there is discretion written into the procedure. There's no evidence --

THE COURT: Doesn't seem to me like there's any discretion in Cal First. 11:42:21

MR. SPARKS: There isn't. And there's been no evidence presented here that that's ever happened in Arizona, and --

THE COURT: Well, so what's -- if you're not going to 11:42:29

do it, then why have it in your policy?

MR. SPARKS: Well, I think that goes to the Turner standard, because the right of access --

THE COURT: Well, I mean, don't you have to tie it to -- if you're going to get a Turner standard, you have to tie it to a reasonable relation to a legitimate penological objective, and so if you're going to have it in there, doesn't it have to be reasonably related to a legitimate penological objective? 11:42:42

MR. SPARKS: I think it would if it were used, if that discretion were used in a particular case. 11:42:56

THE COURT: Right. So why can't I say it's not appropriate unless it's tied to a reasonable penological objective, and you've not provided me with any?

MR. SPARKS: I think the existence of it itself, it doesn't viol- -- the fact that there is potential discretion doesn't, in and of itself, show a First Amendment violation. If that discretion were used in a particular execution, I think the question of whether the qualified right of access was violated -- violated in that case would turn on whether there was a legitimate penological reason for exercising the discretion. 11:43:14 11:43:30

THE COURT: And what would the remedy be in such a circumstance? There would be done, correct?

MR. SPARKS: No, not with respect to the viewing, Your 11:43:44

Honor.

THE COURT: Okay. So isn't that a problem?

MR. SPARKS: Potentially, but I just -- I don't see that the discretion, in and of itself --

THE COURT: Well -- 11:43:57

MR. SPARKS: -- when there's no evidence that it's been used in a way that --

THE COURT: Do you have to tie the discretion to a legitimate penological objective? You can't just have the discretion free hanging, can you? 11:44:09

MR. SPARKS: Not in practice. I mean, not -- not in the discretion's use. And that's why I think it -- the problem -- looking at it from this --

THE COURT: I'm not sure I understood what you just said, I'm sorry. So what do you mean by "not in practice"? 11:44:24

MR. SPARKS: Well -- and maybe that's what I was going to try to explain. You know, looking at it from this direction, you know, there are hypotheticals you could pose. I think there are situations where potentially, there might be a legitimate penological interest -- 11:44:39

THE COURT: Sure, I could --

MR. SPARKS: -- in exercising it, but --

THE COURT: -- I could foresee that. For instance, let's say there's a prison riot, and the people in the room are -- their safety is threatened, but you can put that in the 11:44:51

policy, right?

MR. SPARKS: You could, but then would you have to put in every conceivable instance into the policy?

THE COURT: I'm not sure, but I don't think you just have unlimited discretion, which is what the policy seems to give you now, doesn't it? 11:45:02

Let's move to another point.

MR. SPARKS: Okay.

THE COURT: Let's say we're conducting -- well, let's say we're using the guillotine, and somebody's got a dull blade, and they haven't sharpened the blade, and so we drop the blade once and the head's still hanging on and the guy's still breathing and we drop the blade twice and in fact, we don't cut off the head until the 14th time we drop the blade. You're saying that you don't have any right to see, the public doesn't have any right to witness the fact that the blade had to be dropped 14 times before the head came off? 11:45:12 11:45:34

MR. SPARKS: I wouldn't say that the -- that the right is characterized that way. The public has a right to --

THE COURT: Well, I admit -- 11:45:46

MR. SPARKS: -- view what's happening --

THE COURT: -- that I was being -- I'm giving you an analogy.

MR. SPARKS: I understand. I think when that is encompassed in what the public has a right to view, which is 11:45:56

the viewing of the inmate and what's happening to the inmate --
THE COURT: Yeah, but --
MR. SPARKS: -- then yes.
THE COURT: It is the injection that -- it is the injection that terminates the life of the inmate, isn't it? 11:46:07
MR. SPARKS: I suppose it's the causal step --
THE COURT: Well, it certainly is. They're not going to -- you're not going to terminate an inmate without an injection, are you, in a lethal injection?
MR. SPARKS: Right. Of course. Of course. 11:46:21
THE COURT: And so if you don't terminate him -- or her -- after the first injection, doesn't the public have a right to view the entirety of the execution? And if they don't know and cannot see how many times there's been an injection, how have they been given the right to view the entire 11:46:34 execution?
MR. SPARKS: Two points in response to that question. First, I would say again I think looking to the -- the specific language of California First Amendment, the focus is on the inmate and the public's ability to see the effect of what's 11:46:51 happening on the inmate, and that's affected by --
THE COURT: Assume for a second I don't buy that argument. What's your second one?
MR. SPARKS: Second one is if we were to apply the Press-Enterprise test to that aspect of the execution -- 11:47:05

THE COURT: Let's not apply Press-Enterprise; let's apply Cal First. It's even more deferential to you.

MR. SPARKS: Sure.

THE COURT: What is your legitimate penological objective in not allowing the public to see how many times a lethal injection has been administered? 11:47:16

MR. SPARKS: I think it goes to -- there's certainly a confidenti- -- confidentiality aspect of the personnel who are taking part in it, because it --

THE COURT: Well -- 11:47:33

MR. SPARKS: -- it turns into logistics. How would that right be effect -- effected for the public to see what happened? I think that's a --

THE COURT: I'm all for that, but explain to me, we do have personnel in the execution room, right? And your own 11:47:44 policy requires them to be garbed in such a way that they cannot be identified.

If that's the case, why can't you do that for persons in the chemical room? And why can't you -- and, I mean, if that's further the case, why don't you just focus a camera in 11:47:59 on the injection site, wherever that is, so that anybody in the execution room can see every time that there is a new injection?

Or not in the execution room, the viewing room or whatever you call it. Why can't they do that? Why couldn't 11:48:14

you do it? What is the legitimate penological objective that would prevent you from doing that?

MR. SPARKS: From, in your example, focusing a camera on the --

THE COURT: Well, let's go -- let's go the back one first. Why can't you just have people in the chemical room dress themselves like the people in the execution room do, which is in a way so that they cannot be identified? That's what the policy requires for people in the execution room. 11:48:27

MR. SPARKS: Well, I think it's one thing, and the policy, in talking about someone who enters the execution room dressed in a way to preserve their anonymity, that's someone who's going in to conduct a consciousness check on the inmate, so that's a -- a relatively short procedure where the person's walking in for a short amount of time checking for consciousness and leaving. 11:48:43 11:48:59

In the chemical room, we're talking about a group of individuals who are mixing and administering the drugs, communicating with each other, so I think it's more difficult for them -- 11:49:11

THE COURT: Well --

MR. SPARKS: -- to do that while their faces are hidden.

THE COURT: I mean, I was listening, because I was concerned about this, too, I was listening very carefully to 11:49:16

what Mr. Langford said that he had an objection to, and he did not say that he objects to the fact that you turn the sound off. He didn't say that, so there's no way you're going to hear what they actually say. You can't identify their voices, and that's not identified. 11:49:34

MR. SPARKS: That's right. What I meant was it may hinder their communication among themselves to have their faces covered while they're trying --

THE COURT: How would it hinder their communication among themselves? I mean, I'm open to it. Just tell me how. 11:49:45 There is, after all, I mean, in Cal First, it's pretty clear: There is a right to view the totality of an execution. And it is limited, it is limited if you can identify a Turner concern.

But I will tell you it seems to me that if you can't view the number of times you're getting a lethal injection, 11:50:05 you're not being allowed to view the totality of an execution. So if you're not, you need to provide me with some sort of a legitimate penological objective in preventing that.

MR. SPARKS: I think, first, I would disagree. I don't think there's any support in California First Amendment 11:50:20 to be able to view processes that are occurring elsewhere, that aren't occurring -- the focus in that case is --

THE COURT: Well --

MR. SPARKS: -- on the execution room.

THE COURT: -- okay. So let's say we have a firing 11:50:28

squad. You're saying that California First would allow you to have the gentleman -- or the inmate, the prisoner -- here, and the firing squad here, and a wall here, and you could just look to see what happened to the inmate.

MR. SPARKS: I think that would be consistent with -- 11:50:52

THE COURT: With Cal First?

MR. SPARKS: -- California First Amendment.

THE COURT: All right.

MR. SPARKS: I do. And one thing I would like to point out also is that as we've shown, the -- the issue of how 11:51:00 many doses of drugs are administered --

THE COURT: Um-hum.

MR. SPARKS: -- is not entirely hidden from the public. In fact, detailed records and logs that document each and every administration of a dose, when it occurred at precise 11:51:16 times, are public information immediately after an execution.

THE COURT: After the execution. But unless your reading of Cal First is correct, the fact that you provide it after the con- -- after the execution doesn't give access during the execution to the totality of the execution, does it? 11:51:32

MR. SPARKS: Well, I would argue under Cal First it's not necessary --

THE COURT: Necessarily, you're arguing about Cal First --

MR. SPARKS: Well, I -- 11:51:45

THE COURT: -- or the -- the limited scope of Cal First.

MR. SPARKS: Again, I think --

THE COURT: That's what I said. Unless you're correct about the reading of Cal First, that isn't giving the public access to the whole execution, right? 11:51:51

So what you're really telling me -- and I don't mean to be disrespectful, Mr. Sparks; you and Mr. Langford are both doing a fine job -- but what you're telling me is you're really basing your argument in terms of the viewing of the execution proceeding itself on your interpretation of Cal First, which is Cal First only applies to watching what happens to the inmate. It is not what's happening as a part of the whole execution procedure. 11:52:06

MR. SPARKS: That's correct. 11:52:24

THE COURT: All right. And if -- if I don't agree with you, you agree that they get to watch, because you cannot provide me with a legitimate penological objective that prevents the public from seeing the number of times that a lethal injection is made. 11:52:41

MR. SPARKS: Well, I think the -- a penological interest again goes to the confidentiality, and I understand Your Honor discussed that, you know, there is someone who enters the room whose anonymity is preserved. But as the declaration of Mr. McWilliams stated, that the execution team 11:52:57

members do have concerns about their anonymity.

THE COURT: Well, and I understand that, and I do believe that the -- that at least to some extent, and maybe some other applications, what plaintiffs are seeking here, anonymity preservation may be appropriate. 11:53:07

One of the things I didn't have the time to discuss with Mr. Langford but which concerns me, Mr. Langford, you might want to talk about it in your three minutes, you want the qualifications of executioners.

What in the heck does that mean? It is completely 11:53:24 untethered to anything.

I'm not going to enter an order that says you must provide the qualifications of executioners, because it doesn't mean anything, and it is very -- isn't it very susceptible to the kind of qualifications that could identify persons that are 11:53:41 involved in the execution? I mean, that's my concern.

So I'm not saying that those concerns aren't legitimate. I just don't see how they're legitimate -- how they can't be overcome, because they're already overcome in viewing the execution process itself. 11:53:58

MR. SPARKS: Well, I think there's a difference between someone who enters the room for a brief period of time and then leaves again and viewing those personnel in the chemical room the entirety of the execution. I think there are -- the chances of identification -- 11:54:16

THE COURT: Well --

MR. SPARKS: -- are great.

THE COURT: -- are you saying that no part of the execution procedure itself happens in the chemical room?

MR. SPARKS: I'm saying parts of the procedure that don't fall within the scope of the right identified by the Ninth Circuit do. 11:54:29

THE COURT: All right. So again, we're not talking about legitimate penological objective; we're talking about the state's interpretation of how far Cal First extends. 11:54:40

MR. SPARKS: Right. That would be that argument. And then as far as an objective, I think there are confidentiality -- or anonymity concerns with viewing what takes place in that room.

THE COURT: But you can't give me any specific example of how -- of how -- well, you can't -- because you already address people in a way to preserve their anonymity, you can't tell me why that can't really be accomplished. 11:54:52

MR. SPARKS: Again, I think that the risk there would be the length of time, the greater amount of time that personnel are ex- -- within view -- 11:55:11

THE COURT: Let me ask you, Mr. Langford: Do you want to see the people as they actually function, or do you want to see the number of injections?

MR. LANGFORD: Would you ask the question one more 11:55:22

time, Your Honor?

THE COURT: Do you want to see the people who actually function in the chemical room, or do you want to just see the number of injections from the chemical room?

MR. LANGFORD: We have requested the information to see how many injections are administered. If that requires seeing into the room, then we -- we absolutely think we have a right to view into the room. 11:55:32

THE COURT: Well, it seems to me that it -- I mean, the setup is something that you dictate, right, Mr. Sparks? You could have -- 11:55:44

MR. SPARKS: Yeah.

THE COURT: -- the whole thing go on in one room, couldn't you?

MR. SPARKS: That's correct. 11:55:51

THE COURT: And so all of the plaintiffs have indicated they're asking to see the injections and the number of injections. They haven't asked, apparently, to see the people involved. And it seems to me that you could meet that -- tell me if I'm wrong, Mr. Langford -- by pointing a camera at the site wherever it is that you do those injections by telling the people in the waiting room: This is the site in which we do the injections. You will be able to see the injections, and hopefully there will only be one, but every time there's an injection it happens here, and it is on this 11:56:03 11:56:20

video screen, and you'll be able to see it. So it doesn't involve lengthy exposure of persons.

MR. SPARKS: I think another question might be if -- if the Court were inclined to find the right of access includes to know additional injections. There are portions of the procedure, if I recall 710 correctly, where the warden announces that something has occurred to the witnesses, so, you know, I thought another option may be to have the warden simply state to the witnesses that an additional dose has been administered. 11:56:37 11:56:58

THE COURT: Well, I mean, analogizing, wouldn't that be like having the warden announce: We just shot somebody? If you didn't get to see it?

MR. SPARKS: No, I don't think it -- I see the analogy, I think. I'm not sure that it exactly fits this situation. 11:57:20

THE COURT: No analogy exactly fits, but you understand my point.

MR. SPARKS: I under- -- I understand your point.

THE COURT: Okay. 11:57:30

Now, let's talk about -- we've beaten to death, I think, as far as it's concerned, the access to the procedure. Let's talk about the access to the other information.

MR. SPARKS: Sure.

THE COURT: You've heard Mr. Sparks' argument about 11:57:44

how there is no replacement for understanding the source of the lethal injection chemical as far as the First Amendment is concerned.

Do you have a response to that?

MR. SPARKS: The First Amendment doesn't go that far. 11:58:00 I think there -- there are two lines of cases at issue here. There's the right of access cases, which are access to proceedings, and those that have been applied to documents in court. That's the limit of that doctrine.

The other line of cases that I think plaintiffs' 11:58:16 request for information runs into here is the clear and consistent line of cases from the Supreme Court saying that there's -- the First Amendment doesn't grant the public a right to obtain information from the government. And that's really what they're asking for here. They're not asking for access to 11:58:31 a proceeding.

THE COURT: I mean, they talked about, was it First Almond or California Almond? It's California Almond.

I mean, there is some indication, at least, in California Almond that the Ninth Circuit might extend that 11:58:44 right of access to things other than documents that pertain to the proceeding, right?

MR. SPARKS: That would be the sole case that would even support such an argument. And as Your Honor pointed out, that was dicta; it's not anything that would be binding. And 11:58:58

if you look at the bulk of the body of case law in this area, courts aren't applying the Press-Enterprise test to pieces of information that the public might like to have that are in the government's possession; they're applying it to proceedings. The Ninth Circuit has done that here. 11:59:15

This isn't a courtroom proceeding where pleadings are filed and those are an integral part of the proceeding. We're talking about records that any government entity generates in the normal course of its business, and that simply isn't the type of information that has fallen in with any of the 11:59:29 right-of-access cases.

THE COURT: Are you capable of making any representation about what kind of qualitative analysis that the Department of Corrections is going to provide 10 days after it issues a death warrant? 11:59:45

MR. SPARKS: I can't, and I -- and I wanted to address this to make sure that -- that it's clear. That provision in DO 710 is specific to a situation in which the Department would use compounded drugs, which might not always be the case. If it's not using compounded drugs, that provision wouldn't be 12:00:03 triggered.

But the representation I can make to you today, if the Department were to use compounded drugs, which would trigger that provision, they would have, as I understand it, a Department of Public Safety lab analyze the drugs and produce a 12:00:20

report based on that analysis that would be provided.

THE COURT: And what would be the content of the report? What would be the categories in the report? Categories of information.

MR. SPARKS: I believe it would -- it would give the -- the content of the -- of the vial, I guess, the composition of the -- of the sample, as well as, I believe, a purity analysis. 12:00:40

THE COURT: What about Mr. McWilliams' statement -- I assume by his affidavit that he's the person charged with procuring lethal injection drugs. 12:01:05

MR. SPARKS: That's right.

THE COURT: You have lethal injection drugs. Do you have any right now?

MR. SPARKS: Yes. 12:01:18

THE COURT: So to the extent that you have them, you certainly can't say you can't get them, can you? At least right now.

MR. SPARKS: At least right now, that's right.

And the reason for that -- or at least one reason for that has been the confidentiality statute. That protects the -- the identity of those who provide ancillary services in connection with an execution. 12:01:30

THE COURT: What about Mr. Sparks' assertion that the public has a right to know whether you're illegally importing 12:01:46

drugs?

MR. SPARKS: I don't see how that falls within the -- the right of access to view an execution. There -- there, you know, may be reasons, and -- and that's why we have state public records laws and the federal government has FOIA laws, but their right of access is -- 12:02:05

THE COURT: Have they made access -- have they made a public access -- Public Records Access Act request for the sources and importation of lethal injection drugs before?

MR. SPARKS: Have they been requested -- 12:02:23

THE COURT: Yes.

MR. SPARKS: -- that information?

THE COURT: Yes.

MR. SPARKS: Yes, Your Honor.

THE COURT: Has that information been provided? 12:02:28

MR. SPARKS: The sources, no.

THE COURT: Has the information been provided about the importation, and whether the importation was legal?

MR. SPARKS: I believe the Department has traditionally provided information that -- for example, a particular source, without giving the identity -- was a source that's approved by the FDA. 12:02:45

And to go back to your question, I'm not sure that I'm aware of a specific request asking whether an importation was legal or not, so I'm not sure I can address that -- 12:03:04

THE COURT: Okay.

MR. SPARKS: -- question.

THE COURT: What is the State's interest in enforcing its own capital punishment law?

MR. SPARKS: It's higher than a statutory interest, because the method of execution, lethal injection, is in the state constitution. It's the only constitutional -- 12:03:19

THE COURT: I mean as it --

MR. SPARKS: -- method of execution --

THE COURT: -- pertains to the federal constitution. Is there really a difference whether -- whether the right is the state constitution or a state statute? In either case, I think I'm bound to not strike them as a matter of law if they're capable of a constitutional application. 12:03:31

But if they're not capable, and if they violate the federal constitution, they violate the federal constitution, don't they? 12:03:46

MR. SPARKS: They do, and I would agree with that --

THE COURT: I want to know what the right is, regardless of its source, what is the extent of the right of a state to implement its own method, designated method of capital punishment, if it's duly authorized by law? Do you have any authority for me? 12:03:57

I asked the question in advance so I figured you could give me some. 12:04:18

MR. SPARKS: The closest I could come, there's a U.S. Supreme Court case, Oregon v. ICE, that it -- it's a little bit more general. It talks about how the states have a very strong interest in enforcement of their laws. That's one of the most important functions that the states serve, and I think that's consistent with the idea that the State has a strong interest in implementing the method of execution provided for by its laws. Obviously, a state can't violate the federal constitution in the way that it does something. 12:04:36

I also think that here it would be remarkable if -- the Supreme Court has never found a lethal injection violates the Eighth Amendment, which is the specific amendment that addresses punishments that states can impose on criminal offenders, that it somehow ran afoul of the First Amendment instead, when what we're really talking about in this area is a qualified right of access to view a proceeding. 12:04:50 12:05:10

THE COURT: Okay.

MR. SPARKS: The Court's third question, if you'd like me to address that now --

THE COURT: Did you want to reserve any time, too? It's a cross-motion. Do you want to reserve time? 12:05:28

MR. SPARKS: I will, Your Honor.

THE COURT: Okay. You have five minutes left.

MR. SPARKS: Okay. I will very briefly address the Court's third question. Again, mainly for the reasons that 12:05:41

I've discussed here today, I think the confidentiality statute is always capable of constitutional application because the information that it makes confidential is information that falls outside the scope of the First Amendment right of access. So if there's no right to the information that it -- that it keeps confidential, then it's a constitutional statute. 12:06:03

And I'll reserve the remainder of my time, unless --

THE COURT: All right.

MR. SPARKS: -- the Court has further questions.

THE COURT: Thank you. 12:06:18

MR. LANGFORD: Your Honor, I know I only have three minutes left. I have four points that I want to make.

The first is about qualifications, and what sort of right we're seeking here. I want to be clear: We are not seeking access to the identities of the individuals involved in lethal injections. 12:06:41

THE COURT: Yeah, but how can I know whether it has a tendency to be identifying unless you tell me what qualifications you want? And you haven't done that.

MR. LANGFORD: Your Honor, we have asserted a right of access to the means of executions which we believe encompasses the qualifications of those administering the drugs with this particular lethal injection method, with this particular method of execution. 12:06:52

THE COURT: Well, I don't know what you mean by that, 12:07:06

so, for example, if somebody asks for my qualifications --

MR. LANGFORD: Yes.

THE COURT: -- don't you risk the qualifications that you give identifying me as the -- as the judge that you're talking about? 12:07:19

MR. LANGFORD: Your Honor, but we're on two sides of a test here. There's a right of access to the means of execution. The means of execution with respect to lethal injection executions includes the qualifications of the IV team members. 12:07:31 It then becomes the State's burden to demonstrate that they cannot provide those without hindering a compelling interest.

THE COURT: What do you mean by qualifications of the IV team members? 710 already sets out, in a generic way, what the qualifications of the IV team members are. 12:07:44

MR. LANGFORD: And we're not saying that there's any problem with the State defining the qualifications that it wants these, but we think it encompasses anything licensing, any sort of criminal background check, any sort of CV that's available, and if the State needs to redact it in order to 12:08:00 produce what is disclosable, but we're not saying that identities are disclosable under the statute, to be clear.

And Your Honor, this brings me to a second and related point on two issues, which is the sufficiency of Carson McWilliams' declaration. This declaration says that if forced 12:08:15

to disclose the qualifications, there is a risk that they could not obtain volunteers to perform lethal injection executions.

That is not sufficient. This declaration says that if the State is forced to disclose the identity of its source of drug suppliers, it would be more difficult, not impossible, more difficult to obtain lethal injection drugs. 12:08:34

THE COURT: Identifying the source of drugs used in lethal injections will make it highly difficult, if not impossible, for the Arizona Department of Corrections --

MR. LANGFORD: And in -- 12:08:43

THE COURT: -- to acquire such drugs. So why doesn't that create at least an issue of fact?

MR. LANGFORD: It doesn't based explicitly on the Ninth Circuit's decision in Otter.

THE COURT: I've read it. 12:08:56

MR. LANGFORD: And --

THE COURT: And it seems to me that that's a very different affidavit.

MR. LANGFORD: Your Honor, this is not supported by any evidence in the record. This is simply assertions not based on personal knowledge. 12:09:04

THE COURT: So I -- he says: I am responsible for the planning and overall direction of all pre-execution, execution, and post-execution activities. I have been tasked with locating suppliers of lethal injection drugs. Lethal injection 12:09:17

drugs -- then he goes down and says specific instances in which he's presumably involved in which suppliers have come back and said, I'm not going to do this any more because you're supplying, and then after their identities were made known they dropped off the list. I mean, even if he can't say as a matter 12:09:36 of hearsay what the suppliers told him their reason was, there is an inference that can be drawn from the facts that he sets forth, isn't there?

MR. LANGFORD: Sure, but I better -- sure, and I don't think that it's necessary to go down this path. If you agree 12:09:48 that the states don't -- that State of Arizona doesn't have a compelling interest in lethal injections generally; it has a compelling interest in conducting executions. And so even if they could show that they couldn't obtain lethal injection drugs, it wouldn't be enough to overcome the First Amendment 12:10:03 right of access. And that's why I want to go back and my --

THE COURT: Two more -- two more remaining points.

MR. LANGFORD: Two more remaining points, the third being the sort of big picture here, and then I'll come back to your question about 13-757(C), because I understand you have 12:10:14 concerns about how to rule in light of the state statute.

With respect to the big picture here, we are asserting -- there is no such thing as a secret execution. We know that from California First Amendment. We know that the right to view an execution, as you pointed out, is more than 12:10:29

having the State come out and say: It's done. We shot him. It's over. It has to be more than that. And how much further is a -- is the question that this case presents.

We're saying it encompasses the means of information, the critical information. That is a history that is established through hangings, through lethal gas executions, and even in lethal injections, when the -- when people knew that Hospira provided Arizona with sodium thiopental. There is a history of access of that sort of information, and there is a clear logic of access to that sort of information. You need look no further than Wood's botched execution. 12:10:47 12:11:13

THE COURT: 757(C).

MR. LANGFORD: To 757(C). And with Your Honor's permission, I want to just make clear, with respect to your firing squad example, it is not necessary to know the identity of the -- the trigger-pullers. It is probably not necessary to know who has the blank. It is probably not necessary to know who has which rifle. 12:11:26

THE COURT: Doesn't that work against your argument that you're entitled to know the qualifications of the people who are in the chemical room? 12:11:42

MR. LANGFORD: We're not saying we're entitled to know the qualifications of the people in the chemical room. We're saying we're -- we're entitled --

THE COURT: -- said you to be saying that. 12:11:51

MR. LANGFORD: I am saying there's a First Amendment right of access to the means of execution. That is the principle here. That is a general principle that will apply across execution methods.

Here it means we need the qualifications. It's important, because without that, we can't know the execution is being carried out -- 12:12:04

THE COURT: Okay. You're well over time.

Do you want to wrap up real quick?

MR. LANGFORD: Sure. I would like to address your 13-757(C) question. 12:12:12

THE COURT: I'm going to give you one minute to do it.

MR. LANGFORD: Yes, Your Honor. The question, as you asked your -- you know, is it capable of being applied constitutionally? Our answer with respect to the identity of the drug suppliers is no, it is not, in part because Arizona doesn't have the compelling interest in lethal injections per se, and in part -- 12:12:23

THE COURT: It doesn't say it has to be compelling. Press-Enterprise does not identify compelling. It says a substantial interest, right? A substantial chance of a -- of an important interest or something? 12:12:35

I'll have to look. Maybe it says "compelling." I'll look again.

MR. LANGFORD: Yes, Your Honor. With respect to the 12:12:16

qualifications of the team members, our position is that if the State can show that by iden- -- by revealing qualifications including the CV, licensure, sort of background checks that the State does, then perhaps the protections afforded by 757(C) are appropriate for that set of information, but the State hasn't done that here. 12:13:03

We thank you very much --

THE COURT: Well, you haven't provided what kind of information you wanted, though, have you?

MR. LANGFORD: We've asked for the actual qualifications. We actually don't know -- 12:13:14

THE COURT: But again, when you're talking about qualifications, it may be that some qualifications don't risk identifying somebody, but some do. And you haven't specified what qualifications you want, so I don't know how you expect the State to respond -- 12:13:27

MR. LANGFORD: So --

THE COURT: -- other than to say just requiring qualifications more than we've already provided could risk being identified. 12:13:35

MR. LANGFORD: Your Honor, I think this goes to actually a fairly nuanced question, which is that the First Amendment right of access applies to what the State knows, not the private actors. We're not asking the State to go out and do extra qualification checks and provide those. What we are 12:13:45

asking for is that -- the information that the State already possesses. We know from --

THE COURT: Well, it can be -- that still could be identifying, depending upon what it is.

MR. LANGFORD: Absolutely, Your Honor, but the State hasn't identified what those records are, and it hasn't made the case -- 12:13:56

THE COURT: So what --

MR. LANGFORD: -- that it identified.

THE COURT: -- does the First Amendment -- I have asked you this. I stated it in the -- 12:14:02

MR. LANGFORD: Yeah.

THE COURT: -- first part. The First Amendment doesn't create any obligation in the State to create any qualifications for these people, does it? 12:14:12

MR. LANGFORD: No, Your Honor, absolutely.

THE COURT: And so we don't even know --

MR. LANGFORD: But --

THE COURT: -- aside from the ones that they have already published if there are any qualifications. 12:14:22

MR. LANGFORD: Absolutely, Your Honor, and that goes precisely to our point. If the State of Arizona is carrying out executions with people who they have not checked the qualifications of and who they are not documenting the backgrounds of, that is an important fact for the people of 12:14:32

Arizona to know, and --

THE COURT: But you can't manufacture a First Amendment right in the information unless you specify what information specifically you're seeking for this Court to determine that it doesn't risk identifying the person involved. 12:14:44

MR. LANGFORD: With your permission, we would be happy to submit a brief setting out the sorts of information we are seeking here.

THE COURT: And then we would just sort of like just reschedule this forever and forever and forever? I'm not going 12:14:55 to allow it. But I appreciate the invita- -- I appreciate the request.

MR. LANGFORD: Your Honor, we very much appreciate your questions and the thoughtful argument. In closing, quickly, we would just ask that this Court issue declaratory 12:15:12 and injunctive relief making clear that the First Amendment right of access attaches to the information we're seeking here, and making clear that Arizona has not carried its burden in demonstrating that right has been overcome, and requiring Arizona to produce that information. 12:15:29

THE COURT: Thank you.

MR. LANGFORD: Thank you.

THE COURT: Mr. Sparks.

MR. SPARKS: Just to briefly address the request to view the execution room one more time. 12:15:42

THE COURT: Yeah.

MR. SPARKS: I think if you look at the right of access to courtroom proceeding cases, there's no doubt that the public has a right to attend a trial and to watch what happens, to be in the courtroom. But there are parts of that that happens that the public doesn't see or hear. There are bench conferences -- 12:15:52

THE COURT: Yeah, but we're really talking about California First here, right?

MR. SPARKS: We are, but we're talking -- 12:16:04

THE COURT: And California First really related to an execution in a prison, which is a lot more analogous to this, which is an execution in a prison, right?

MR. SPARKS: Right.

THE COURT: So isn't California First the really most applicable precedent? 12:16:17

MR. SPARKS: It is the most directly applicable. And I'm not -- but I'm not sure that it specifically answers the question of whether the right of access includes to view what happens in that other room. 12:16:36

THE COURT: Well, it does say the totality of the execution, right?

MR. SPARKS: It does, but again, the focus, especially in the Court's reasoning for finding a right, the focus is on the inmate and what's happening to the inmate, and that's how 12:16:48

the public can determine whether what's happening is humane or not, or something that the public thinks should be done or shouldn't be done.

THE COURT: Well, is it irrelevant, for example, in the case of Mr. Wood, that there were 14 lethal injections? Is that irrelevant to the public's ability to evaluate what's happening to Mr. Wood, to know how many times he'd received lethal injections and what his reactions are? 12:17:03

MR. SPARKS: I think the important thing is that the public was able to watch the inmate, and as -- as I've shown here -- 12:17:25

THE COURT: But isn't it informed -- I mean, if we're trying to really find out how this is affecting the inmate, if that's what it's limited to, isn't it informative to know when and how -- when and how many lethal injections he received? 12:17:42

MR. SPARKS: It certainly would be informative, but I don't think that -- that the facts --

THE COURT: I mean, in terms of how it affected him and the public's ability to assess that, right?

MR. SPARKS: It would be informative, but I don't think the fact that something would be informative necessarily makes it part of the right of access. 12:17:57

THE COURT: Well, it may not, except for you haven't been able to yet give me, I don't think, any legitimate penological objective in light of the limited request that 12:18:12

plaintiffs are making to know the number of lethal injections received. One last chance.

MR. SPARKS: Again, I would -- I would just stand on the -- on the idea that -- that allowing the witnesses to view into that room where those team members are working, there -- 12:18:29 there's a risk of their anonymity being lost.

THE COURT: All right. And again, I think Mr. Sparks made clear they're not asking to see the people; they want to see the lethal injection site.

MR. SPARKS: So I suppose it goes to the -- the 12:18:42 logistics and the --

THE COURT: Or Mr. Sparks, it's not Mr. Sparks, I'm sorry. I got you confused. Anyway, go ahead.

MR. SPARKS: Sure. And -- you know, I don't know that plaintiffs have suggested how they want that to happen. 12:18:59

THE COURT: Well, I don't know that they have to suggest how they want it to happen, do they? If it's part of the -- if I determine that it is part of the execution that they're entitled to see, then you have to figure out how to make that happen. 12:19:16

MR. SPARKS: That is correct.

THE COURT: Okay. Thank you both. I appreciate your willingness to participate in argument that I think was focused and designed to help me. It requires, of course, that I ask some pretty pointed questions. I appreciate your willingness 12:19:31

to take the questions and give the best answers that you could. I will issue the decision as shortly as I can. Thank you.

MR. SPARKS: Thank you.

(Proceedings concluded at 12:19 p.m.)

C E R T I F I C A T E

I, GARY MOLL, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 31st day of October, 2016.

s/Gary Moll