WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Guardian News & Media LLC, et al., | No. CV-14-02363-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| Charles L. Ryan, et al., | |
| Defendant. | |

Pending before the Court are the Motion for Summary Judgment by Plaintiffs Arizona Republic, Associated Press, Guardian News & Media LLC, KPHO Broadcasting Corporation, KPNX-TV Channel 12, and Star Publishing Company (Doc. 43), and the Motion for Summary Judgment by Defendant Charles L. Ryan (Doc. 45). For the following reasons, the Court grants in part and denies in part Plaintiffs' motion, and denies Defendant's motion.

## BACKGROUND

This case concerns the extent to which the press and the public are entitled to view executions in Arizona and to obtain information relating to those executions. Plaintiffs are members of the news media. They contend that the press and the public have a First Amendment right to view aspects of executions that are not currently open to public view pursuant to state policies. (Doc. 1 at 11.) They also contend that the press and the public have a First Amendment right to certain information about executions—specifically, the "source, composition, and quality" of the drugs used and the "qualifications" of those involved in the execution. (*Id.*) Plaintiffs seek a declaratory judgment that these rights

1   exist and an injunction prohibiting the State from violating them.  (*Id.* at 11–12.)

2      Executions in Arizona are conducted pursuant to Arizona Revised Statutes

3   ("A.R.S.") §§ 13-757 and 13-758, and Arizona Department of Corrections ("ADC")

4   Department Order 710, (Doc. 52-1 at 1, PDF 7).  Department Order 710 is a public

5   document; the most recent version, effective as of October 23, 2015, is available online at

6   https://corrections.az.gov/sites/default/files/policies/700/0710_-_effective_10-23-15.pdf.

7   Various provisions in the state statute and in Department Order 710 relate to the

8   information to which Plaintiffs assert a right of access.

9      The parties have filed cross-motions for summary judgment on whether, and the

10  extent to which, the First Amendment grants the access Plaintiffs seek and overrides any

11  state statutory provisions to the contrary.

12                                   **DISCUSSION**

13  **I.    Legal Standard**

14      The Court grants summary judgment when the movant "shows that there is no

15  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

16  of law."  Fed. R. Civ. P. 56(a).  In making this determination, the Court views the

17  evidence "in a light most favorable to the non-moving party."  *Warren v. City of*

18  *Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995).  Where the parties have filed cross-motions

19  for summary judgment, the Court "evaluate[s] each motion independently, 'giving the

20  nonmoving party in each instance the benefit of all reasonable inferences.'"  *Lenz v.*

21  *Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2015) (quoting *ACLU v. City of*

22  *Las Vegas,* 333 F.3d 1092, 1097 (9th Cir. 2003)).  Even when both parties assert that

23  there is no uncontested issue of material fact and seek summary judgment, the Court must

24  make its own determination whether a dispute exists and may deny summary judgment to

25  both if appropriate.  *See United States v. Fred A. Arnold, Inc.*, 575 F.2d 605, 606 (9th Cir.

26  1978) (per curiam).  "[A] party seeking summary judgment always bears the initial

27  responsibility of informing the district court of the basis for its motion, and identifying

28  those portions of [the record] which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

## II.   Analysis

Plaintiffs assert the right to view the totality of the execution. Plaintiffs also assert a right to more information than can be gathered from simply being present and witnessing the totality of the execution. Specifically, they seek (1) information about the "composition" and "quality" of the lethal execution drugs, (2) information about the qualifications of those who perform the execution, and (3) the identity of the source or sources of the lethal injection drugs.

1  Plaintiffs claim that each of these asserted rights derives from the First
2 Amendment right of access.  Beginning in the 1980s, in a series of cases dealing with
3 criminal proceedings, the Supreme Court recognized that "[f]ree speech carries with it
4 some freedom to listen."  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576
5 (1980).  "In guaranteeing freedoms such as those of speech and the press, the First
6 Amendment can be read as protecting the right of everyone to *attend* trials so as to give
7 meaning to those explicit guarantees."  *Id.*  (emphasis added).  Though this "right of
8 access" was initially recognized in the context of criminal trials, the Supreme Court
9 described it in language that could apply to other government proceedings.  *See, e.g.*,
10 *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–05 (1982) (describing the
11 right of access as "protect[ing] the free discussion of governmental affairs" and
12 "ensur[ing] that this constitutionally protected discussion of governmental affairs is an
13 informed one").

14  To determine whether there is a First Amendment right of access to a government
15 proceeding, courts consider two "complementary considerations":  (1) whether the
16 proceeding has "historically been open to the press and general public" and (2) "whether
17 public access plays a significant positive role in the functioning of the particular process
18 in question."  *Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 8–9 (1986) ("*Press-*
19 *Enterprise II* ").  "These considerations of experience and logic are, of course, related, for
20 history and experience shape the functioning of governmental processes."  *Id.* at 9.
21 Where a government proceeding passes the "tests of experience and logic," there arises
22 "a qualified First Amendment right of public access."  *Id.*  But even then, the right of
23 access "is not absolute."  *Id.*  The government may still close a proceeding to which a
24 right of access attaches by showing a sufficient justification to do so.  *Id.* at 13–14.  The
25 burden the government must meet to justify closure depends on the type of proceeding.
26 *Compare Globe Newspaper*, 457 U.S. at 606–07 ("Where . . . the State attempts to deny
27 the right of access in order to inhibit the disclosure of sensitive information, it must be
28 shown that the denial is necessitated by a compelling governmental interest, and is

narrowly tailored to serve that interest."), *with Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 877 (9th Cir. 2002) (applying a more deferential standard to closure of executions).   Regardless of the standard applied, "*Press-Enterprise II* balances the vital public interest in preserving the media's ability to monitor government activities against the government's need to impose restrictions if necessary for safety or other legitimate reasons." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).  "Under this framework, a court cannot rubber-stamp an access restriction simply because the government says it is necessary." *Id.*  "[C]ourts have a duty to conduct a thorough and searching review of any attempt to restrict public access." *Id.*

### A.    The Right to View the Totality of the Execution Proceeding

Here, Plaintiffs seek the right "to see and hear the totality of an execution, including whether the State is administering additional doses of lethal injection drugs." (Doc. 1 at 11.)  For example, during the execution of Joseph R. Wood on July 23, 2014, witnesses could see Wood but could not see the execution team administering additional doses of the lethal injection drugs after the initial dose failed to induce death.  Witnesses could "watch and listen via closed-circuit television as two IV lines were inserted into Mr. Wood inside the death chamber," but then "[a]fter the IVs were set, the closed-circuit television was turned off, the curtains to the chamber were opened, and the audio allowing witnesses to hear inside the chamber were shut off."  (Galvan Decl., Doc. 47-1 at 174, ¶¶ 3–5.)  "For the remainder of the execution, the views of the observers were restricted to line-of-sight observation of Wood from a distance.  Observers could not see where the drugs were mixed and injected into the IV lines."  (*Id.* at 174 ¶ 6.)  The observers were unable to view execution team members administering the additional doses and were therefore "completely unaware while observing the execution that additional doses were being administered."  (*Id.* at 175 ¶ 15.)

Though Department Order 710 does not fully describe the layout of the execution complex, it identifies three rooms relevant to the Court's analysis.  The "execution room" is where the defendant is secured to a gurney, connected to IVs, and, eventually,

executed.  (Doc. 52-1 at PDF 35, Dep't Order 710-D(D).)  The "chemical room" is where the "Special Operations Team" prepares the drugs and syringes.  (*Id.* at PDF 31, Dep't Order 710-D(B).)  Eventually, the drugs are injected into the IV lines from this room as well. (*Id.* at PDF 37, Dep't Order 710-D(F)(3).)  Witnesses are located in the "witness room."  (*Id.* at PDF 36, Dep't Order 710-D(D)(10).)  While members of the "IV Team," in the execution room, place the IV catheters, witnesses in the witness room observe the process via audio and video feeds.  (*Id.*)  The audio feed from the execution room is turned off prior to the administration of lethal chemicals.  (*Id.*)  At some point after the IVs are placed, witnesses are able to view the defendant directly through a window between the execution room and the witness room.  The curtains on this window may be closed, however, at the direction of the Director of ADC.  (*Id.* at PDF 37, Dep't Order 710-D(F)(5).)  At no point do witnesses have audio or visual information about what is happening in the chemical room.

A.R.S. § 13-758 regulates who may be present at executions.  Plaintiffs do not challenge any specific provision of that statute, but rather some of the state practices which delineate what witnesses may and may not see.  Plaintiffs note, for example, that they are unable "to see and hear the totality of an execution, including whether the State is administering additional doses of lethal injection drugs." (Doc. 1 at 11.)  According to Plaintiffs, "ADC violates this access right by excluding the administration of drugs from observation, leaving witnesses unaware of the administration of doses beyond those called for by its protocol."  (Doc. 43 at 7.)  Plaintiffs also challenge a provision of Department Order 710 that authorizes the ADC Director to "direct the curtains to the witness viewing room be closed, and, if necessary, for witnesses to be removed from the facility."  (Doc. 52-1 at PDF 37, Dep't Order 710-D(F)(5).)

In *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), the Ninth Circuit addressed a California execution protocol that prevented witnesses from observing the execution until after the prisoner had been strapped down and the IV lines inserted.  *Id.* at 871.  The Ninth Circuit applied the *Press-Enterprise II*

test in determining that the public and the press have a right of access to executions.  The Court concluded:  (1) "[t]he public and press historically have been allowed to watch the condemned inmate enter the execution place, be attached to the execution device and then die," and (2) "[i]ndependent public scrutiny—made possible by the public and media witnesses to an execution—plays a significant role in the proper functioning of capital punishment."  *Id.* at 876.  The Court determined that "[b]ecause there is both an historical tradition—beginning with entirely public executions and continuing with the practice of inviting official witnesses—and a functional importance of public access to executions, both prongs of the [experience and logic test] have been satisfied."  *Id.* at 877.  In scope, this right is the right to view the entirety of a criminal execution, "from the moment the condemned is escorted into the execution chamber, including those initial procedures that are inextricably intertwined with the process of putting the condemned inmate to death."  *Id.* The same logic applies with equal force to the administration (or subsequent administrations) of doses of the lethal injection drugs when and if such additional injections are deemed necessary.

The Ninth Circuit also determined that the standard for determining whether the right of access to view executions can be overcome is the "unitary, deferential standard for reviewing *prisoners*' constitutional claims," even though restricting the public's right of access to executions affects "the rights of outsiders rather than prisoners."  *Id.* at 877–78 ("Because the executions at issue here take place within prison walls . . . and are staffed by the same personnel who participate in the daily operations of the prison, our level of scrutiny must be guided by the line of cases addressing constitutional challenges to prison regulations, rather than by those governing access to governmental proceedings.").  This "hands-off approach" is applied to issues of prison administration because the nature of such problems is "peculiarly within the province of the legislative and executive branches of government."  *Id.* (quoting *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974)).  In applying this deferential standard, a court must determine "whether the regulation 'is reasonably related to legitimate penological objectives, or

1  whether it represents an exaggerated response to those concerns.'"  *Id.* at 878 (quoting

2  *Turner v. Safley*, 482 U.S. 78, 87 (1987)).  However, the Ninth Circuit determined that

3  because a restriction on the public's right to view executions is "broad in nature," there

4  must be a "closer fit" than usual between the restriction and the state's interest in the

5  security of those involved in executions.  *Id.* at 879.

6       Plaintiffs identify two ways in which Department Order 710 falls short of allowing

7  the press and the public the access to which they are entitled.  The first is ADC's failure

8  to provide a means of viewing the administration of lethal injection drugs, including the

9  administration of additional or subsequent doses of the drug.  Defendant has not

10  established that the failure to provide this access "is reasonably related to legitimate

11  penological objectives" and does not "represent[] an exaggerated response to those

12  concerns."  *Turner*, 482 U.S. at 87.  Defendant's assertion that "physical and logistical

13  difficulties exist, given that the drugs are administered into the IV lines in a separate

14  room," (Doc. 53 at 10), carries no weight in the absence of any indication of what those

15  difficulties might be, particularly since closed-circuit televisions are already used to allow

16  witnesses to view the insertion of the IV lines.  *See* Fed. R. Civ. P. 56(c) ("A party

17  asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to

18  particular parts of the record . . . or (B) showing that the materials cited do not establish

19  the presence of a genuine dispute . . . .").  Defendant mentions ADC's interest in

20  "protecting the anonymity of personnel in the room where the drugs are administered,"

21  (Doc. 53 at 10), but this assertion fails factually and legally.  If ADC can maintain the

22  anonymity of its personnel while focusing a camera on the IV placement site, as provided

23  for in Department Order 710-D(D)(10), there is no reason it cannot likewise focus a

24  camera on the area in the chemical room in which syringes are injected into the IV line.

25  Alternatively, the Ninth Circuit has held that "[t]he use of surgical garb is a practical

26  alternative to restricting access to witness lethal injection executions in order to conceal

27  the identity of such execution staff should security concerns warrant such concealment."

28  *Associated Press v. Otter*, 682 F.3d 821, 825 (9th Cir. 2012) (quoting *Cal. First*

1    *Amendment Coal.*, 299 F.3d at 884).   Indeed, Department Order 710-D(G)(4) already

2    calls for the IV Team Leader to be "dressed in a manner to preserve their anonymity."

3    By failing to provide for the contemporaneous awareness[1] of the administration of drugs,

4    ADC violates Plaintiffs' right of access, without a legitimate penological purpose for

5    doing so.

6         The second problem is the Director's discretionary authority to "direct the curtains

7    to the witness viewing room be closed, and, if necessary, for witnesses to be removed

8    from the facility."  (Doc. 52-1 at PDF 37, Dep't Order 710-D(F)(5).)  Of course, the right

9    to view executions may be burdened if the state can show legitimate penological reasons

10   for ordering a closing of a particular execution, so long as there is a "close fit" between

11   the means of closing the execution and the ends sought.  But Department Order 710 does

12   not cabin the Director's authority in this or any other way.  It may be, as Defendant

13   asserted at oral argument, that the Director would only exercise this authority in a

14   situation where legitimate penological objectives called for it.  But, a court should not

15   "uphold an unconstitutional statute merely because the Government promises to use it

16   responsibly."  *United States v. Stevens*, 559 U.S. 460, 480 (2010).  Nor is the prospect of

17   retrospective relief, should the Director use this authority improperly, sufficient to save

18   the provision as written.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First

19   Amendment freedoms, for even minimal periods of time, unquestionably constitutes

20   irreparable injury.").  This provision violates Plaintiffs' First Amendment right of access

21   without legitimate penological justification.

22        The Court therefore grants summary judgment to Plaintiffs on this issue.

23   Defendants are permanently enjoined from conducting lethal injection executions without

24   providing a means for witnesses to be aware of the administration(s) of lethal drugs, and

25   from invoking Department Order 710-D(F)(5) as currently written to close the viewing of

26   _____

27   [1] Plaintiffs' pleadings assert a right to "see and hear" the administration of drugs.
     However, at oral argument, Plaintiffs clarified that they do not seek an audio feed into the
28   chemical room, and conceded that a video feed showing the administration of drugs
     would satisfy the asserted right of access.

an execution absent the existence of a legitimate penological objective which would merit such closure.

### B.    The Right to Obtain Information About Executions

In addition to seeking unrestricted access to the execution proceeding itself, Plaintiffs also seek access to information about (1) the "composition"[2] and "quality" of the lethal injection drugs, (2) the qualifications of those performing the executions, and (3) the identity of the source or sources of lethal injection drugs.  Both state statutory law and Department Order 710 speak to the extent of access currently allowed as to this information.

If the execution involves the use of any compounded chemicals, Department Order 710 specifies that the compounded chemicals must be "obtained from a certified or licensed compounding pharmacist or compounding pharmacy in good standing with their licensing board."  (Doc. 52-1 at PDF 32, Dep't Order 710-D(C)(2).)  The Inspector General's Office reviews the licensing, certification, and criminal history of the compounding pharmacist or pharmacy.  (*Id.*)  As of the October 23, 2015 revision to Department Order 710,[3] "[a] qualitative analysis of the compounded chemical to be used in the execution shall be provided upon request within ten calendar days after the state seeks a Warrant of Execution."  (*Id.*)

Department Order 710 describes the medical training required to participate in the "Intravenous Team" ("IV Team"), which is responsible for inserting intravenous lines.  The IV Team comprises "any two or more of the following:  physician(s), physician assistant(s), nurse(s), emergency medical technician(s) (EMT's), paramedic(s), military corpsman or other certified or licensed personnel including those trained in the United States Military."  (Doc. 52-1 at PDF 12, Dep't Order 710.03.1.2.5.1.)  All members of the IV Team must be "currently certified or licensed within the United States to place IV

---

[2] Plaintiffs do not define "composition" in their Complaint.  A full reading of Plaintiffs arguments and evidence indicates that "composition" includes information about concentration and potency.

[3] The October 23, 2015 revision was published after the complaint in this case was filed.

lines." (*Id.*)

By statute, "[t]he identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in records that would identify those persons is confidential and is not subject to disclosure . . . ." A.R.S. § 13-757(C).  Citing the statute, Department Order 710 also addresses confidentiality, in an introductory section entitled "Important Guidelines Regarding Confidentiality and Voluntariness of Participation in an Execution."  (Doc. 52-1 at PDF 8.)  It provides that "[t]he anonymity of any person . . . who participates in or performs any ancillary function(s) in the execution, including the source of the execution chemicals, and any information contained in records that would identify those persons are, as required by statute, to remain confidential and are not subject to disclosure." (*Id.*)

Determining whether these provisions violate Plaintiffs' First Amendment right of access requires an examination of just how far that right of access extends.  As a general matter, the First Amendment does not guarantee "a right of access to government information or sources of information within government control." *Houchins v. KQED*, 438 U.S. 1, 15 (1978) (plurality opinion).  The *California First Amendment Coalition* decision addressed only the right to *view* executions and did not address whether there was a right to access related information.  Generally, simply because the public and the press have a right to access a proceeding does not automatically imply a right to information about the proceeding.  In the context of *some* judicial proceedings, the Ninth Circuit has found a right of access to *some* related documents but not others.  *See, e.g.*, *CBS, Inc. v. U.S. Dist. Court*, 765 F.2d 823, 825 (9th Cir. 1985) ("We begin with the presumption that the public and the press have a right of access to criminal proceedings *and documents filed therein*.") (emphasis added); *Associated Press v. U.S. Dist. Court*, 705 F.2d 1143, 1145 (9th Cir. 1983) (noting that pretrial documents "are often important to a full understanding" of the judicial process and thus "[t]here is no reason to distinguish between pretrial proceedings and the documents filed in regard to them").  So, too, has the Supreme Court.  *Press-Enterprise II* itself involved the right of access to a

document: a transcript of a preliminary hearing.  478 U.S. at 5.

But the right of access to a given proceeding does not automatically grant a right to access all information related to that proceeding, or even all information that would help in meaningfully understanding the proceeding.  *See First Amendment Coal. of Ariz. v. Ryan*, No. CV-14-01447-PHX-NVW, 2016 WL 2893413, at *13 (D. Ariz. May 18, 2016) ("The public's First Amendment right to view court proceedings does not reach back to sitting in on the police's, the prosecutor's, or the judge's preparation for the proceeding.").  Transcripts of hearings on a motion to seal would certainly help the public understand the underlying criminal proceeding.  But they are not subject to a right of access.  *See In re Copley Press, Inc.*, 518 F.3d 1022, 1027–28 (9th Cir. 2008).  Access to a presentencing investigation report prepared by a court's probation department would help the public understand a sentencing hearing.  But while there is a First Amendment right of access to sentencing hearings, *see United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012), whether there is a right of access to presentence investigation reports requires a case-by-case, common law analysis.  *See United States v. Schlette*, 842 F.2d 1574, 1582–84 (9th Cir. 1988).

To extend *California First Amendment Coalition* to cover all related documents and information that would help more fully understand the execution goes beyond its holding.  Rather, if information about executions is encompassed by a First Amendment right of access, that right of access is best determined by an independent application of the *Press-Enterprise II* test to the specific information sought.  *See In re Boston Herald, Inc.*, 321 F.3d 174, 184 (1st Cir. 2003) ("[T]he First Amendment does not grant the press or the public an automatic constitutional right of access to every document connected to judicial activity. Rather, courts must apply the *Press-Enterprise II* standards to a particular class of documents or proceedings and determine whether the right attaches to that class."); *United States v. Corbitt*, 879 F.2d 224, 228–29 (7th Cir. 1989) ("[T]he press' right of access to documents submitted for use in a hearing must be considered separately from the press' right to attend the hearing itself.").

Unlike the right to view executions, the existence of a right to access information about executions has not been decided in the Ninth Circuit.[4]  The Ninth Circuit has noted that the *Press-Enterprise II* test is used "to evaluate right of access claims in a variety of nonjudicial contexts."  *See Courthouse News Serv., Inc. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014) (citing *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 960 F.2d 105, 109 (9th Cir. 1992)).  The Court therefore applies the *Press-Enterprise II* test here.

Initially, however, this challenge occurs not with respect to any pending execution but with respect to Arizona's execution policy on its face.  Facial challenges are generally "disfavored."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).  Courts should be cautious in declaring statutes unconstitutional where claims o facial invalidity "rest on speculation" and thereby anticipate questions of constitutional law that may not need to be addressed.  *Id.*  Courts have discretion to deny summary judgment when the factual record is underdeveloped.  *See Askew v. Hargrave*, 401 U.S. 476, 478–79 (1971) (per curiam) (finding summary judgment inappropriate when "pleadings and an affidavit" were inadequate to decide the claim and holding that the "claim should not be decided without fully developing the factual record at a hearing").  This is especially so when a court is asked to resolve a First Amendment facial challenge through a declaratory judgment at the summary judgment stage.  *See Eccles v. Peoples Bank of Lakewood Village, Cal.*, 333 U.S. 426, 434 (1948) ("Caution is appropriate against the subtle tendency to decide public issues free from the safeguards of critical scrutiny of the facts, through use of a declaratory summary judgment."); *Nation Magazine v. U.S. Dep't of Def.*, 762 F. Supp. 1558, 1572 (S.D.N.Y. 1991) (declining to

---

[4] Two courts in this district have considered the question and reached opposing conclusions.  *Compare Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668 (D. Ariz. Oct. 7, 2013), *with Wood v. Ryan*, No. CV-14-1447-PHX-NVW (JFM), 2014 WL 3385115 (D. Ariz. July 10, 2014), *rev'd*, 759 F.3d 1076 (9th Cir. 2014), *vacated*, 135 S. Ct. 21 (2014).  The Ninth Circuit reversed the latter decision and noted in the course of granting a preliminary injunction that there was a "serious question[] as to whether a First Amendment right, in the context of executions, attaches to" information about drug manufacturers and qualifications of executioners.  *Wood v. Ryan*, 759 F.3d 1076, 1086 (9th Cir. 2014, *vacated*, 135 S. Ct. 21 (2014).  That decision was subsequently vacated by the Supreme Court.  *Ryan v. Wood*, 135 S. Ct. 21 (2014).

1    "grant plaintiffs' request for declaratory relief on their right of access claim" when issues

2    were "presented in a highly abstract form" and "a full record [was not] available").  With

3    this in mind, it is clear even without going through the *Press-Enterprise II* analysis that

4    several of the issues are not appropriate for summary judgment at this time.

5                    **1.       Composition and Quality of the Execution Drugs**

6            On October 23, 2015, after Plaintiffs filed their motion for summary judgment,

7    ADC promulgated a revised version of Department Order 710.  (*See* Doc. 52 at ¶ 13.)

8    Department Order 710 now provides that "[i]f any compounded chemical is used" in the

9    execution, "[a] qualitative analysis of the compounded chemical . . . shall be provided

10   upon request within ten calendar days after the state seeks a Warrant of Execution."

11   (Doc. 52-1 at PDF 32, Dep't Order 710-D(C)(2).)  Plaintiffs still assert that "[t]his

12   revised protocol does not indicate that ADC will make public information about the

13   source, composition, or quality of the execution drugs."  (Doc. 52 at ¶ 14.)  A plain

14   reading of the policy, however, indicates that ADC will do exactly that, at least with

15   respect to compounded chemicals.  It would, after all, be a deficient "qualitative analysis

16   of the compounded chemical to be used" that did not adequately and fairly disclose the

17   composition and quality of the drug.  Because Department Order 710 requires ADC to

18   provide an advance "qualitative analysis of the compounded chemical" that ADC will use

19   in the execution, and because Plaintiffs have not yet requested or received such a

20   qualitative analysis, there is presently no sufficient factual basis for the Court to conclude

21   that the state's procedures for disclosing information about compounded chemicals

22   violates any First Amendment rights that Plaintiffs may have to such information").  And

23   while the new policy makes no provision for a qualitative analysis of non-compounded

24   chemicals, Plaintiffs have thus far focused their arguments on the need for information

25   about compounded drugs.  At this point, there has been neither evidence nor argument

26   respecting a demand or need for information about the quality and source of non-

27   compounded drugs.  It would be, at best, premature for the Court to rule that the state

28   policy in this respect is unconstitutional.  *See A.L. Mechling Barge Lines, Inc. v. United*

*States*, 368 U.S. 324, 342 (1961) ("We think that sound discretion withholds the remedy [of declaratory judgment] where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted.").  Summary judgment is therefore denied to both parties as to whether there is a right of access to information about the "composition" and the "quality" of the drugs.

### 2.    Qualifications of Execution Personnel

There is also a problem with Plaintiffs' request for information about the "qualifications of those chosen to administer" the lethal injection drugs.  (Doc. 43 at 1.) Plaintiffs do not specify the nature of the qualifications they believe the First Amendment requires to be disclosed in addition to those that are already disclosed by Department Order 710.[5]  Plaintiffs make no argument that the First Amendment requires the government to establish particular qualifications, only that the First Amendment requires unspecified "qualifications" to be disclosed to the public.  Yet, state statutory law prohibits the disclosure of any information that would identify those who participate in or have ancillary functions in executions.   A.R.S. § 13-757(C) ("The identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in records that would identify those persons is confidential and is not subject to disclosure.").  An untethered requirement that a team member's "qualifications" be disclosed, which presumably would require disclosure beyond the generic qualifications already established by Department Order 710, risks disclosing information which could identify a team member.  Without knowing what qualifications Plaintiffs seek, the Court cannot determine whether the disclosure of such qualifications would violate the statute, and whether, if so, it would fall within the ambit of the First Amendment, through the *Press-Enterprise II* test or otherwise, to nevertheless

---

[5] Department Order 710 provides that the IV Team comprises "any two or more of the following:   physician(s), physician assistant(s), nurse(s), emergency medical technician(s) (EMT's), paramedic(s), military corpsman or other certified or licensed personnel including those trained in the United States Military."  (Doc. 52-1 at PDF 12, Dep't Order 710.03.1.2.5.1.)

1  compel the disclosure of such qualifications.  The Court cannot grant summary judgment

2  on such a generalized request.[6]  Therefore, the Plaintiffs' request for summary judgment

3  is denied as to qualifications.  Because it is not clear that Plaintiffs would be unable to

4  request qualification information that would not be identifying, however, Defendant's

5  motion is also denied.

6  ### 3.        Identities of the Sources of the Execution Drugs

7        Plaintiffs also seek to compel the identity of the sources of lethal injection drugs

8  despite the identity protection afforded by A.R.S. § 13-757(C).  In Department Order

9  710, ADC makes clear that the confidentiality granted by A.R.S. § 13-757(C) extends to

10  those who provide ADC with lethal injection drugs.  (Doc. 52-1 at PDF 8.)   The

11  compounding and/or preparation of such drugs constitutes at least an ancillary function to

12  an execution.   Plaintiffs argue that they have a qualified right of access to this

13  information pursuant to the First Amendment and the statute and policy are therefore

14  unconstitutional.  Further, because Plaintiffs seek to have a declaratory judgment entered

15  on the question as a matter of law, they seek a determination that the statute is

16  unconstitutional *per se* and is not capable of a constitutional application, at least as it

17  applies to withholding the manufacturer of lethal injection drugs.  The scope of Plaintiffs'

18  requests and, accordingly, the state laws and policies implicated, are clearer than in the

19  other requests for information.  Here, too, however, summary judgment is inappropriate,

20  as is revealed by an application of the *Press-Enterprise II* test to the facts of this case.

21        The burden is on the Plaintiffs to establish that the First Amendment entitles them

22  to obtain the identity of the lethal injection drug manufacturer despite the statute's

23  restriction on such information.   Plaintiffs contend that the "experience and logic"

24  analysis of *Press-Enterprise II, see* 478 U.S. at 8, demonstrates this entitlement.  The

25  _____

26  [6] Plaintiffs have clarified, at oral argument and in subsequent written submission to the
Court, that they seek "whatever information [the State] obtains about the relevant

27  qualifications of those appointed to the IV team." (Doc. 69 at 3 n.1.)  While this makes it
possible to *eventually* determine what that information is and whether it might run the

28  risk of identifying team members, the facts are insufficient to make that determination at
this point.

1   "experience" prong requires a court to consider whether the information at issue has

2   "historically been open to the press and general public." *Id.*  This inquiry is "significant

3   in constitutional terms not only 'because the Constitution carries the gloss of history' but

4   also because 'a tradition of accessibility implies the favorable judgment of experience.'"

5   *Globe Newspaper*, 457 U.S. at 605 (quoting *Richmond Newspapers*, 448 U.S. at 589

6   (Brennan, J., concurring in judgment)).  The historical inquiry "does not look to the

7   particular practice of any one jurisdiction, but instead to the experience in that *type* or

8   *kind* of hearing throughout the United States." *El Vocero de P.R. v. Puerto Rico*, 508

9   U.S. 147, 150 (1993) (internal quotation marks omitted). [7]

10      Plaintiffs characterize all of their requests for information as asking for

11   information about the "means" of the execution, to make sure that the "means" are

12   functioning properly.  (Doc. 43 at 13–14.)  The historical record Plaintiffs present does

13   lend support to a historical tradition of the public viewing of executions—a matter

14   already decided by *California First Amendment Coalition*.  It also suggests that in some

15   types of executions the public was able to inspect some of the instrumentalities of

16   execution.  For example, Plaintiffs proffer evidence that "hangings, the dominant method

17   of execution in the United States for most of American history, were usually public

18   events that were often viewed by large audiences," and that the witnesses "typically had

19   access to information about the instruments used to carry out the execution."  (Banner

20   Decl., Doc 47-1 at 19 ¶ 2.)  At jail-yard hangings, "some spectators carefully examined

21   the gallows before the execution, trying out the pulleys and the spring."  (*Id.* at 21 ¶ 11.)

22   Plaintiffs also proffer evidence that when the "first gas chamber execution in American

---

[7] The experience prong, however, may be less relevant if the proceeding at issue has undergone significant changes over time.  In *Seattle Times Co. v. U.S. Dist. Court*, 845 F.2d 1513, 1516 (9th Cir. 1988), the Ninth Circuit applied the *Press-Enterprise II* test to the issue of press access to briefs filed in a pretrial detention hearing.  The Court noted that changes in pretrial proceedings generally, and bail procedures specifically, meant that the traditional "informal procedures are no longer adequate." *Id.* at 1516.  This meant that "[u]nder these circumstances, the historical tradition surrounding bail proceedings is much less significant." *Id.*  The Court then found that the logic inquiry "weigh[ed] heavily in favor of a right of access to bail proceedings" and found a qualified right of access on that basis. *Id.* at 1516–17.

history" occurred, "[n]ewspapers reported that the lethal gas used in the Nevada execution was manufactured by the California Cyanide Company of Los Angeles." (Christianson Decl., Doc 47-1 at 42 ¶ 16.)

Nevertheless, Plaintiffs do not dispute that there are different levels of access to the different instrumentalities used in the different methods of executions. There does appear, within the application of some still-used historical execution techniques, a concern to keep confidential the identities of those involved in the execution from the public and, at times, even from the executioners themselves. For example, Plaintiffs' expert Stuart Banner describes, in a book he cites in his declaration, the manner in which firing squad executions in Nevada were carried out in the early part of the twentieth century:

> The firing squad was located in a tent to hide the sharpshooters' identity from the spectators. A target was placed over the condemned person's heart. Some of the guns were loaded with bullets and others with blanks, in a pattern not known to the shooters, so that none would know whether he was actually an executioner.

Stuart Banner, The Death Penalty: An American History 203 (2002).[8]

Similarly, A.R.S. 13-757(C) or its predecessor—the Arizona statute that affords confidentiality to those involved in even ancillary aspects of executions—has been in place since 1998, less than six years after Arizona adopted lethal injection as a method of execution. *See* 1998 Ariz. Sess. Laws ch. 232, § 1 (adding present-day A.R.S. § 757(C)); 1993 Ariz. Sess. Laws ch. 2, § 1 (adopting lethal injection). The State did disclose the identity of one of its suppliers in 2013, pursuant to a court order, and that information was apparently already available to the public. (Def's Resp. to Interrogatories, Doc. 47-1

---

[8] Similar measures were apparently taken in the 1977 execution of Gary Gilmore and the 2010 execution of Ronnie Lee Gardner, both executed in Utah by firing squad. *See The Law: After Gilmore, Who's Next to Die?*, Time, Jan. 31, 1977, http://content.time.com/time/magazine/article/0,9171,918639,00.html ("Hidden behind the curtain stood five riflemen armed with .30-.30 deer rifles, four loaded with steel-jacketed shells, the fifth with a blank."); Ray Sanchez, *Ronnie Lee Gardner Executed by Firing Squad in Utah*, ABC News, June 18, 2010, http://abcnews.go.com/GMA/Broadcast/convicted-killer-ronnie-lee-gardner-executed-utah/story?id=10949786 ("A team of five anonymous marksmen [stood] behind a brick wall cut with a gun port . . . . One rifle was loaded with a blank so no one knew who fired the fatal shot.").

1    at 205.)  But ADC has also refused to disclose the identities of drug suppliers on several

2    occasions.  (*Id.* at 204.)  And, as to the lessons to be drawn from this history, the affidavit

3    of Carson McWilliams in this matter suggests that disclosures that have been made have

4    resulted in a refusal by suppliers to provide execution drugs, in response to the negative

5    reaction by members of the public towards the manufacturer.  (*See* McWilliams Decl.,

6    Doc. 50-1 at 2–3.)

7          The historical inquiry requires an examination not just of local experience but of

8    the experience of the type or kind of proceeding throughout the United States.  *See El*

9    *Vocero de P.R.*, 508 U.S. at 150.  Some states have adopted laws barring the disclosure of

10   the identities of the suppliers of lethal injection drugs.[9]  Such laws are generally of recent

11   vintage, having been adopted within the past decade.   South Dakota, to take a

12   representative example, adopted statutory protections for executioner identities in 2008[10]

13   and extended that protection to drug suppliers in 2013.[11]   Other states that authorize

14   capital punishment have no such statutory protections.   Of course, the use of lethal

15   injection as a method of execution is itself a relatively recent development, dating back to

16   1977.  *See Baze v. Rees*, 553 U.S. 35, 42 (2008).  The actual practices of information

17   disclosure by various states since the adoption of lethal injection might well be

18   illuminating in determining the lessons of experience, but such evidence has not been

19   presented and is beyond the appropriate scope of judicial notice.  At least some states that

20   employ lethal injection have determined that disclosure of the identities of lethal injection

21   suppliers does not carry the "favorable judgment of experience," but the facts before the

22   Court at this point do not lend themselves to a broader conclusion than this on the

---

[9] *See, e.g.*, Okla. Stat. Ann. tit. 22, § 1015(B) (West 2016) ("The identity of all persons who participate in or administer the execution process and persons who supply the drugs, medical supplies or medical equipment for the execution shall be confidential . . . ."); S.D. Codified Laws § 23A-27A-31.2 (2016) ("The name, address, qualifications, and other identifying information relating to the identity of any person or entity supplying or administering the intravenous injection substance or substances . . . are confidential.").

[10] 2008 S.D. Sess. Laws ch. 117, § 25.

[11] 2013 S.D. Sess. Laws ch. 113, § 1.

- 19 -

"experience" prong.

The "logic" prong requires a court to consider "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II,* 478 U.S. at 8.  In deciding that public access played an important role in allowing the press total access to an execution proceeding, the Ninth Circuit observed that "[i]ndependent public scrutiny . . . plays a significant role in the proper functioning of capital punishment" and that "[a]n informed public debate is critical in determining whether execution by lethal injection comports with 'the evolving standards of decency which mark the progress of a maturing society.'" *Cal. First Amendment Coal.*, 299 F.3d at 876 (quoting *Trop v. Dulles,* 356 U.S. 86, 101 (1958)).  Plaintiffs argue that disclosure of the sources of lethal injection drugs contributes to this informed public debate.  They submit evidence that information about the *source* of the drugs is necessary for the public to assess the drugs' *quality*.  (Waisel Decl., Doc. 47-1 at 135–40.)  Plaintiffs present evidence that compounding pharmacies are largely unregulated by the FDA, and that several recent high-profile tragedies have occurred as a result of disease outbreaks or other problems at compounding pharmacies.  (*Id.* at 136–37.)  Even if the quality of an individual batch could be verified by qualitative analysis, more information about the source of the drug could "allow observers to evaluate the pharmacy's reputation by checking such facts as its volume of drug sales, number of drug recalls, litigation filed against it or citations issued by the FDA or state pharmacy board."  (*Id.* at 137.)  This, in turn, could arguably "support[] public confidence in the execution process itself and ensure[] an informed debate over capital punishment."  (Doc. 43 at 14.)

But the logic prong requires consideration not just of the benefit to the public but also of the detriment to the government.  Even when it is clear that openness and public scrutiny would serve a beneficial purpose, logic may still dictate that there is no right of access if the public access would place a substantial burden on the governmental function.  *See id.* at 8–9 (noting in describing the logic prong that "[a]lthough many governmental processes operate best under public scrutiny, it takes little imagination to

1    recognize that there are some kinds of government operations that would be totally

2    frustrated if conducted openly"); *see also, e.g.*, *United States v. Kravetz*, 706 F.3d 47, 54

3    (1st Cir. 2013) ("As for logic, there is scant value *and considerable danger*" in finding a

4    right of access to Rule 17(c) subpoenas." (emphasis added)); *PG Publ'g Co. v. Aichele*,

5    705 F.3d 91, 111 (3d Cir. 2013) ("In addition to considering the benefits that would result

6    from press and public access, we must take account of the flip side—the extent to which

7    openness impairs the public good.  Indeed, the logic analysis *must* account for the

8    negative effects of openness, for otherwise it is difficult to conceive of a government

9    proceeding to which the public would not have a First Amendment right of access."

10   (internal citations and quotation marks omitted)).

11       The Ninth Circuit followed this balancing approach in applying the *Press-*

12   *Enterprise II* test in the context of pre-indictment warrant proceedings.  *See Times Mirror*

13   *Co. v. United States*, 873 F.2d 1210, 1217 (9th Cir. 1989).  There, the Ninth Circuit held

14   that even though "it is unquestioned that open warrant proceedings might operate as a

15   curb on prosecutorial or judicial misconduct," that "social utility . . . would be

16   outweighed by the substantial burden openness would impose on government

17   investigations."  *Id.* (internal quotation marks omitted).   As a result, the court held, there

18   was "no First Amendment right of access" to pre-indictment warrant proceedings at all.

19   *Id.* at 1218.  Following this analysis, the Court must weigh both the benefits and costs of

20   disclosure in determining whether a qualified right of access exists.

21       Thus, Defendant in this case does not contest that there could be aspects of

22   openness that would insure the quality of execution drugs.  Rather, Defendant presents

23   evidence that if the source of the drugs used in lethal injection executions were made

24   public, the drugs would become "highly difficult, if not impossible" to obtain.

25   (McWilliams Decl., Doc 50-1 at 2 ¶ 7.)  Defendant presents evidence in the form of the

26   declaration of Carson McWilliams, who is employed by ADC as the Director of the

27   Division of Offender Operations and is "tasked with locating suppliers of lethal injection

28

drugs."[12]  (*Id.* at 2 ¶¶ 1–2.)  McWilliams states that "[l]ethal injection drugs have been difficult to obtain without promises of confidentiality of the supplier."  (*Id.* at 2 ¶ 3.)

> After the identity of a supplier for midazolam was publicly revealed in litigation in another state, that supplier wrote to the Arizona Department of Corrections, as well as corrections departments in other states, stating that it would no longer sell the drug to corrections departments for use in lethal injections. Compounding pharmacies that provided pentobarbital for executions began refusing to provide it after their identities were released publicly and they began receiving threats.

(*Id.* at 2 ¶ 4.)  This evidence indicates two distinct, albeit related, dangers proceeding from public disclosure of execution drug sources:  not only that Arizona would be unable to carry out executions, which presents a substantial burden on a governmental function, but that drug suppliers would face threats or boycotts for their participation in the execution process when state statute guarantees their anonymity.

Plaintiffs have presented evidence that disclosure of the drugs' source may well contribute to informed public discourse about capital punishment.   Defendant has presented evidence that disclosure of the drugs' source may impair Arizona's ability to obtain lethal injection drugs—and, by extension, Arizona's important government interest in carrying out executions entirely.  To determine whether there is a qualified right of access to the drugs' source requires this Court to weigh whether the "social utility" of disclosure "would be outweighed by the substantial burden openness would impose on" Arizona's ability to carry out executions.  *Times Mirror*, 873 F.2d at 1217 (internal quotation marks omitted).  On similar facts, a district court in Ohio recently determined, albeit in the context of a Rule 26(c) protective order dispute rather than a First Amendment right of access question, that the balance of interests favored non-disclosure.  *See In re Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, 2015 WL 6446093, at *10 (S.D. Ohio Oct. 26, 2015).  Nevertheless, the Court is disinclined to

---

[12] Mr. McWilliams's declaration is admissible evidence.  Where a declaration is "based on personal knowledge, legally relevant, and internally consistent," the evidence in the declaration is "sufficient to establish a genuine dispute of material fact."  *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497–98 (9th Cir. 2015).  Personal knowledge may be inferred from a declarant's position.  *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000).

grant summary judgment to either side on this question, especially when as it pertains to suppliers of lethal injection drugs doing so would require a *per se* determination that A.R.S. § 13-757(C) is unconstitutional.  If the parties wish to pursue a declaratory judgment on this matter, they must provide the Court with a more complete factual and legal record.

Moreover, even if the Court were, in this case, to determine that the First Amendment provides a qualified right of access to the identity of drug sources, that right of access can be overcome.  The level of scrutiny a court is to apply in determining whether the qualified right of access is overcome depends on the type of process involved.  In *California First Amendment Coalition* the Ninth Circuit applied a relaxed standard of review as applied to executions.  Rather than require "specific, on the record findings . . . demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest,'" 478 U.S. at 13–14, which is the *Press Enterprise II* standard, the Court merely required that the State show "legitimate penological objectives"—the *Turner* standard—to burden the right to view the execution. *Cal. First Amendment Coal.*, 299 F.3d at 873.  Although the *Turner* standard originally applied only to regulations affecting prisoners, and *California First Amendment Coalition* only extended it to an execution taking place within a prison, it may make sense to extend it here to restrictions on information related to executions—as it can hardly be questioned that capital punishment implements the state's penological objectives.  Just like prison administration generally and execution administration within prisons, the logistical steps in administering executions may not be "readily susceptible of resolution by decree" and "require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."  *Cal. First Amendment Coal.*, 299 F.3d at 877–78 (quoting *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974)).

Nevertheless, the Court need not decide which level of scrutiny applies here, because, for the reasons specified above, the Court declines to rule as a matter of

summary judgment that the public has a qualified right of access to the identity of the supplier of the state's lethal injection drugs.  In the absence of such a ruling, the question of whether that right of access can be overcome does not yet present itself.  Nevertheless, the evidence presented by both parties indicates that the relationship between public opinion, supplier confidentiality, and government ability to carry out executions may be a dynamic one.  A categorical resolution may be particularly inappropriate here, when the relevant inputs in the constitutional analysis are not static facts and may require case specific analysis.  *See, e.g.*, *El Vocero de P.R.*, 508 U.S. at 151 ("The concern of the majority below that publicity will prejudice defendants' fair trial rights is, of course, legitimate.  But this concern can and must be addressed on a case-by-case basis."); *Globe Newspaper*, 457 U.S. at 608 ("A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim.").

On summary judgment, the moving party or parties must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The record before the Court at this time is insufficient to make the determination whether there is a qualified right of access in the public to the source of lethal injection drugs and if so whether the state has a sufficient interest to overcome that right.  The "critical scrutiny of the facts" that the Supreme Court called for in cases involving the declaration of public rights demands more.  *See Eccles*, 333 U.S. at 434.

The Court therefore denies summary judgment to both parties on the matter of enjoining Defendant to disclose the source of the ADC's lethal injection drugs.

## CONCLUSION

The public and the press enjoy a qualified First Amendment right of access to view executions in their entirety, including each administration of the means of achieving death, and Defendant has not overcome this right of access.  The Court therefore grants Plaintiffs a permanent injunction requiring Defendant to allow execution witnesses to view the entirety of the execution, including each administration of drugs, and declares

that all sections of Department Order 710 that provide to the contrary are unconstitutional on their face.

Summary judgment as to whether there is a qualified First Amendment right of access to information about executions is inappropriate at this time.  The stage of the proceedings and the current factual record prevent the declaration of the rights of the parties at this stage.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment by Plaintiffs (Doc. 43) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment by Defendant Charles L. Ryan (Doc. 45) is **DENIED**.

Dated this 21st day of December, 2016.

Honorable G. Murray Snow
United States District Judge