UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Guardian News & Media, LLC, et al., Plaintiffs, vs. Charles L. Ryan, et al., Defendants. | 2:14-cv-02363-GMS<br>Phoenix, Arizona<br>March 3, 2017<br>1:31 p.m. |

BEFORE: THE HONORABLE G. MURRAY SNOW, JUDGE

# REPORTER'S TRANSCRIPT OF PROCEEDINGS

# FINAL PRETRIAL CONFERENCE

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona 85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

# A P P E A R A N C E S

For the Plaintiffs:

Ballard Spahr, LLP
By: CRAIG CARSON HOFFMAN, ESQ.
1 East Washington Street, Suite 2300
Phoenix, AZ 85004

Levine Sullivan Koch & Schulz, LLP
By: DAVID A. SCHULZ, ESQ. (via telephone)
321 W 44th Street, Suite 510
New York, NY 10036

Media Freedom & Information Access Clinic - Yale Law School
By: JOHN LANGFORD, ESQ.
PO Box 208215
New Haven, CT 06520

For the Defendants:

Office of the Attorney General - Phoenix
By: JEFFREY LEE SPARKS, ESQ.
1275 W. Washington Street
Phoenix, AZ 85007

P R O C E E D I N G S

(Proceedings resume at 1:31 p.m.)

THE COURT: Please be seated.

COURTROOM DEPUTY: This is CV14-2363, Guardian News & Media, LLC, et al. v. Ryan et al., on for pretrial conference.

Counsel, please announce your appearances.

MR. LANGFORD: John Langford for the plaintiffs.

MR. HOFFMAN: Craig Hoffman for the plaintiffs.

THE COURT: Can I get you, when you speak, to speak directly into a microphone, please?

MR. LANGFORD: Sure.

THE COURT: It's a big courtroom, and it makes it easier for me, as well as the court reporter, to hear what you're saying.

MR. LANGFORD: Yes, Your Honor. Sorry.

John Langford for the plaintiffs. And we also have David Schulz for the plaintiffs on the phone.

THE COURT: Thank you.

MR. HOFFMAN: And it's Craig Hoffman --

MR. SCHULZ: Good afternoon.

MR. HOFFMAN: Craig Hoffman for Ballard Spahr on behalf of plaintiffs as well.

THE COURT: Thanks.

I will say, if it's easier, so you don't have to bend over, feel free to approach the podium when you speak.

MR. SPARKS: Jeff Sparks for the defendant.

THE COURT: Thank you.

You can be seated.

This is a trial to the Court, so we can dispense with all of the jury stuff.

And let me just be pretty pointed before we get down to some of the more mundane things.

I've read through the final pretrial statement -- I appreciate it -- by the parties.

I take it that you're not going to subject me to things that I've already read in the affidavits submitted on the motion for summary judgment. And I offer that to both sides.

Is that correct?

MR. LANGFORD: By "subject" Your Honor --

(Laughter in the courtroom.)

MR. LANGFORD: Sorry.

THE COURT: Appropriate enough.

Let me just say, I've read the affidavits. I'll read them again before trial.

I guess what I'm going to say is, you can position the case -- both of you -- however you want. But I think you're both smart enough to know that what I was telling you in the motion for summary judgment is, if you persist in a level of abstraction that isn't helpful to me, you wouldn't get any kind

of judgment that you want. For example, you may recall in summary judgment I said, what information do you want; what sort of qualifying information do you want? I still don't see that. I mean, I see it at a level of abstraction. But if you want me to issue a declaratory judgment that pertains to all possible qualifying -- all possible qualifying information, you're not going to get it from me. Well, I shouldn't say that. But I -- but I should say, it's not very likely you'll get it because I am very hesitant to conclude, based on abstract information, absent specific facts that I'm going to give you an order at the level of generality that might apply to things that I cannot foresee. And you haven't given me, unless I missed it, what specific qualifying -- qualification information you want from the state.

Do you understand what I'm staying in that respect?

MR. LANGFORD: Yes. Yes, Your Honor.

THE COURT: So I don't want to waste a whole lot of time talking -- well, I mean, I will listen to whatever your expert wants to tell me. But if you don't put it in the framework of what qualifying information you claim you're entitled to, it won't be very helpful to me.

Similarly, I get that you want the source of compounding drugs and the source of any other drugs that may be used in the lethal injection process, whether they're compounded or not.

What else do you want, other than the qualifications that have yet to me been unspecified as to those who are on the execution team, the sources of the drugs used in the process? Is there anything else you want that -- and I also get, and this is -- I will sort of badger the state here in a minute -- I also get that the state's revised lethal injection protocol that came out in the course of this, which caused me to -- and I think you correctly characterized it as a hedge -- caused me to hedge on any sort of analysis of each drug because they said they're going to provide a complete analysis. What do you want about that? Specifically, what do you want that they haven't -- that they aren't giving you?

And when I say I'm going to hop on you, Mr. Sparks, I want, and I expect, some sort of detailed description of what the, quote, qualitative analysis means.

In other words, I'm asking you both if you want to defeat a declaratory judgment or if you want a declaratory judgment. I am very nervous giving a declaratory judgment in generalized terms unless you meet the burden of proof, which would be considerably more substantial to suggest that it would apply in all and every circumstance.

Do you understand what I am trying -- the concept I'm trying to get across?

MR. LANGFORD: I think so, Your Honor.

THE COURT: All right. So where are we going to go

from here? I mean, what -- I'll listen -- and I will find -- I've got to admit, I'm kind of -- I love history -- oh, and that reminds me. I need to disclose something to the parties.

I read -- I read histories. It's just one of the things I do. And I listen to books on tape when I'm working out to double-time -- to kind of double-task. I was listening to a book called Valiant Ambition by a guy named Nathaniel Philbrick, and it's about Benedict Arnold and George Washington.

At the end of the book, before I could shut it down, it tells me that in the execution of Major John André, they let a Tory, the United -- or Washington let a Tory loose, as long as he agreed to perform the execution. And the Tory took gunpowder and blackened his face so that his identity would remain unknown. And Major John André did not wish then for the Tory to touch him because he had come dressed rather nicely for his execution, and he didn't want that to be botched.

So I informed both parties that I did listen to that just a couple of weeks -- well, a couple of days ago. I didn't know it was there. That is the source of information. If you want to comment on it, I'd tell you about it.

You know, I find all that -- the point of it is, I find it all interesting, but I think I gave you pretty good guidance in the motion for -- in my order on summary judgment as to what I believe the relevant legal standard is applied at

the level of factual specificity that I think is appropriate.

So while I will find all of that very interesting, unless you're going to try to get an order that is much more broad, in which case the burden of proof will be heightened, I would appreciate knowing exactly what qualifications you want.

I would like to know exactly what your qualitative analysis is going to consist of, Mr. Sparks, so that the plaintiffs know what they're getting and what they're not getting, and so I know what they're getting and they're not getting.

And in the absence of that, it seems to me like you've already got my ruling on the summary judgment. And so if we're going to just replay what was already played in your briefs, trial is not going to be particularly helpful to me.

Do you understand what -- I'm repeating myself. But I want this trial to be useful to you and useful to me, and it is going to be most useful if it is done at a level of factual specificity, meaning what information do you claim you're entitled to under the current process that you're not getting. And what does the current process actually entail, and what does a qualitative description and analysis mean? Who would perform that analysis, at what level of specificity? And I want to know that information.

Does that help?

MR. LANGFORD: Yes. Very much, Your Honor.

MR. SPARKS: Yes, Your Honor.

THE COURT: What other -- and let's just get it on the record right now. What other information do you specifically want?

MR. LANGFORD: Sure.

MR. SCHULZ: Judge, this is Dave Schulz. Could I respond to that?

THE COURT: I suppose, Mr. Schulz. But it would be nice to have you here, if you were going to respond.

MR. SCHULZ: I'm sorry, Judge.

THE COURT: I would ask you to speak as clearly as you can because there's some distortion that comes over the telephone lines here. It's probably our fault, but it's nevertheless distorted. So please speak as clearly as you can.

MR. SCHULZ: Sure. And thank you, Judge.

We did take to heart what was in your summary judgment order, and I've tried to supplement the record to be very, very specific about what is missing and why it -- what -- what we need is -- what is being provided is insufficient. That, in large part, is the reason that we sought permission for an additional expert, Dr. Ruble. And in his testimony he will be very specific about the chemical analysis that we believe is required in order to adequately inform the public about the likely effect of the drugs and the potential to cause severe, prolonged pain. And that includes, as he identified, the very

specific things, including the potency of the drug, the osmolarity of the chemical, the pH of the chemical. I think there's five characteristics. So he will explain they are all readily identifiable, they're quantifiable, and he will explain why they're needed, to be very, very specific about that.

He also is an expert on the compounding pharmacy process, and he will be able to provide, I think, very specific information for the Court about what will be learned by knowing the source of the drug, who the compounder was. That can't be determined simply by the chemical analysis. And so that's the whole that he will sell. And we will do our best to be specific about the qualifications, which essentially what we believe is required is information about the experience and skill of the individuals that is tied to their amount of time that they've worked, the licensing and training that they have, and certain other defined pieces of data, that we will be as specific as we possibly can.

THE COURT: All right. And I appreciate that, Mr. Schulz. I did look at your stipulation with the state pertaining to that testimony, and I guess it helps me understand with more clarity what kind of analysis you want of the chemicals.

Mr. Sparks, you're presumably aware of that.

But I still am not aware of what -- and maybe the state doesn't want to specify -- but I would certainly be

interested in knowing what the qualitative analysis means from the state so that we know what really is contested here and what really is not contested.

And Mr. Schulz, even though that does, I think, go fairly to what -- what qualitative analysis you want, I'm still at a loss for what kind of qualifications you want. But it seems to me when we're talking about qualifications, as I said at summary judgment, the more qualifications you get, the more likely they are to be identifying. And I can't do that analysis unless I know -- or that weighing unless I know what specific qualifications you're looking for.

MR. SCHULZ: Right.

And Judge, what we will try to do at trial is basically to explain that what we're looking for is not, you know, a detailed résumé for someone, but essentially a certification from the department that certain criteria are met by the team, which I think that in the past, at least, were -- were part of the protocol that these criteria would be met. And there's a change over time. But we're basically looking for certification that these individuals have a certain level of skill and experience. And again, I believe Dr. Ruble and Dr. Waisal will be able to explain why that's important.

THE COURT: Well, let me just ask. Has any effort been made to identify what those are to the state, to see if the state is willing to provide that information? Do we even

really need to go to trial on this?

MR. SCHULZ: We've had some discussion in the nature of settlement, Judge, but I --

THE COURT: But I mean, have you indicated to the state exactly the --

MR. SCHULZ: What we would like?

THE COURT: Yeah, the certifications you would like to see if the state has any objection to providing them?

MR. SCHULZ: Yes, we have, Judge.

THE COURT: Mr. Sparks?

MR. SPARKS: As he indicates, we have had discussions, and I'm not sure that we have conclusively resolved as far as what the state would be willing to provide and whether that would satisfy what they're asking for.

THE COURT: So have the plaintiffs given you a specific list of generalized certifications that they would want?

MR. SPARKS: They have done that, Your Honor.

THE COURT: And the state declines to provide those?

MR. SPARKS: No, not necessarily. As I said, we've been discussing -- because there are certain -- certain information going to that that the state is willing to provide.

THE COURT: Well, have you indicated what you're willing to provide and what you're not willing to provide?

MR. SPARKS: We have.

THE COURT: And why don't -- why isn't that in the final pretrial statement so I know exactly what's at issue here?

MR. SPARKS: To the -- I mean -- please correct me if -- you know -- you need to, but as far as I understood it, we were still in the process, I think, of determining whether what the state is willing to provide is something that would satisfy what plaintiffs are looking for, to the point where they would -- where we would be willing -- or able to reach some kind of agreement.

THE COURT: Okay. So that's still up in the air, and you might still -- can I ask if you'll agree on that before you come to court? I mean, I don't really think it makes a whole lot of sense for you to waste -- it's not a waste, so that's the wrong term -- but I don't think it makes a whole lot of sense for us to go through a trial if the state is going to be willing to provide information of a sufficiently generalized qualification nature to the -- to the plaintiffs. Why are you going to make me decide that, if you're willing to do it, you know, at a level that isn't going to be identifying? What's the point, other than you're requiring me to compel another -- you know, to compel a state agency to do something that they were otherwise willing to do? We're always reluctant to do that, but that doesn't mean that we won't do it if it's indicated. So can we do that? Do you have the ear of people

at the DOC who can be the decision-makers and come up with a decision prior to trial?

MR. SPARKS: I do, Your Honor. We can do that.

THE COURT: All right. Thank you.

So how about, now, are you aware -- as long as we're talking about this, are you aware of specifically what kind of quantitative -- aside from -- aside from the identity of the compounding source or the source of the drug -- are you aware of the information that plaintiffs claim should be in the quantitive analysis -- or in the qualitative analysis that you have agreed to provide, at any rate?

MR. SPARKS: I am, and it appears to my understanding that I think there's a -- there's a difference between what the qualitative analysis that the state intends to provide will contain and what plaintiffs are asserting they're entitled to.

THE COURT: Okay. So the state has already determined at what level it is going to provide a qualitative analysis and what level it won't provide a qualitative analysis.

MR. SPARKS: Right. And if -- if the Court wants me to, I can briefly just describe what that would be.

The Department of Corrections intends to have the drugs tested by the Department of Public Safety's laboratory. That test would consist of -- and it -- depending on the type of drug, the analyst would do either a liquid chromatography or a gas chromatography-mass spectrometry -- mass spectrometry

analysis -- kind of a mouthful -- and what that will show is what the substance is. In other words, it will identify the chemical that's being tested, essentially, confirming whether it is what it's supposed to be, and it will also provide a concentration level of the chemical.

THE COURT: Okay. So it would take the chemical. It would tell me, this is how much is of this substance, this is how much of that substance, and it would total 100 percent of the substance.

MR. SPARKS: I'm not sure that that's exactly what it would do. I think by way of example, we have -- in the record there is test results from the same type of test that would be done that were done after the last execution that was done in the state of Arizona. And essentially, those results -- there were two drugs that were tested, and for each one it said the drug is, for example, midazolam at a concentration of, and then it gave a percentage, and I don't remember what that was off the top of my head. But that is essentially the information that the test results will provide.

THE COURT: All right. Here's what I would suggest you do, as long as we're trying to resolve the other thing, because this will help me a lot. So I'm going to ask you to do it. I'm not going to compel you to do it.

It seems to me one of the things that was in the final pretrial statement -- and if not, Mr. Schulz has just spelled

it out a little bit -- and it seems to me it was also in the stipulation by which I agreed to extend the testimony of the expert. The plaintiffs have put forth the information that they think the First Amendment compels.

Would you get your decision-makers to look at that, to see if they have any problem? Or -- I shouldn't say -- I shouldn't phrase it that way -- to see what of that information they're willing to provide and what they're not willing to provide, and give a list to the plaintiffs and to me so that when I'm listening to the testimony, what I can know is, does the First Amendment compel this specific information or not? Because that's the way I'm going to approach this, at that level of specificity. And it will just help focus this trial a great deal for me.

If any -- if either of you have objections if I approach it that way, I'm certainly willing to listen. But it would -- to listen to what you have to say. But it seems to me that that is how I am inclined to approach it.

Could you do that?

MR. SPARKS: I can, Your Honor.

THE COURT: How much time are you going to need to accomplish this so that we can really narrow it to what's at issue and what's not at issue?

Oh, by the way, have I stated -- have we now run over everything that the plaintiffs want by way of information or

believe that the First Amendment compels?

MR. LANGFORD: Yes, Your Honor. I mean, the information that Mr. Schulz walked through that's in Ruble's -- Dr. Ruble's report, the qualifications which we've laid out with some degree of specificity in the proposed findings of fact, the joint proposed findings of fact, and the identity of the source. That's the universe.

THE COURT: Okay. So Mr. Sparks, why don't you review that with the decision-makers and see where we're going to go with that. We can review the -- the particular qualif -- or I suppose generic certifications of qualifications and see where the state's going to go with that. And then I suppose the remaining issue is the identity of the drug sources, whether they be single or compound drugs.

Is that right?

MR. LANGFORD: Yes, Your Honor.

THE COURT: And I assume the state is just not going to give those up in any event.

MR. SPARKS: That's correct.

THE COURT: All right. So those will definitely be at issue.

But if I'm looking at it with that level of specificity, it will be greatly helpful to me. And I will feel like trial is actually serving some purpose to educate me on issues.

I'm not sure that I won't have questions for the experts if you don't ask them, because even though I did look at the affidavits, and I think I have a basic understanding, I'm not sure that I understand the necessary mechanics of how the one -- and I'm not sure that I'm up on the current protocols. You have a current protocol that gives three choices: Two single level; and one compounded drug, lethal injection?

MR. SPARKS: Right, two single drug combinations of one drug -- it's not really a combination -- but then one three-drug combination or three options.

THE COURT: All right. So a compounding pharmacy -- could a compounding pharmacy be used in any of those three possibilities? In other words, can a compounding pharmacy be used to formulate a single drug? Do you know? Because I -- I don't really know, and I'm ashamed to admit my ignorance, but I don't. And I would rather look ignorant, which I am, than not know.

MR. SPARKS: As far as would a compounding pharmacy be able to compound the two different drugs that are options as one drug; is that the question?

THE COURT: Well, here is what I'm really trying to get. What are the potential sources for these three different -- one is a drug cocktail, we'll call it, because it's a mixture of drugs. The other two are just straight

lethal injection drugs. Could you get that from a compounding -- could you get the first two from a compounding pharmacy? Or is a compounding pharmacy only at issue when you're talking about making a lethal cocktail of other drugs -- of more than one drug?

MR. SPARKS: No, I believe that a compounding pharmacy would be able to compound either of the two drugs that are available for use.

THE COURT: All right. And so it may well be that the state's source for any of those three could be a compounding pharmacy.

MR. SPARKS: It could be, that's right.

THE COURT: Well, thank you. That's helpful.

I may have questions for all of your experts. And usually what I do when I have questions is -- I don't always do this, but I usually do, and I especially am less worried when it isn't a trial to a jury because I'm not influencing a jury -- I usually, however, will let you ask the questions of your own witness, and I'll usually wait for cross-examination to see if my questions get asked sometimes in direct or cross. If they don't, then I usually ask my questions so that on redirect you could address my questions, and then I usually allow any recross to the extent it relates to my questions only.

Does either party have any real objection if I proceed

that way?

MR. SPARKS: No, Your Honor.

MR. LANGFORD: No, Your Honor.

THE COURT: All right.

Are we going to stipulate to all of the exhibits?

MR. SPARKS: We already reviewed those.

MR. LANGFORD: We already have, Your Honor.

THE COURT: That's what I thought. There aren't going to be any that are not stipulated to?

MR. SPARKS: I don't believe so, Your Honor.

THE COURT: Are we going to have any rebuttal exhibits that are going to be submitted to the clerk?

MR. LANGFORD: I think it's a possibility, but I -- I don't know that at this time.

THE COURT: Okay.

Are we going to do any motions in limine?

MR. LANGFORD: We're not planning to at this time, Your Honor.

MR. SPARKS: We don't intend to file any either, Your Honor.

THE COURT: What about equipment needs?

MR. LANGFORD: I think at most we will need a way to project an image. I don't think we've made a firm, you know, decision on how to proceed on that front. But some sort of audio-visual equipment that would allow us to put up, you know,

a chart or a particular exhibit. But otherwise, I think -- I think that's it.

THE COURT: Well, Kathleen, you want to lower the screen for them?

You don't?

COURTROOM DEPUTY: It will take me a moment to turn the system on, Judge.

THE COURT: See that slot right there? There is a screen. It's very long. It's very big. It drops from that slot. You might find it more useful to bring in your own screen. But you don't have to because we do have one in this courtroom.

Let me just say that Kathleen probably has cards for you. They are for Brian Lalley. She'll give them to you both. He is our information systems management expert. And what he'll do, and what I would suggest to you both that you do -- because he'll meet with you both, probably at the same time, or if you want separately, he'll do it separately. So if you're going to use, for example, trial presentation software, if you're going to have any issues about projecting -- well, you know, actually, as I think about that -- I don't know why I'm so slow today -- usually you can project stuff right on the screen. And I have a screen right here, just like I was a member of the jury. And you can just run it off your trial presentation software. See, if you're satisfied with me just

seeing it on the screen, Mr. Sparks would be able to see it on his screen; if he runs something, you would be able to see it on your screen.

MR. LANGFORD: And would there be a screen for the witness, as well?

THE COURT: Yes.

MR. LANGFORD: Okay.

THE COURT: The witness has a screen. It's usually just easier to do that.

In any case, Mr. Lalley will take your trial presentation software, if you've got it -- and that's usually what they run that stuff on -- and just go through it with you to make sure there's no flaws or mistakes, and you can run it smoothly.

He would do the same with you, Mr. Sparks. And as I say, you could do it both at the same time to make sure your systems run correctly.

Are there going to be any issues about evidentiary exhibits? I mean, are you going to bring anything in here that's going to be unusual or that we ought to have special accommodation for?

MR. LANGFORD: Not to my knowledge, Your Honor.

MR. SPARKS: No, not from the defendants either.

THE COURT: Okay. So if you just want to -- I see that Kathleen has already set out the card. If you just want

to take the card and make an appointment with Mr. Lalley, he'll make your life a lot easier.

I will say that this is -- this is the oldest courtroom in this building that was -- I mean, I guess I'll put it in a positive way. This was the first courtroom that was geared to be electronic, and as a result it occasionally has some glitches. So it's not a bad idea to come in here and do a trial run with Mr. Lalley, just to make sure that things run appropriately.

Are we going to have any needs for translators or anything like that?

MR. SPARKS: We're not.

THE COURT: Doctors, all the witnesses speak English?

MR. LANGFORD: Yes. Yes, Your Honor.

THE COURT: Any of them have special needs that need to be accommodated?

MR. LANGFORD: Not to my knowledge, Your Honor, but we'll confirm.

MR. SPARKS: No, Your Honor.

THE COURT: You've given me 17 hours. I can't really imagine this is going to take 17 hours because I'm going to be pretty pointed. But if you want 17 hours -- how about we do this. We'll look to schedule two trial days. Two trial days will give me 12 hours. You've asked, I think, for six hours and three hours on rebuttal, and you've asked for two hours for

the presentation of your case, and you both asked for a couple of hours on opening statement.

Let me just say I know what this case is about. You don't have to spend a whole lot of time on opening statement. You know, I'll give you whatever time you want.

Are you really going to need six hours, do you think?

MR. LANGFORD: I think it's possible that we can do this in less than six hours, Your Honor. But we did not want to come back to the Court and ask for additional time. So I think our thinking too was that two trial days would be sufficient.

THE COURT: Okay. Why don't I give you two trial days, and why don't I give them the possibilities I've got now.

Do you have your calendars here?

MR. SPARKS: Yes, Your Honor.

MR. LANGFORD: Yes.

THE COURT: First one -- first two days I have a possible are April 11th and 12th.

MR. SPARKS: That would work for defendant.

MR. LANGFORD: That will not work for us, Your Honor.

Let me pull up -- I've got it right here somewhere.

Here we go. I believe on April 11th and 12th, neither of our witnesses are available.

THE COURT: On neither day?

MR. LANGFORD: On either day. And I can --

unfortunately, Your Honor, we actually have fairly limited windows, in part because Dr. Waisal has a very busy schedule at the Boston Children's Hospital and so has limited availability. Dr. Ruble also has fairly limited availability. And I would be happy to tell you the days we know for sure will work, or we can walk through Your Honor's calendar. Whatever you prefer.

THE COURT: Well, why don't we do my days first.

MR. LANGFORD: Sure.

THE COURT: I appreciate what you're saying. But maybe what we do is have one trial day and then wait for two weeks and have another, if we have to do it that way.

Let me just give you the days that I have, and you can see if they match up.

MR. LANGFORD: Okay.

THE COURT: I have April 11, 12, 13.

I also have April 27. We could fit one day of trial testimony in there.

Then I have May 9 and 10, May 16 and 17, May 23 and 24.

Those are all the dates I'm going to give you.

MR. LANGFORD: Okay. Of those dates, May 10th works for us. And one of our windows here would have been May 10th through 11th. But on May 10th, we could certainly do at least one day.

THE COURT: What do I have on the 11th, Kathleen?

(Pause in proceedings.)

THE COURT: I can do May 11 in the afternoon, but the morning I cannot do anything about. So you can have May 10 all day. You can have May 11 in the afternoon.

Do I have anything May 12?

(Pause in proceedings.)

THE COURT: Can't give you anything on the 12th.

MR. LANGFORD: Okay.

THE COURT: So what we would have to do is, May 10; if you want the afternoon of the 11th, I'll give you that. And then we'll finish on the 16th, if we need to go to the 16th.

MR. SPARKS: And all of those dates are open for us, Your Honor.

MR. LANGFORD: That could work for us, Your Honor. It would mean, I think, that we would need -- neither of our witnesses are available on the 16th, but I think we can get through both of our witnesses in a day-and-a-half, along with openings. So that's certainly a possibility.

If you wanted to schedule further out, we have more availability.

THE COURT: Well, how much more? Do you have two days together? Give us the instances where you have two days together, because that might be mildly preferable.

MR. LANGFORD: Yeah. Yes, Your Honor.

So going in chronological order, we have July 11th and

12th -- I'm sorry. I'm sorry. I started too late.

We have June 27th through the 29th.

THE COURT: Nope.

MR. LANGFORD: July 11th and 12th.

THE COURT: Nope.

I'm not going to go beyond July. We need to do this case. So I think if it -- unless you're going to tell me it's unacceptable, what we'll do is we'll schedule for May 10, the afternoon of May 11, and then give you May 16 if you need it.

MR. LANGFORD: That will work. If you're interested in terms of in July, we -- we also have a big chunk of time between the 26th and August 4th.

I know that's later than Your Honor would prefer.

(Pause in proceedings.)

THE COURT: All right. We have, if it's okay with you, Mr. Sparks, July 25 and 26. And the afternoon of the 27th, if you were to need it.

MR. SPARKS: That's open for us too.

MR. LANGFORD: Yeah, that would be -- that works for us.

THE COURT: All right. Set it firm.

MR. LANGFORD: Okay.

THE COURT: All right. That will give you plenty of time, I think, Mr. Sparks, with the plaintiffs to see which of these specific informational items they want that's just not

worth either one of you dying on a hill for, and resolving those, and letting me know specifically what specific items of information the plaintiffs want the state is unwilling to provide. And then that will help me, as I listen to the testimony, focus on what the issues really are in this case. I'll be glad to then do my very best to try to resolve in a way that I think the law requires.

Are there other issues you had that you wished to raise at this time?

MR. LANGFORD: I think we can clarify this closer to trial, but I think you already hinted that there will be an opening and a closing.

THE COURT: You can have an opening and closing, if you want. I'm not going to tell you not to.

MR. LANGFORD: Okay.

THE COURT: Just seemed to me like two hours is an awfully long time for somebody who I think -- somebody for me -- I already know what the issues are, I think. It doesn't mean I know everything about the issues. And your opening and closing, I will tell you this now, would be most helpful to me to the extent that it is really specific and bores in on the points that if we're going to trial, the state isn't going to provide and why you think the First Amendment compels that knowledge go to the public. That's going to be most helpful in an opening, and you can get right to it. And if you don't get

right to it, you can expect that I'll tell you, get right to it.

Understood that, Mr. Sparks?

MR. SPARKS: Yes, Your Honor.

THE COURT: All right. Anything else?

MR. LANGFORD: No, Your Honor.

THE COURT: Mr. Sparks?

MR. SPARKS: No, Your Honor.

THE COURT: All right.

Well, I thank you both for coming. I hope -- well, I have the sense that this has been helpful, at least to let me explain to you how I'm going to approach this case and what I'm going to be looking at, and I hope it will be helpful in terms of narrowing in and refining the issues.

So, thank you.

Have a nice weekend.

MR. SPARKS: Thank you.

MR. SCHULZ: Thank you, Judge.

(Proceedings in recess at 2:10 p.m.)

C E R T I F I C A T E

I, CHARLOTTE A. POWERS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 14th day of March, 2017.

s/Charlotte A. Powers
Charlotte A. Powers, RMR, FCRR