MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

DOMINIC DRAYE (033012)
SOLICITOR GENERAL

JEFFREY L. SPARKS (027536)
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, AZ 85007
TELEPHONE: (602) 542–4686
CADocket@azag.gov

ATTORNEYS FOR DEFENDANT

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

Guardian News & Media LLC; The Associated Press; *The Arizona Republic*, a division of Phoenix Newspapers, Inc.; KPNX-TV Channel 12, a division of Multimedia Holdings Corporation; and Star Publishing Company d/b/a/ *Arizona Daily Star*,

Plaintiffs,

-vs-

Charles L. Ryan, Director of the Arizona Department of Corrections,

Defendant.

No. 2:14–cv–02363–GMS

**DEFENDANT'S SIMULTANEOUS POST-TRIAL BRIEF**

Assigned to the Hon. G. Murray Snow

Plaintiffs assert a First Amendment right of access to (1) the source of Arizona's lethal injection drugs, (2) test results revealing the drugs' osmolarity, stability, sterility, pH, purity, and concentration, and (3) disclosure whether members of the IV Team are qualified or certified to place IV lines and whether any member of the IV Team is an anesthesiologist. To establish their entitlement to this information, Plaintiffs must demonstrate that "the place and process have historically been open to the press and general public" and that "public access plays a significant positive role in the functioning of the particular process in

question." *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986) (*Press-Enterprise II*); *Calif. First Amend. Coal. v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002). Plaintiffs' claim fails because the evidence does not demonstrate either a history of public access to the sought-after information or that public access to it would play a significant positive role in the functioning of capital punishment in Arizona.

***Source of Lethal Injection Drugs***

The evidence fails to demonstrate a history of public access to the source of lethal injection drugs. First, Plaintiffs' reliance on public access to information about other execution methods, such as the qualities of a rope for hanging or the mechanism of the electric chair and gas chamber, are insufficiently analogous to lethal injection drugs to meet *Press-Enterprise II*'s first requirement. *See In re Boston Herald, Inc.*, 321 F.3d 174, 184 (1st Cir. 2003) ("[T]he First Amendment does not grant the press or the public an automatic constitutional right of access to every document connected to judicial activity. Rather, courts must apply the *Press-Enterprise II* standards to a particular class of documents or proceedings and determine whether the right attaches to that class.").

Moreover, circumstances have changed dramatically from the time when the public had at least some access to information about execution implements. Hangings in the 1800s and 1930s (Trial Exh. 9, at 6–7; Exh. 7, at 5–6), adoption of the electric chair in the 1880s (Trial Exh. 8, at 5), and states' purchases of gas chamber devices in the 1930s and 1950s (Trial Exh. 8, at 7; Exh. 9, at 7) shed little light on the modern history of access to the source of lethal injection drugs. That is so because recently, unlike in the era of hangings, the electric chair, and the gas chamber, "anti-death-penalty advocates [have] pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences." *See Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015) ("Activists then pressured both the company and the Italian Government to stop the sale of sodium thiopental for use

in lethal injections in this country. . . . Anti-death-penalty advocates lobbied the Danish manufacturer of [pentobarbital] to stop selling it for use in executions."). (*See also* R.T. 7/25/17, at 165 (highlighting State's difficulty in acquiring lethal injection drugs).)

Nor does Plaintiffs' evidence specifically regarding lethal injection drugs demonstrate a history of public access. Comparing Trial Exhibit 3, a purported list of all lethal injection executions in the United States since 1982, with Trial Exhibit 4, a purported list of state disclosure of drug sources, shows instead that the overwhelming majority of lethal injection executions occurred without a corresponding disclosure of drug source. For example, while California apparently disclosed drug sources in 2011, it carried out numerous executions before that and has not carried out any since 2005—six year before the disclosure. (Trial Exh. 3, at 20; 4, at 0001.) Similarly, Texas, which supposedly disclosed drug sources on one occasion in 2011, had previously carried out dozens of executions with no disclosure. (Trial Exh. 3, *passim.*; 4, at 0002.) In sum, Plaintiffs' charts demonstrate that lethal injection executions historically occur without any disclosure of drug source.

Moreover, Plaintiffs' table indicates that only 10 states of the 32 jurisdictions (31 states and the federal government[1]) that use lethal injection have disclosed their source of drugs, meaning that more than two-thirds of jurisdictions have apparently never disclosed their source.[2] And finally, Plaintiffs provide evidence of only a single disclosure from each of the 10 states listed. If anything, Plaintiffs' evidence proves a historical tradition of *no* public access to the source of lethal injection

---

[1] Death Penalty Information Center, *Facts about the Death Penalty*, https://deathpenaltyinfo.org/documents/FactSheet.pdf (last visited Aug. 7, 2017).

[2] Arizona, for one, has not voluntarily disclosed the source of lethal injection drugs. (R.T. 7/25/17, at 209.)

drugs, with a small handful of exceptions. History thus provides no support for a First Amendment right of access to the source of lethal injection drugs.

Even if history were not fatal to Plaintiffs' claim, their failure to establish *Press-Enterprise II's* logic prong is. Both Drs. Waisel and Ruble testified that, in their own practices, they use the source of a drug as a "proxy" for its probable quality. (R.T. 7/25/17, at 40–42, 84, 107–08, 148, 151.) In sum, their testimony amounted to the conclusion that, without knowing the source, they could not say for certain whether lethal injection drugs would work properly and painlessly. But the First Amendment right of access does not exist to set substantive standards for carrying out government functions, such as administering death sentences; instead it rests on "the common understanding that 'a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.'" *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)). To that end, Dr. Waisel also testified that injection with drugs of poor quality—which might consist of problems with purity, pH, stability, osmolarity, or sterility—would cause pain and that the inmate would most likely express that pain. (R.T. 7/25/17, at 70–76, 89.) Thus, the public's ability to watch the execution—and observe whether the inmate reacts to pain—allows it "[t]o determine whether lethal injection executions are fairly and humanely administered." *Cal. First Amend. Coal.*, 299 F.3d at 876. Knowing the source would not tell the public whether a particular execution was humanely administered and thus would not play a significant positive role in the functioning of capital punishment.

Plaintiffs' own evidence further supports the conclusion that the ability to *watch* executions—not access to background information about the methods by which they are carried out—is the cornerstone of free discussion of government affairs and the public's ability to determine whether executions are fairly and humanely administered. Each of Plaintiffs' numerous examples of states changing

methods after gruesome or "botched" executions by hanging, electric chair, or lethal gas make clear that public opinion was swayed by what witnesses *observed*, not background information they obtained. (*See*, *e.g.*, Trial Exh. 7, at 6 ("five minutes of writhing," "scene of horror," "noose slipped and Bergen fell half-strangled to the floor"); Trial Exh. 8, at 7 ("the most barbarous thing I've ever seen"), at 8 ("First-hand accounts by witnesses were reported in the press and had the effect of exposing gruesome effects of hangings"), at 9 ("her head snapped off and rolled away," "He coughs and groans"), at 10 ("moaned and jerked violently," "gasping, shuddering, and convulsing"); Trial Exh. 9, at 6 ("published fifty long and graphic descriptions of hangings"), at 7 ("gruesome beheading," "Just as the images of pain associated with botched hangings led, at least in part, to the gallows' demise, the suffering of prisoners who died in botched uses of the gas chamber led to Arizona's elimination of the gas chamber"), at 8 ("turned red, and began convulsing").)

Finally, Carson McWilliams' testimony showed that disclosure of drug sources would have a significant *negative* impact on the functioning of capital punishment in Arizona. As discussed above, anti-death-penalty advocates have successfully made it nearly impossible for states to acquire the most effective drugs for lethal injection. Mr. McWilliams, who has been procuring lethal injection drugs for a decade and has spoken with around 20 drug suppliers during that time, testified that, based on his experience, that difficulty would only increase if the State were required to disclose the source of execution drugs. (R.T. 7/25/17, at 164–66.) Highlighting his conclusion, at least one potential supplier declined to do further business with the state after receiving a letter threatening to ruin his business if he provided drugs for use in lethal injection. (*Id.* at 165.) Mr. McWilliams' testimony firmly established that disclosure of supplier identities would not "play[] a significant positive role in the functioning" of Arizona's execution protocol, *Press-Enterprise II*, 478 U.S. at 8, but rather would frustrate

Arizona's ability to carry out legally-imposed death sentences.[3] *See Wood v. Ryan*, 759 F.3d 1076, 1100 (9th Cir. 2014) (Bybee, J., dissenting) ("In the end, efforts to disclose the manufacturers' identities only renders the imposition of capital punishment more cruel than necessary by making it more difficult for states to reliably and safely execute inmates who were long-ago sentenced to death. Individuals like Wood, who have been lawfully tried and sentenced, are used as a means to accomplish a long-term policy objective that ought to be conveyed to state legislatures rather than federal courts."), *vacated by Ryan v. Wood*, 135 S. Ct. 21 (2014) (mem.).

***Osmolarity, Stability, Sterility, pH, Purity, and Concentration***

Plaintiffs' evidence also fails to establish either a history or logic of access to test results revealing the osmolarity, stability, sterility, pH, purity, and concentration of lethal injection drugs.[4] First, Plaintiffs provided no evidence at all of a history of access to such information, most likely because none exists.

And, for the same reason Plaintiffs' claim regarding drug sources failed to meet *Press-Enterprise II's* second consideration, the evidence also does not demonstrate that access to these drug characteristics would play a positive role in the functioning of capital punishment. Both of Plaintiffs' experts testified that without knowing a drug's osmolarity, stability, sterility, pH, and purity, they could not certify that a lethal injection will be effective, reliable, and painless. (R.T. 7/25/17, at 95–96, 113.) But again, the right of access exists to protect the free

---

[3] Even if Plaintiffs could establish a qualified right of access to source identities, Mr. McWilliams' testimony also proves that withholding drug source information is reasonably related to the state's legitimate penological interest in imposing sentences of death imposed for criminal convictions. *See Cal. First Amend. Coal.*, 299 F.3d at 877–85 (applying *Turner v. Safley*, 482 U.S. 78 (1987) standard to right of access to executions).

[4] The state's lethal injection procedures specify that it will provide results of a quantitative analysis of lethal injection drugs, and the evidence showed that those results will reveal the drug's identity and concentration. (Trial Exhibits 19, 42 at Attachment D, p.1, ¶ B.1; R.T. 7/25/17, at 78–79, 104–05, 110–11.)

discussion of governmental affairs, not to create substantive standards for carrying out criminal sentences. As with drug source, the public's ability to watch the execution—and see whether the inmate reacts to pain—allows it "[t]o determine whether lethal injection executions are fairly and humanely administered." *Cal. First Amend. Coal.*, 299 F.3d at 876. Technical information about the drug's composition would not tell the public whether a particular execution was humanely administered—the public's right to watch the proceeding would. The evidence thus fails to show either a history of public access to comprehensive testing of lethal injection drugs, or that such testing would play a significant positive role in the functioning of capital punishment.

Finally, Plaintiffs' request for comprehensive testing of lethal injection drugs also fails insofar as they might claim it could serve as a practical alternative to disclosing drug sources. First, they cannot establish a right of access to source information in the first place. Second, Plaintiffs have provided no authority in First Amendment right of access jurisprudence—nor is the State aware of any—requiring the government to affirmatively investigate or otherwise obtain information it does not already have.

***IV Team Qualifications***

Plaintiffs presented no evidence demonstrating a history of public access to the "qualifications" of individuals involved in carrying out executions. Moreover, this Court may take judicial notice of the inarguable fact that, "throughout history, the executioner has been hooded—both literally and figuratively." Ellyde Roko, Note, *Executioner Identities: Toward Recognizing a Right to Know Who is Hiding Beneath the Hood*, 75 Fordham L. Rev. 2791, 2796 (2007); *see also id.* at 2800 ("With execution by firing squad, at least one triggerman fires blanks instead of bullets, so no one knows who fired a real bullet."); see also Fed. R. Evid. 201(b)(2) (court may take judicial notice of a fact "that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned”).

Not having attempted to establish *Press-Enterprise II’s* first consideration, Plaintiffs also failed to prove the second—that disclosure whether IV Team members are qualified to place IV lines and whether any member of the IV Team is an anesthesiologist or has any certification or licensing relating to sedation and anesthetization would “play[] a significant role in the proper functioning of capital punishment.” *See Cal. First Am. Coal.*, 299 F.3d at 876.

First, regarding certification or qualification to set IV lines, Dr. Waisel testified that, if the IV is improperly set, the inmate is likely to experience pain upon injection of the drug. (R.T. 7/25/17, at 50–51, 55, 66.) This testimony does not establish, however, that knowing whether the IV Team members are qualified to place IVs plays a significant positive role in the proper functioning of capital punishment. At best, knowing whether IV Team members are qualified to set IVs might give the public a basis to speculate about the *likelihood* that an execution will be carried out as intended. However, the State’s procedures provide that the execution witnesses will observe the IV insertion procedure (Trial Exh. 42, at Attachment D, p.4, ¶ D.10), and Dr. Waisel testified that he would expect an inmate who was injected with drugs with an improperly placed IV to react to any resulting pain. (R.T. 7/25/17, at 86–87.) Thus, the witnesses’ ability to observe the IV placement and injection of drugs allows the public “[t]o determine whether lethal injection executions are fairly and humanely administered.” *Cal. First Amend. Coal.*, 299 F.3d at 876. Knowing the IV Team’s qualifications to set IVs would not meaningfully add to the public’s ability to make that determination.[5]

---

[5] Even if Plaintiffs could establish a right to know whether the IV Team members are qualified to place IVs, the State’s execution procedures satisfy that right by specifying, “All [IV] team members shall be currently certified or licensed within the United States to place IV lines.” (Trial Exh. 42, at p.6, ¶ 1.2.5.1.) Plaintiffs waived any contention that this requirement fails to satisfy any such First Amendment right. (R.T. 7/25/17, at 43.)

Regarding certification to monitor anesthesia versus sedation, Dr. Waisel testified that adequate training and experience is necessary to tell whether a person is anesthetized or merely sedated. (R.T. 7/25/17, at 59–60.) He further stated that only an anesthesiologist is qualified to do so. (*Id.* at 103.) However, Dr. Waisel also admitted that the American Board of Anesthesiology, which certifies anesthesiologists to practice medicine, states that anesthesiologists should not assist with capital punishment and that it may revoke the certification of an anesthesiologist who does so. (*Id.* at 87–88.) It follows that requiring the State to disclose whether any member of the IV Team is an anesthesiologist would dissuade that type of physician (who Dr. Waisel stated is most qualified to monitor anesthetization) from taking part in an execution for fear that the disclosure would lead to efforts to uncover their identity at a risk to the anesthesiologist's professional certification. Consequently, the disclosure Plaintiffs request would not "play[] a significant positive role in the functioning" of Arizona's execution protocol. *Press-Enterprise II*, 478 U.S. at 8. Instead, it would likely dissuade qualified individuals from offering their assistance. *See Wood*, 759 F.3d at 1100 (Bybee, J., dissenting) ("[A]ttempts to dissuade qualified medical personnel from participating in lawful executions will likely only harm inmates sentenced to die by forcing states to rely on less experienced professionals.").

Moreover, Dr. Waisel testified that proper monitoring of anesthetization during an execution is important because, while an anesthetized person feels no pain, one who is merely sedated can feel pain. (R.T. 7/25/17, at 56–57.) Yet he also stated that a person under sedation "can easily express they're experiencing pain, in which case the person doing the sedation can take appropriate intervention." (*Id.*) Under these circumstances, therefore, the witness's ability to observe whether the inmate reacts to pain fosters free and full discussion of government affairs and gives the public the information it needs "[t]o determine whether lethal injection executions are fairly and humanely administered." *Cal.*

*First Amend. Coal.*, 299 F.3d at 876. Knowing whether any IV Team member is an anesthesiologist does not contribute to the public's ability to make that determination.

## CONCLUSION

The evidence fails to support either a tradition of public access to the information Plaintiffs seek or that access would play a significant positive role in the functioning of capital punishment in Arizona. Instead, Plaintiffs claims look more like an attempt to impose substantive requirements on a government process than a request for information necessary "[t]o determine whether lethal injection executions are fairly and humanely administered." *Cal. First Amend. Coal.*, 299 F.3d at 876. This Court should therefore deny Plaintiffs relief.

DATED this 15th day of August, 2017.

Respectfully submitted,

Mark Brnovich
ATTORNEY GENERAL

Dominic Draye
SOLICITOR GENERAL

Lacey Stover Gard
CHIEF COUNSEL

s/Jeffrey L. Sparks
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

David J. Bodney
Craig Carson Hoffman
Ballard Spahr LLP
1 E. Washington St., Ste. 2300
Phoenix, AZ 85004–2555

David A. Schulz
Jonathan Manes
John Langford
Media Freedom & Information Access
Clinic – Yale Law School
P.O. Box 208215
New Haven, CT 06520

Attorneys for Plaintiffs

s/Liz Gallagher

6101929