WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Guardian News & Media LLC, et al., | No. CV-14-02363-PHX-GMS |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW JUDGMENT ORDER** |
| v. | |
| Charles L Ryan, et al., | |
| Defendants. | |

On July 25, 2017, this matter was tried to the Court without a jury.  Thereafter the Court allowed the parties to file post-trial briefs.  Pursuant to Federal Rule of Civil Procedure 52, the Court hereby makes its findings of fact and conclusions of law.

### FINDINGS OF FACT

**I.    Background**

1.  Plaintiffs, members of the news media, assert that the First Amendment grants the public and the press a right of access to certain information about executions in Arizona, beyond the information that the state of Arizona currently makes public.

2.  Specifically, Plaintiffs assert that the First Amendment grants the public and the press a right to information about six specific measures of the composition and quality of the drugs used in lethal injections, the identities of the suppliers of those drugs, and specific qualifications of those who administer the drugs and monitor the inmate during executions.

3.  This asserted right derives from the First Amendment's "right of access" to

certain government proceedings.  *See Press-Enterprise Co. v. Co. v. Superior Court of Cal. for Cty. of Riverside*, 478 U.S. 1 (1986) ("*Press-Enterprise II*").

4.   To determine whether a right of access to a given proceeding exists, courts examine both "whether the place and process have historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enterprise II*, 478 U.S. at 8.  These two questions may be referred to as the "experience" prong and the "logic" prong.

5.   If these two factors favor access, a qualified right of access under the First Amendment arises.  *Id.* at 9.

6.   The government may, however, close a proceeding to which there is a qualified right of access with sufficient justification.  *Id.*

7.   Depending upon the nature of the governmental proceeding, such a closure must be justified either by a legitimate penological purpose, *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002), or by a compelling interest achieved by narrowly tailored means, *Press-Enterprise II*, 478 U.S. at 10.

8.   The Ninth Circuit has held that there is a qualified First Amendment right of access to execution proceedings, subject to closure on the basis of legitimate penological purposes.  *See Cal. First Amend. Coal.*, 299 F.3d at 877–79.

9.   This Court previously granted summary judgment to Plaintiffs to the extent that they wished to witness all relevant aspects of the execution.  The Court declined to enter summary judgment for either party on whether the First Amendment grants the public and the press a right of access to information about the composition and quality of the drugs used in lethal injections, the suppliers of those drugs, and the qualifications of those who administer the drugs and monitor the inmate during executions.  (Doc. 70.)

## II.   Lethal Injection Executions in the United States

10.   The first states to authorize the use of lethal injection as an execution method were Texas and Oklahoma in 1977.

11.   Today, the federal government and all states that carry out executions

authorize execution by lethal injection.

12.  From 1977 to January 31, 2017, there were 1270 lethal injection executions carried out in the United States.

**III.     Executions in Arizona**

13.  As a matter of law, executions in Arizona are conducted exclusively by lethal injection, although inmates convicted of an offense that took place prior to November 23, 1992 may elect to be executed by lethal gas instead of through lethal injection.  A.R.S. § 13-757.

14.  Executions in Arizona are conducted pursuant to the Arizona Department of Corrections' ("ADC") written execution protocol, contained in Department Order 710.

15.  Department Order 710 is publicly available at https://corrections.az.gov/sites/default/files/policies/700/0710_062917.pdf.

16.  Among other things, Department Order 710 lists two specific drug and dosage alternatives that ADC may use to carry out an execution.  It also lists the required qualifications for the IV Team personnel who assist in administering the drugs.

17.  Department Order 710 does not include any guidelines relating to the procurement of lethal injection drugs apart from clarifying that, pursuant to state law, the identities of the suppliers of lethal injection drugs are to be kept confidential.

18.  Also pursuant to state law, Department Order 710 provides that the identity of any member of the IV Team is to remain confidential, as well as any information contained in records that would identify such persons.

19.  The confidentiality provisions of Department Order 710 are based on A.R.S. § 13-757(C), which states that "[t]he identity of executioners and other persons who participate or perform ancillary functions in an execution and any information contained in records that would identify those persons is confidential and is not subject to disclosure[.]"

/ / /

/ / /

- 3 -

**IV.    The Characteristics of the Drug**

**A.    The Drugs ADC Uses and the Information it Provides**

20.    Department Order 710 currently provides that ADC will use either pentobarbital or sodium pentothal as the execution drug.

21.  Department Order 710 requires ADC to provide notice of the drug it will use in an execution.

22.  Department Order 710 also requires the ADC to obtain a quantitative analysis of the drug, the results of which must be made public upon re quest.

23.  The quantitative analysis is conducted by the Arizona Department of Public Safety ("DPS").

24.  Department Order 710 does not define the quantitative analysis that DPS will perform on ADC's behalf; but the parties stipulated at trial that this quantitative analysis will identify the substance that is tested as well as its concentration.

25.  The concentration of a drug refers to the mass per volume of the drug.

26.  The concentration of a drug is relevant because it allows the calculation of how much of a drug must be injected to achieve a given dose and a given effect.

27.    The injection of either pentobarbital or sodium pentothal at a lower concentration than expected could lead to underdosing, which creates a risk of inadequate anesthetization or prolonged death, as well as a possible need to administer further doses.

28.  The injection of either pentobarbital or sodium pentothal at a higher than expected concentration could lead to an overdose, which could cause pain during administration.

**B.    Additional Measures of Composition and Quality**

29.  Concentration is one of the six specific measures of the lethal injection drug that the Plaintiffs assert the First Amendment compels the ADC to obtain and disclose. The other five are: stability, sterility, purity, osmolarity and pH of the drug.

30.  Drugs that are correctly identified and have a proper concentration may still fail to perform as expected or cause pain upon injection.

- 4 -

31.   The quantitative analysis does not definitively answer whether the drugs analyzed are likely to cause pain during a lethal injection procedure, or be fully effective.

32.   Stability refers to the expected time during which a drug or chemical formulation will stay within a certain concentration range under a specific set of storage conditions.

33.   Stability is measured by multiple potency or concentration analyses separated by time; mathematical formulas can be used to predict when the concentration will drop below a useful level.

34.   The sterility of a drug or chemical formulation refers to the extent that foreign microbial contaminants are present in the solution.

35.   Sterility can be affected by a number of issues surrounding the method of manufacture or preparation, including, for example, whether the compounding pharmacy starts with bulk active material as well as its terminal sterilization procedures.

36.   The sterility of a drug -- the presence or absence of impurities of various types -- can also affect the drug's efficacy and the potential that it will cause pain when injected into the body.

37.   If a drug is not sterile, particulate matter may change the osmolarity of the drug and cause pain, or the pH of the drug may change, also causing pain; alternatively, it is possible that nonsterile matter may congeal and block the blood vessel or burst it.

38.   The sterility of a drug may be tested using a sterility testing plate.

39.   The purity of a drug refers to the extent to which the drug is free of unintended additives.

40.   Unintended additives may cause the drug not to work as intended.  They also may affect other qualities such as the osmolarity and pH, or cause an allergic reaction in the body.

41.   The use of impure drugs in lethal injections creates a risk of pain to the inmate.

42.   Purity, like potency and concentration, may be measured by a sufficiently

detailed liquid chromatography analysis.

43.   Osmolarity refers to the concentration of a solution expressed as the total number of solute particles per liter, and this includes both the active drug and any inactive ingredients added in the production or preparation process.   In other words, osmolarity measures the total number of particles in a solution.

44.   Knowing the potency of a drug does not necessarily indicate its osmolarity, because potency measures only the concentration of the active drugs in the solution.

45.   Pharmaceutical drug products and preparations contain both active drug molecules and inactive ingredients.   Any ingredient added into the solution contributes to the osmolarity of the solution.

46.   In human physiology and homeostasis, the body tries to maintain a consistent osmolarity in blood.   If an injectable drug or chemical formulation has an osmolarity, the drug or formulation will exert a substantial pressure change across the cell membranes in the blood, throughout the body, when injected.

47.   Depending on the severity of the pressure change, this condition can create extraordinary pain for the individual receiving the injection.

48.   The osmolarity of a drug may be tested with an osmometer.

49.   The pH of a drug refers to the extent to which the drug is acidic or basic.

50.   The pH of a solution can also affect how a drug or chemical formulation acts upon injection into the body.   If the pH is too extreme, the drug or chemical formulation will be incompatible with the pH of human blood and its injection would be expected to cause substantial pain.

51.   The pH of a drug or chemical formulation is also relevant to the stability and potency of the drug.   If the pH is not stabilized in some way, this can cause chemicals in the solution to fall out of solution and revert to a solid form, known as a precipitate, which renders it unfit for intended use and can cause many untoward effects in the body.

52.   The pH of a drug may be measured through pH probes or paper testing strips, or a pH meter.

53.  Plaintiffs have presented uncontested evidence that historically, the public had the ability to obtain at least some information about the quality of the means of execution. For example, "some spectators carefully examined the gallows before the execution, trying out the pulleys and the spring" and "[s]pectators at jail-yard hangings are also known to have collected pieces of rope after the hanging had ended, and thus could inspect its physical qualities."  (Pls. Exh. 7 at 4–5.)

54.  The public has not traditionally had access to chemical analyses performed to determine the characteristics of a specific batch of lethal injection drugs. Nor do the Plaintiffs provide any evidence that suggests that the State performs such analyses on lethal injection drugs apart from the quantitative analysis provided for in Department Order 710.

**V.      Qualifications of Execution Team Members**

     **A.      ADC's Policies as to the IV Team**

55.  Department Order 710 sets out the roles of various execution team members and the qualifications required to participate.

56.  The "IV Team" comprises any two or more of the following: physicians(s), physician assistants(s), nurse(s), emergency medical technician(s), paramedic(s), military corpsman or other certified or licensed personnel including those trained in the United States military.

57.  The IV Team is responsible for inserting the IV catheters, supervising the mixing of chemicals and the preparation of syringes, and monitoring the inmate during the procedure.

58.  The IV Team will use either a peripheral IV catheter or a central femoral line, as determined by the Director of ADC based on the recommendation of the IV Team Leader.

59.  All members of the IV Team must be currently certified or licensed within the United States to place IV lines.

60.  If a central femoral line is used, the Team member placing the line must be

qualified to do so by "experience, training, certification or licensure."

61.  Department Order 710 requires ADC to conduct a criminal history check on IV Team members.

62.  ADC possesses records reflecting the IV Team members' qualifications, certifications, licenses and criminal history, including copies of relevant certifications and licenses, and results of criminal history investigations.

63.  Department Order 710 does not require specific qualifications, certifications or licenses relating to monitoring the inmate during the execution procedure, nor does it require the disclosure of such qualifications if any team member has them.

64.  ADC does not make public information about the specific qualifications of specific members of the IV Team.

65.  Since 1998, Arizona law has explicitly protected the identity of executioners and those who perform ancillary functions in executions.  *See* A.R.S. § 13-757(C).

66.  All team members' service regarding an execution is strictly voluntary.

67.  ADC relies on the voluntary participation of team members to carry out lethal injection executions.

68.  The personnel necessary for ADC to carry out lethal injection executions are less likely to voluntarily participate if their specific qualifications, such as licenses and certifications they hold and any criminal history they might have, are publicly disclosed for fear that disclosure of this information could lead to discovery of their identities.

69.  Public access to specific information about execution team members, such as the licenses and certifications they hold and any criminal history, would therefore make it more difficult for the State to have the voluntary participation of qualified individuals it requires to carry out lawfully-imposed, constitutional sentences of death.

70.  Plaintiffs provide no persuasive evidence of an historical tradition of public access to information about the identities or qualifications of those administering lethal injection drugs or performing executions generally.

71.  To the contrary, as the Court noted in its summary judgment order, and

- 8 -

discussed with the parties at oral argument, there is at least some historical tradition of keeping the identity of executioners secret. Plaintiffs have presented no evidence to the contrary.

**B.      The Certifications Plaintiffs Seek**

72.  Plaintiffs seek a certification from the State that all members of the IV Team are qualified to place IV lines.

73.  Plaintiffs concede that as currently written, Department Order 710 already requires all members of the IV Team to be qualified to place IV lines, but they seek a declaration that this certification is required by the First Amendment.

74.  The improper placement of an intravenous line may cause pain to the inmate.

75.  An improperly placed IV line may cause infiltration or extravasation, where intravenous fluid leaks into the surrounding tissue rather than proceeding through the venous system.

76.  The infiltration or extravasation of either pentobarbital or sodium pentothal would cause significant pain.

77.  Additionally, infiltration or extravasation may lead to a lower actual dose of the chemical having an effect on the inmate.

78.  IV lines need to be monitored on an ongoing basis to ensure that they are working properly.

79.  The IV Team's responsibility of monitoring the inmate includes assessing the inmate's level of consciousness and establishing the time of death.

80.  The skills of IV placement are wholly unrelated to the ability to properly sedate or anesthetize a person.

81.  It is difficult for someone without training to tell the difference between sedation and anesthesia, and unqualified individuals are likely to miss subtle signs of inadequate anesthesia.

82.  An inmate who is properly anesthetized will not be aware of any pain; one who is merely sedated, however, may be able to feel pain.

83.    Both pentobarbital and sodium pentothal anesthetize patients in sufficient doses, but merely sedate patients at lower doses.

84.    Significant training and certification are necessary before a medical professional can become qualified to properly anesthetize a patient.

85.    Inadequate anesthesia during a lethal injection may lead to significant pain and sensations such as suffocation or air hunger.

86.    The skill necessary for successfully monitoring anesthetization comes from experience in monitoring.

87.    Apart from physicians trained as anesthesiologists, none of the professions listed as qualified to be members of the IV Team are qualified by training to assess whether a patient is fully anesthetized.

88.    The American Board of Anesthesiology prohibits its members from participating in lethal injections.  Anesthesiologists who participate in executions by lethal injection may have their certifications revoked by the American Board of Anesthesiology.

89.    Although there are no national certifications for recognizing the distinction between anesthetization and sedation apart from being a board certified anesthesiologist, some individual hospitals do provide training and certifications to non-anesthesiologists related to monitoring sedation.

90.    Accordingly, Plaintiffs also claim entitlement to information about any certifications and experience that qualifies each member of the IV Team to assess whether the inmate is properly anesthetized or sedated.

I.    **Information about the Source of Lethal Injection Drugs**

    A.    **Suppliers of Lethal Injection Drugs**

91.    Plaintiffs seek the disclosure of the identities of the suppliers of lethal injection drugs.

92.    Arizona has obtained lethal injection drugs both from pharmaceutical manufacturers and from compounding pharmacies, though drugs from compounding

pharmacies have never been used in an execution.

93.  Pharmaceutical manufacturing involves the commercial manufacture of drugs.

94.  Compounding, on the other hand, is a process by which a pharmacist brings together active and inactive pharmaceutical ingredients to create a drug.

95.  There are two types of compounding pharmacies; "traditional" (503A) and "non-traditional" or "hybrid" (503B).

96.  These categories were demarcated for regulatory purposes by Congress following a 2012 incident in which contaminated drugs from a compounding pharmacy resulted in 751 illnesses and 64 deaths, and subsequent FDA inspections subsequent identified problems in 78% of the compounding pharmacies examined.

97.  503A compounding pharmacies create drugs to meet the needs of a specific patient with a prescription.

98.  503B compounding pharmacies, on the other hand, mass produce drugs for sale and distribution.

99.  Different regulatory standards apply to pharmaceutical manufacturers, 503B compounding pharmacies and 503A compounding pharmacies.

100.  Pharmaceutical manufacturers are subject to FDA oversight and must follow the current Good Manufacturing Practice For Finished Pharmaceuticals ("cGMPs") as set forth in 21 C.F.R. § 211.

101.  503B pharmacies must register with the FDA and submit to FDA inspection, and are expected to conform to the cGMPs.  The precise formulations of the drugs, however, are not scrutinized by the FDA.

102.  503A pharmacies are expected to follow the minimum practices and quality standards set for in U.S. Pharmacopeial Convention's *United States Pharmacopeia and The National Formulary* Chapter 797 ("USP 797").  They are not subject to the FDA regulatory framework.

103.  Additionally, purchasers of drugs receive different information regarding the length of time for which the drug remains good, depending on the type of manufacturer

who produced the drug.

104.  Pharmaceutically manufactured drugs are assigned an expiration date, which is the date beyond which the remaining pharmaceutical ingredient is around 90% of what it originally was.

105.  By contrast, compounded drugs do not have an expiration date, but they do have a "beyond-use date," which is defined in USP 797 as the "date or time after which a compounded sterile preparation ('CSP') shall not be stored or transported."

106.  Beyond-use dates are not determined with the same scientific rigor as expiration dates.

107.  Since compounded drug preparations degrade in a non-linear manner, frequently much more rapidly than FDA-approved drugs, compounded drug preparations lose their fitness for intended use more rapidly and have comparatively short beyond-use dates.

**B.  ADC's Practices as to Suppliers**

108.  ADC does not inquire if the sources from which it purchases lethal injection drugs comply with USP 797, or with applicable Arizona regulations (A.A.C. R4-23-670).

109.  When ADC seeks to purchase drugs from foreign sources, it does not inquire about those sources' practices.

110.  Both A.R.S. § 13-757(C) and Department Order 710 explicitly provide that the identities of the sources of lethal injection drugs are to remain confidential.

111.  Other states have also adopted laws protecting the identities of the suppliers of lethal injection drugs, mostly within the past twenty years.

112.  Of the thirty-one states that have adopted lethal injection executions, fourteen have secrecy laws protecting the identities of suppliers.   Only two states (Arizona and Florida) adopted secrecy laws prior to 2011.

113.  It has become increasingly difficult for the state to purchase lethal injection drugs.   During the last ten years in which Carson McWilliams, the ADC Director in charge of prison operations, has been tasked with procuring lethal injection drugs, he has

1    found fewer and fewer producers willing to sell such drugs to the state.  He believes that

2    this is due to campaigns to discourage manufacturers from selling such drugs.  He has,

3    however, spoken with at least one potential drug supplier that was willing to provide

4    lethal injection drugs to Arizona so long as its identity was kept confidential.  He believes

5    it will become much more difficult to obtain lethal injection drugs if the identity of the

6    supplier becomes known, and currently he knows of no one in the United States who will

7    sell lethal injection drugs to the state.

8        114.   He has also been provided by at least one compounding pharmacy what

9    appeared to be a mass-produced letter threatening the future viability of the pharmacy if it

10   was discovered that the pharmacy provided lethal injection drugs to the state of Arizona.

11       115.   There is no evidence of a widespread practice of states voluntarily and

12   proactively making public the identities of the suppliers of lethal injection drugs,

13   although there is evidence that such identities have at times been publicly known.

14       116.   The level of public access to information about the sources of execution

15   equipment has varied over time.  While public hangings were often widely attended and

16   thoroughly observed, there is no evidence that spectators knew who supplied the lumber

17   or the ropes.

18       117.   Plaintiffs present evidence that several manufacturers of gas chambers were

19   publicly known, as was the supplier of the lethal gas used in those gas chambers,

20   although they do not present evidence suggesting that the state disclosed such

21   information.

22                              **CONCLUSIONS OF LAW**

23       1.   A right of access to a proceeding does not necessarily imply a right of access to

24   information about that proceeding.  *See United States v. Corbitt*, 879 F.2d 224, 228–29

25   (7th Cir. 1989) ("[T]he press' right of access to documents submitted for us in a hearing

26   must be considered separately from the press' right to attend the hearing itself.").

27   Further, when analyzing whether a right of access attaches to information about a

28   proceeding, a court must analyze not whether there is a right of access to information

generally but to each specific type of information sought.  *See In re Boston Herald, Inc.*, 321 F.3d 174, 184 (1st Cir. 2003) ("[T]he First Amendment does not grant the press or the public an automatic constitutional right of access to every document connected to judicial activity.  Rather, courts must apply the *Press-Enterprise II* standards to a particular class of documents or proceedings and determine whether the right attaches to that class.").  Accordingly, the Court must consider whether the *Press-Enterprise II* test applies to each category of information the Plaintiffs seek, and if so, what the results of that test are.

2.  As to the qualifications of the IV Team members, Plaintiffs seek (1) a certification that the members of the IV Team are qualified to place an IV line; and (2) information about the team members that indicates whether each team member is sufficiently skilled to assess whether the inmate is properly anesthetized.  It is undisputed both that Department Order 710 requires each member of the IV Team to be qualified to place an IV line (and at least one member to be qualified to place a central femoral line if such a line is used), and that all of the professions required by the protocol as a prerequisite to IV team membership require that a person be qualified to set peripheral IV lines.  Plaintiffs thus, in essence, seek the State to certify what is already set out in Department Order 710: that every member of the IV Team is qualified to place an IV.  Indeed, Plaintiff's counsel conceded that the State's policy serves as sufficient certification, while still seeking a declaration that the First Amendment requires the State to continue to make this certification.

3.  As an initial matter, it is not clear that there is even a justiciable controversy as to the qualifications of the IV Team to place IV lines.  At the very least, a declaration that the State's current practice comports with the First Amendment runs afoul of "the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450

(2008) (internal quotation marks and citations omitted).  Nor is it apparent that a change in the State's policy would escape review since the Plaintiffs can raise such arguments if the State ever changes its policy in this regard.

4.  Even assuming that a sufficient controversy exists, what the Plaintiffs request is not the disclosure of information held by the State; but that the State certify that those performing part of the execution function meet certain criteria.  No matter how wise it may be for the State to set specific substantive qualifications for those who perform execution procedures, Plaintiffs offer no precedent, either legal or historical, which would give the media, through its First Amendment right of access, the ability to oblige the State to obtain certification that those performing functions involved in executions are certified to perform them.  Such a use would sever the *Press-Enterprise II* test from its moorings in the First Amendment.  The First Amendment does not set substantive standards for various procedures to which  the government must adhere, and Plaintiffs provide no cases in which the *Press-Enterprise II* test has been so applied.  As with their demand that the State ascertain and disclose certain categories of information about the drug, discussed below, Plaintiffs seek to define the substantive requirements for performing authorized government procedures through the First Amendment.  The substance of procedures is a matter best left to the political process.  *See Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy."); *see generally Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009) (citing cases for the proposition that the First Amendment is not a vehicle for the public to control government speech).

5.  With respect to the disclosure of any certifications or other information relating to IV Team members that may reflect their ability to monitor the inmate to assess anesthesia and/or sedation, related problems exist.  First, Plaintiffs offer nothing to suggest that the disclosure of qualifications of those participating in executions has

historically been required.  Second, even though it likely would ensure more painless executions  to require that a member of the IV team have qualifications to monitor the difference between sedation and anesthetization, based on the testimony offered by the Plaintiffs at hearing it would be difficult if not impossible for the state to obtain such persons.   Plaintiff's expert, Dr. David Waisel, testified at hearing that only anesthesiologists are qualified to perform such functions and further that, anesthesiologists are prohibited by the American Association of Anesthesiologists from participating in executions in any capacity.

6.  Further as is discussed above, nothing in the First Amendment entitles the media to require anesthesiologists be part of the IV team.

7.  And, Plaintiffs have failed to demonstrate that forcing the state to disclose such credentials that are held by IV team members, even if they are not required by the protocol, would not serve to identify those team members to their detriment.   For example, the testimony at the hearing was that although only an anesthesiologist would be able adequately to distinguish between sedation and anesthetization, some individual hospitals may provide sedation training to other medical professionals.  However, If the state were required to disclose such certifications as are provided by specific local hospitals, the disclosure of such certifications would seem to have  a high potential to be identifying of the IV Team member.   Plaintiff does not purport to desire to obtain information that would be identifying.  And the Plaintiffs put forth no evidence that there is a qualified First Amendment right of access to information that would identity persons participating in executions.

8.  On the other hand, nothing prevents the press from publishing that the State has no requirement that a person qualified to adequately distinguish between sedation and anesthesia be part of the execution team, nor is there anything preventing the press from disclosing that it may prove very difficult, if not impossible, for the state to obtain such participation on its IV team.   Thus, in this instance the required disclosure of the qualifications has no historic precedent and would serve limited benefit under the logic

prong that would not be more than offset by harm resulting from the disclosure.

9.    The *Press-Enterprise II* test does not apply to the information about the composition and quality of the drugs that Plaintiffs seek.[1]    First, again, the First Amendment does not serve to establish and specify criteria with which the government must comply in performing its functions.  It merely allows the Press to observe and report those functions.  Second, the information Plaintiffs seek as to composition and quality is information that the State does not  possess.   There is no indication that the First Amendment requires the government to generate information that is not in its possession. The parties have not presented, and the Court has not found, a single case ever finding that *Press-Enterprise II* requires the government to generate information.[2]   *Press-Enterprise II* involves a right of *access* to information, not a right to require the generation of information.  In other words, the First Amendment only protects against "arbitrary interference with access to important information."  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 583 (1980) (Stevens, J., concurring).

10.    State statute prohibits the disclosure of the source of execution drugs, reflecting the State's judgment that confidentiality is necessary both to protect drug suppliers and to ensure that the State has access to such drugs.  When it comes to the source of the state's lethal injection drugs, the state presumably has this information unlike information related to the makeup of the drug.  Further disclosure of the source of the drugs does not serve to compel, in itself, a standard of quality that the drugs must meet.  Thus, the question of the constitutionality of the statute as it applies to the source

---

[1] As an initial note, that sections of rope used in public hangings were collected as souvenirs after the fact does not suggest a historical tradition of the public testing the instrumentalities of execution  beforehand or otherwise, to ensure the efficacy and relative painlessness of the hanging.

[2] Plaintiffs argue that the State's refusal to perform additional tests on the lethal injection drugs is analogous to a refusal "to obtain and produce a translated transcript of a criminal trial conducted in a language understood only by trial participants."  (Doc. 97 at 10.) This analogy is inapposite.  Courts in the United States do not conduct proceedings in an esoteric language known only to the participants, but in the same language, English, that predominates in public discourse.  While the State must of course provide *participants* in a legal proceeding with a translation of the proceedings in any non-English language they understand, it has no such duty to members of the public.

of lethal injection drugs is amenable to the application of the *Press-Enterprise II* test.

11.  As an initial matter, the Court reiterates its decision on an argument to which Plaintiffs alluded at trial.  The Ninth Circuit's decision in *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002), holding that the public has the right to view the entirety of an execution proceeding, does not necessarily mean that the public has a right of access to all information possessed by the government concerning an execution.  As the Court has already held, "the right of access to a given proceeding does not automatically grant a right to access all information related to that proceeding, or even all information that would help in meaningfully understanding the proceeding" and accordingly "if information about executions is encompassed by a First Amendment right of access, that right of access is best determined by an independent application of the *Press-Enterprise II* test to the specific information sought."  (Doc. 70 at 12.)

12.  The first prong of the *Press-Enterprise II* test asks "whether the place and process have historically been open to the press and general public."  *Press-Enterprise II*, 478 U.S. at 8.  The historical record as applies to the suppliers of lethal injection drugs is short, and the historical record as abstracted to suppliers of execution materials in general is far from clear—and of questionable relevance.  Lethal injection drug suppliers have also been at times publicly known, but secrecy statutes are now commonplace.  Evidence has been presented that the identity of Arizona's suppliers has at times been public knowledge, but that the State itself only disclosed such information pursuant to court order.  To the extent that suppliers of execution drugs are considered entitled to the same confidentiality protection as those on the IV team—as Department Order 710 considers them to be—there is, as discussed above, no evidence that the identities of the IV team, or previous executioners has been made known, and evidence that various affirmative steps have historically been taken to protect the identities of executioners.

13.  The Ninth Circuit has noted that where the proceeding at issue has undergone significant changes over time, the experience prong may be less relevant in determining whether a qualified right of access exists.  *See Seattle Times Co.*, 845 F.2d at 1516–17.

1    That caution seems particularly appropriate given the changes in capital punishment

2    throughout American history.

3        14.  The question thus becomes "whether public access plays a significant positive

4    role in the functioning of the particular process in question."  *Press-Enterprise II*, 478

5    U.S. at 8.  Answering this question requires the Court to consider both the benefits and

6    detriments of public access.  *See United States v. Index Newspapers, LLC*, 766 F.3d 1072,

7    1087–88 (9th Cir. 2014) ("Where the harm cause by disclosure of judicial records

8    outweighs the benefit of disclosure to the public, public access no longer 'plays a

9    significant positive role in the functioning of the particular process in question.'"

10   (quoting *Press-Enterprise II*, 478 U.S. at 8)); *In re Boston Herald, Inc.*, 321 F.3d at 186

11   (noting that "a test that is blind to the functional drawbacks of access becomes no test at

12   all" and accordingly the logic of access "cannot be ascertained without some reference to

13   the potential problems created by public access as well as to the advantages").

14       15.  Plaintiffs assert that disclosure of sources improves the functioning of capital

15   punishment in two distinct ways.  First, it serves as a proxy for determining the quality

16   and composition of the lethal injection drugs, as the public can infer these characteristics

17   from the type of supplier and its reputation.  The public then has a better basis for

18   assessing whether capital punishment is carried out in a humane manner, and for

19   demanding that improvements be made if necessary.  Second, disclosure of sources

20   serves a general democratic oversight purpose, such that the public can review the

21   decisions the State is making with respect to its choice of drug suppliers.

22       16.  Disclosure of the sources may motivate the State to attempt to acquire high-

23   quality drugs as an assurance that capital punishment therefore functions in a more

24   humane fashion. Yet, according to McWilliams's uncontested testimony, there are

25   currently no sources for such drugs in the United States, so acquiring such drugs from

26   pharmaceutical manufacturers is not a possibility.  Further, the press is free to report  that

27   under the protocol, the State will neither reveal the specific source from which it obtains

28   the drugs, nor certify that it acquires the drug from sources whose reliability is

established either by reputation or regulation.  Nothing prevents the press from informing the public of the significant difference between the quality of drugs produced by manufacturers and those produced by compounding pharmacies.  The public knows that the State declines to make this guarantee, and the public can meaningfully assess whether a program of capital punishment absent such a guarantee is one in which it wants its government to engage.  Thus, the ability to report on the information that the state declines to provide, itself fulfills to a significant extent the purpose of the logic prong of the *Press-Enterprise II* test.  To the extent that some of the purposes of the logic prong might be more fully served by the media having access to the actual source of the lethal injection drug, that benefit must also be weighed against the detriment that access to the information would cause to the functioning of the process, and to persons and entities involved in it.

17.  Capital punishment is not unconstitutional.  The legislature of Arizona has chosen to authorize it in the form of lethal injection.  The State presented evidence that the opposition to capital punishment by a substantial portion of the public presents risks not only to those involved in the process, but to the State's ability to carry it out entirely.  Carson McWilliams testified that no manufacturing sources will now sell execution drugs to the state, and he further testified of being shown an anonymous threat to a potential compounding pharmacy, threatening to ruin that pharmacy's business if the pharmacy did business with ADC.  The phenomenon of opponents of capital punishment using threats of boycotts to discourage drug producers to provide capital punishment drugs has been widely noted.  *See, e.g.*, *Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015) ("*Baze* cleared any legal obstacle to use of the most common three-drug protocol that had enabled States to carry out the death penalty in a quick and painless fashion.  But a practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences."); *Zink v. Lombardi*, 783 F.3d 1089, 1106 (8th Cir. 2015) ("In this capital litigation, it should be remembered that one stated objective of the prisoners' lawsuit is to pressure the State's suppliers and

agents to discontinue providing the drugs and other assistance necessary to carry out lawful capital sentences."). Such activism is, of course, itself entitled to First Amendment protection. Nevertheless, it negatively affects the functioning of the execution process. Indeed, the process of capital punishment—a constitutional punishment that the State has chosen to impose—might not function at all if anti-death penalty activists are successful in discouraging suppliers from providing drugs to the State.

18. Further, if the disclosure causes harm or threats, economic or otherwise, to those who participate in a legal process, that potential harm itself must be taken into account when assessing whether the logic prong would dictate access. The State has an interest in protecting the wellbeing of those who participate in the execution process—an interest demonstrated by the confidentiality provision of A.R.S. § 13-757(C). It is true of course, as Plaintiffs suggested at trial, that the State might select other methods of capital punishment, but again, the First Amendment rarely, if ever, directly dictates the methods used by states to accomplish their constitutional objectives; ; it may only be used to accurately report how they do, or do not, do so.

19. State statute currently provides a guarantee of confidentiality, and it is logical and unsurprising in light of testimony and case law that absent that guarantee, at least some sources of drugs would decline to do business with ADC, and those who do business with ADC may suffer negative consequences. *See, e.g.*, *In re: Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, 2015 WL 6446093, at *2–3 (S.D. Ohio Oct. 26, 2015) (describing threatening letter sent to compounding pharmacy regarding the provision of execution chemicals). The First Amendment protects the right of the people to argue against the imposition of capital punishment through many means including activism; it does not oblige the State to reveal statutorily-protected information to the detriment of the State's ability to carry out its constitutional, lawfully-imposed criminal punishments. That the First Amendment right of access extends to information that improves the positive functioning of a legitimate governmental process does not prevent the

government from declining to provide limited information relating to that process if providing such limited information  would otherwise practically disable that process or endanger the persons or businesses involved in it.

20.   In sum, Plaintiffs have failed to show that they have a qualified First Amendment right to the information they seek in this lawsuit.  The Court therefore need not determine whether, in the context of information about executions, the State may overcome that right by demonstrating, as in other execution-related contexts, that non-disclosure advances "legitimate penological objectives," *Cal. First Amend. Coal.*, 299 F.3d at 877–79, or alternatively must demonstrate that non-disclosure achieves a compelling interest by narrowly tailored means, *Press-Enterprise II*, 478 U.S. at 10.

21.  Any conclusion of law deemed a finding of fact is so adopted.

## CONCLUSION

For the reasons stated above, the Court finds in favor of Plaintiffs to the extent that it granted them summary judgment in its previous Order (Doc. 70) and finds in favor of the Defendants on the remaining issues that were set forth at trial.  It thus enters judgment in favor of the Plaintiffs insofar as they have requested access to the entire execution procedure, and enters judgment on the remaining issues tried by the parties in favor of the Defendants.

**IT IS THEREFORE SO ORDERED AND JUDGMENT IS SO ENTERED.**

Dated this 21st day of September, 2017.

Honorable G. Murray Snow
United States District Judge